FILED
CLERKS OFFICE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS 2005 AUG 25  P 2: 39

DISTRICT COURT

JOSEPH ARCHAMBAULT,
                    Plaintiff

VS.

 LIBERTY LIFE ASSURANCE
COMPANY of BOSTON,
                    Defendant

05 - 11762 NG

)
)
)
)
)
)
)
)

**CIVIL ACTION
NO.**

Colling MJ

RECEIPT #
AMOUNT $ 250
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE 8 25 05

## **COMPLAINT**

## **PARTIES**

1.    The Plaintiff, **JOSEPH ARCHAMBAULT,** is an adult individual , born May 12,

       1951, and is a resident of the Town of Wellfleet, Barnstable County, Massachusetts,

2.    The Defendant, **LIBERTY LIFE ASSURANCE COMPANY of BOSTON,** is a

       business corporation duly organized under the laws of the Commonwealth of

       Massachusetts, with a principal place of business in the City of Boston, Suffolk

       County, Massachusetts.

## **DECLARATION OF FACTS**

4.    At all times relevant, prior to and including November 9, 2000, the Plaintiff was

       employed by Marriott Hotels as a food service worker and was an eligible employee

       under the ERISA Long Term Disability (LTD) Plan for Marriott Hotel employees,

       administered and underwritten by Defendant Liberty Life Assurance Company of

       Boston. (A true copy the Sodexho/Marriott Group Disability Income Policy

       is attached hereto as Exhibit A).

5.     On or about November 10, 2000, the Plaintiff became totally and permanently
       disabled by reason of a stroke and residual complications which include weakness
       of the left upper extremity, permanent flexion and severe loss of function of the
       left hand and wrist, marked weakness of the left leg impairing ambulation, frequent
       painful spasms of left arm and left leg and chronic fatigue with impaired cognitive
       function.

6.     Plaintiff filed a claim for LTD benefits under the Sodexho/Marriott ERISA plan,
       based on his stroke and its after effects, and he began receiving disability benefits on
       said claim as of December 12, 2000.

7.     On April 25, 2005, Defendant Liberty Life Assurance Company sent a notice
       to Plaintiff that his LTD benefits were terminated.   (A true copy of that notice is
       attached hereto as Exhibit B).

8.     After Plaintiff requested a review, Defendant Liberty Life Assurance Company
       sent a letter to Plaintiff, dated June 22, 2005, denying his appeal from the decision
       to terminate his LTD benefits, stating that it was a "final determination" of the
       claim and advising Plaintiff of his right to commence a civil action under section
       502(a) of ERISA.   (A true copy of that letter is attached hereto as Exhibit C).

9.     The termination of Plaintiff's LTD benefits under the Sodexho/Marriott ERISA
       Plan was arbitrary and capricious, was not supported by the substantial evidence
       of record in the Defendant's claim file and was otherwise unreasonable.

**COUNT I:  WRONGFUL CLAIM DENIAL UNDER ERISA**

10.    By reason of the matters stated in Paragraphs 1 through 9, the Defendant has
       wrongfully and unreasonably terminated Plaintiff's LTD benefits under the
       Sodexho/Marriott ERISA Plan, in violation of ERISA, 29 U.S.C. Sect. 1132(a)

2

(1)(B) and Sect. 1133; and Defendant is liable therefor to Plaintiff for payment of all benefits due from April 25, 2005, through the present, and for further payment of monthly benefits through Plaintiff's 65th birthday, plus interest, costs and attorney's fees.

## COUNT II:    BREACH OF CONTRACT

11.     By reason of the matters stated in Paragraphs 1 through 9, the Defendant has breached its contractual obligations to Plaintiff under the Sodexho/Marriott ERISA Plan, and it is liable therefore, as provided by 29 U.S.C. Sect. 1132(a) (1)(B), for all benefits payable to Plaintiff for the period from April 5, 2005, through the present, plus the value of Plaintiff's foregone future benefits, plus interest, costs and attorney's fees.

**WHEREFORE, Plaintiff demands judgment and relief as follows:**

**First,** on Counts I and II, that the Court make findings that Defendant's termination of of Plaintiff's LTD claim was arbitrary and capricious, unsupported by the substantial evidence of record, unreasonable and/or in violation of Defendant's contractual obligations, with judgment for monetary damages against Defendant Liberty Life Assurance Company of Boston, for payment of all long term disability benefits past due and due in future on Plaintiff's claim under the Sodexho/Marriott ERISA Plan through May 12, 2007, plus interest, costs of the action and attorney's fees;

**Second,** on Counts I and II, and in the alternative, that the Court make findings that Defendant's termination of Plaintiff's LTD claim was arbitrary and capricious, unsupported by the substantial evidence of record, unreasonable, based on inadequate review of the issues raised by the substantial evidence and/or in violation of Defendant's contractual obligations, with an order that the matter be remanded to Defendant, Liberty Life Assurance Company of

3



Boston, for further review and redetermination of Plaintiff's long term disability claim under

the Sodexho/Marriott ERISA Plan, with costs of the action and attorney's fees; and

**Third,** that the Court grant to Plaintiff such other relief as may be available to him against

the Defendant Liberty Mutual Life Assurance Company of Boston on the facts as pleaded

herein.

Dated: August 23, 2005                    For the Plaintiff,

                                          Richard K. Latimer, BBO #287840
                                          Kistin Babitsky Latimer & Beitman
                                          Box 590, 13 Falmouth Heights Road
                                          Falmouth, MA 02541
                                          (508) 540-1606



**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only)_____
   Joseph Archambault  vs.  Liberty Life Assurance Company of Boston

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

   |   |      |                                                                                          |
   |---|------|------------------------------------------------------------------------------------------|
   | ☐ | I.   | 160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.                                   |
   | ☑ | II.  | 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,  *Also complete AO 120 or AO 121 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.   for patent, trademark or copyright cases |
   | ☐ | III. | 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891. |
   | ☐ | IV.  | 220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900. |
   | ☐ | V.   | 150, 152, 153.                                                                           |

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

   _____

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

   YES ☐   NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

   YES ☐   NO ☑

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

   YES ☐   NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

   YES ☐   NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? – (See Local Rule 40.1(d)).

   YES ☑   NO ☐

   A.  If yes, in which division do all of the non-governmental parties reside?

   Eastern Division ☑        Central Division ☐        Western Division ☐

   B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

   Eastern Division ☐        Central Division ☐        Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)

   YES ☐   NO ☐

**(PLEASE TYPE OR PRINT)**

ATTORNEY'S NAME _____ Richard K. Latimer _____

ADDRESS _____ Box 590, Falmouth, MA  02541 _____

TELEPHONE NO. _____ (508) 540-1606 _____

(CategoryForm.wpd - 5/2/05)

JS 44 (Rev. 11/04)



# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.    (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Joseph Archambault

**DEFENDANTS**

Liberty Life Assurance Company of Boston

**(b)** County of Residence of First Listed Plaintiff    Barnstable
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Suffolk
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Richard K. Latimer, Kistin Babitsky Latimer & Beitman
Box 590, Falmouth, MA  02541        (508) 540-1606

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question (U.S. Government Not a Party) |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☒ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
29 U.S.C. Sect. 1132(a)

Brief description of cause:
Wrongful Denial of ERISA Disability Benefits

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE                            DOCKET NUMBER

DATE
08/23/2005

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

EXHIBIT A

# GROUP DISABILITY INCOME POLICY

**Sponsor:**      **Sodexho, Inc.\*\***

**Policy Number:   GF3-810-252576-01 \***

**Effective Date:    March 28, 1998**

**Governing Jurisdiction is the District of Columbia** and subject to the laws of that State.

**Premiums** are due and payable monthly on the last day of each month.

**Policy Anniversaries** shall occur at the end of each fiscal year beginning in 1999.

Liberty Life Assurance Company of Boston *(hereinafter referred to as Liberty)* agrees to pay the benefits provided by this policy in accordance with its provisions. *This policy provides group Long Term Disability coverage.*

**PLEASE READ THIS POLICY CAREFULLY FOR FULL DETAILS.**

This policy is a legal contract and is issued in consideration of the Application of the Sponsor, a copy of which is attached, and of the payment of premiums by the Sponsor.

The following pages including any amendments, riders or endorsements are a part of this policy.

Signed at Liberty's Home Office, 175 Berkeley Street, Boston, Massachusetts, 02117.

**\*Change Policy Number effective January 2, 1999**

**\*\*Change Sponsor name Effective June 20, 2001**

**NON-PARTICIPATING**

**Form DOP3**

# TABLE OF CONTENTS

SECTION 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SCHEDULE OF BENEFITS

SECTION 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DEFINITIONS

SECTION 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ELIGIBILITY AND EFFECTIVE DATES

SECTION 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DISABILITY INCOME BENEFITS

SECTION 5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . EXCLUSIONS

SECTION 6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . TERMINATION PROVISIONS

SECTION 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . GENERAL PROVISIONS

SECTION 8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . PREMIUMS

SECTION 9. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . APPLICATION

## SECTION 1 - SCHEDULE OF BENEFITS

**ELIGIBLE CLASSES FOR INSURANCE BENEFITS:** *(an Employee's eligibility will be based on the minimum requirement for scheduled hours worked per week as determined by the employment policy for the unit which provides the employee's benefit - in no event will the minimum hourly requirement be less than 20 hours per week.)*

**Long Term Disability Benefits:**

Class 1: All Non-Temporary Domestic Employees who are eligible for salaried benefits and are in Active Employment are eligible for Long Term Disability Coverage.

Class 2: All Salaried Associates, including Associates required to be covered under this Policy by any foreign country's laws, statutes or mandates, residing outside the United States and are in Active Employment are eligible for Long Term Disability Coverage.

**ELIGIBILITY WAITING PERIOD:**

The Eligibility Waiting Period for each Employee covered under this policy is determined by the Sponsor.

*Note:*   *There will be no Eligibility Waiting Period for any Employee(s) covered under the Sponsor's self-funded Sodexho, Inc. Short Term Disability plan at the time they become eligible for coverage under this policy, provided they enroll for coverage within 45 days of entering an eligible class under this policy.*

*Note:*   *For former Sodexho USA Employees - Approved (whether paid or unpaid) Leave of Absence will be considered actively at work*

*Note:*   *Former Employees of DMC Rehab Hospital are to be given prior service credit toward the waiting period for time served with the prior company.*

**EMPLOYEE CONTRIBUTIONS REQUIRED:**   Domestic Employees:   Yes

Foreign Employees:   No

*Note:*   *Each Employee covered under this policy will be required to contribute to the cost of the plan. Contributions will be deducted from the Employee's paycheck each pay period. The amount contributed will depend on the Covered Person's base salary, including commissions earned in a prior 12 month period, as determined by the Sponsor.*

**NAME OF ASSOCIATED COMPANY(S):**

Sodexho Marriott Management, Inc.
The Prentice-Hall Corporation System, Inc.
1090 Vermont NW
Washington, D.C.  20005

## SECTION 1 - SCHEDULE OF BENEFITS
(Continued)

**COVERAGE BASIS - SPECIAL ARRANGEMENT**

Long Term Disability coverage is provided on a Non-Occupational basis, except with respect to work related Disabilities occurring on-the-job at the Covered Person's other place of employment. The Covered Person's other place of employment must not be an entity that is affiliated with Sodexho, Inc., or is covered under its fully-insured Sodexho, Inc. Long Term Disability policy insured by Liberty.

Benefits payable under this policy for an occupational Injury or Sickness that occurred on-the-job at the Covered Person's other place of employment will be paid according to the Special Arrangement - Work Related Benefit Limitation provision of this policy.

**LONG TERM DISABILITY COVERAGE**

**Elimination Period:**

The greater of:

    a.   the end of the Covered Person's insured Short Term Disability Benefits; or

    b.   30 days.

**Amount of Insurance Benefits:**

60% *(Benefit Percentage)* of Basic Weekly Earnings not to exceed a Maximum Weekly Benefit of $3461.54 **Less Benefits from Other Income Stated In This Coverage.**

**Maximum Benefit Period:**

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than age 60 | to age 65 |
| 60 – 64 | 5 years |
| 65 – 69 | To age 70 *(but not less than 1 year)* |
| 70 and over | 1 year |

**Minimum Benefit:**   No Minimum Benefit included in this policy.

## SECTION 2 - DEFINITIONS

In this section Liberty defines some basic terms needed to understand this policy. The male pronoun whenever used in this policy includes the female.

**"Active Employment"** means the Employee must be actively at work for the Sponsor:

1. on a full-time basis and paid regular earnings;

2. for at least the minimum number of hours shown in the Schedule of Benefits.

An Employee will be considered actively at work if he is reporting to work on a current basis in accordance with his usual work schedule. An Employee who is on leave without pay, not regularly working on a full-time schedule, or who is on a disability leave is not considered actively at work, except as stated in the Special Arrangement - Work Related Benefit Limitation provision.

**"Administrative Office"** means Liberty Life Assurance Company of Boston, 100 Liberty Way, Dover, New Hampshire 03820.

**"Application"** is the document designated Section 9, it is attached to and is made a part of this policy.

**APPLICABLE TO ASSOCIATES RECEIVING COMMISSION-BASED PAY: "Basic Weekly Earnings"** or **"Pre-Disability Earnings"** : means 1/52 of the Covered Person's annual base salary. Annual base salary* for the purposes of calculating plan benefits may be determined by one of the following methods:

1. annual base salary only;

2. annual base salary plus commissions from a prior 12 period to be determined by the workplace; or

3. the greater of annual base salary or prior calendar year's commission.

*Refer to the definition of annual salary captioned under "Applicable to All Other Employees".

**APPLICABLE TO ALL OTHER EMPLOYEES:** ."Basic Weekly Earnings" or "Pre-Disability Earnings": means 1/52 of the Covered Person's annual base salary. Annual base salary is calculated at the primary rate of pay converted to an hourly rate (rate 1 in the Marriott payroll system times 2080). This amount does not change if the actual number of hours worked per week varies or the actual pay is based on a rate other than the primary rate. It does not include overtime, premium, bonus, incentive or commission pay.

**"Covered Person"** means an Employee insured under this policy.

**"Disability" or "Disabled"** means:

1. For persons other than pilots, co-pilots, and crew of an aircraft:

   i. **"Disability" or "Disabled"** means during the Elimination Period and the next 24 months of Disability the Covered Person is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness; and

Definitions

## SECTION 2 - DEFINITIONS

(Continued)

"Disability" or "Disabled" (Continued)

1. For persons other than pilots, co-pilots, and crew of an aircraft (Continued)

    ii. After 24 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

2. With respect to Covered Persons employed as pilots, co-pilots and crew of an aircraft:

    "Disability" or "Disabled" means because of Injury or Sickness the Covered Person cannot perform the material and substantial duties of any gainful occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

"Disability Benefits", when used with the term Retirement Plan, means money which:

    1. is payable under a Retirement Plan due to Disability as defined in that plan; and

    2. does not reduce the amount of money which would have been paid as Retirement Benefits at the normal retirement age under the plan if the Disability had not occurred. *(If the payment does cause such a reduction, it will be deemed a Retirement Benefit as defined in this policy.)*

"Eligibility Date" means the date an Employee becomes eligible for insurance under this policy. Eligible Classes are shown in the Schedule of Benefits.

"Eligibility Waiting Period" as shown in the Schedule of Benefits means the continuous length of time an Employee must serve in an eligible class to reach his Eligibility Date.

"Elimination Period" means a period of consecutive days of Disability for which no benefit is payable. The Elimination Period is shown in the Schedule of Benefits and begins on the first day of Disability.

Notwithstanding the preceding, if the Covered Person returns to work for any seven (7) or less days during the Elimination Period and cannot continue, Liberty will count only those days the Covered Person is Disabled to satisfy the Elimination Period.

"Employee" means a person in Active Employment with the Sponsor.

"Evidence of Insurability" means a statement or proof of an Employee's medical history upon which acceptance for insurance will be determined by Liberty.

"Gross Weekly Benefit" means the Covered Person's Weekly Benefit before any reduction for Benefits from Other Income and earnings.

"Injury" means bodily impairment resulting directly from an accident and independently of all other causes. Any Disability which begins more than 60 days after an Injury will be considered a Sickness for the purpose of determining benefits under this policy.

"Physician" means a person who:

    1. is licensed to practice medicine and prescribe and administer drugs or to perform surgery; or

Form DOP3-DEF-0002/0003/0004          Definitions

GF3-810-252576-01 R (1) Effective March 28, 1998

## SECTION 2 - DEFINITIONS
(Continued)

"Physician" (Continued)

    2.  is a licensed practitioner of the healing arts in a category specifically favored under the health insurance laws of the State where the policy is delivered and practicing within the terms of his license.

"Physician" does not mean the Covered Person or his spouse, daughter, son, father, mother, sister or brother.

"Pre-Disability Earnings" - See definition of Basic Weekly Earnings.

"Pre-Existing Condition" - See definition in Section 5 Exclusions.

"Retirement Benefit", when used with the term Retirement Plan, means money which:

    1.  is payable under a Retirement Plan either in a lump sum or in the form of periodic payments;

    2.  does not represent contributions made by an Employee *(payments which represent Employee contributions are deemed to be received over the Employee's expected remaining life regardless of when such payments are actually received)*; and

    3.  is payable upon:

        a.  early or normal retirement; or

        b.  Disability, if the payment does reduce the amount of money which would have been paid under the plan at the normal retirement age.

"Retirement Plan" means a plan which provides Retirement Benefits to Employees and which is not funded wholly by Employee contributions. The term shall not include: a profit-sharing plan, informal salary continuation plan, registered retirement savings plan, stock option plan, stock ownership plan, deferred stock plan, restricted stock plan, or a non-qualified plan of deferred compensation.

"Schedule of Benefits" means the section of this policy which shows, among other things, the Eligible Classes, Eligibility Waiting Period, Elimination Period, Amount of Insurance, and Maximum Benefit Period.

"Sickness" means illness, disease, pregnancy or complications of pregnancy.

"Sponsor" means the entity to whom the policy is issued.

"Sponsor's Retirement Plan" is deemed to include any Retirement Plan:

    1.  which is part of any Federal, State, Municipal or Association retirement system; or

    2.  for which the Employee is eligible as a result of employment with the Sponsor.

"Weekly Benefit" means the amount payable by Liberty to the Disabled Covered Person. Benefits for Long Term Disability coverage are determined on a weekly basis, and paid bi-weekly.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES

### Eligible Classes for Insurance Benefits

The Eligible Classes for Insurance Benefits are shown in the Schedule of Benefits.

### Eligibility Date for Insurance Benefits

An Employee in an eligible class will qualify for insurance on the later of:

1. this policy's Effective Date; or

2. the day after the Employee completes the Eligibility Waiting Period shown in the Schedule of Benefits.

### Effective Dates of Insurance

1. Insurance will be effective at 12:01 A.M. Standard Time in the governing jurisdiction on the day determined as follows, but only if the Employee:

   a. enrolls with Liberty through the Sponsor; and
   b. in a manner satisfactory to Liberty.

2. An Employee will be insured for contributory insurance on the the Employee's Eligibility Date, if he enrolls for insurance during the Eligibility Waiting Period.

   *Note: If an individual enrolls within the Eligibility Waiting Period but is not in Active Employment on the date his coverage is due to begin because he is on an approved leave of absence, coverage will not start until he returns to Active Employment.*

   *To "enroll" means to make a request for coverage using procedures for enrollment established by the Sponsor.*

3. An Employee who does not enroll for contributory insurance during the Eligibility Waiting Period(s) defined by the Sponsor, or terminated his insurance while continuing to be eligible, may only enroll for contributory insurance during the Annual Enrollment Period(s) defined by the Sponsor. An Employee must submit Evidence of Insurability to Liberty for approval. This will be at the employee's expense. Once Liberty gives its approval, an Employee will be insured for such insurance on the later of theses dates:

   a. the first day of the next plan year; or
   b. the Saturday coinciding with or next following the date Liberty gives its approval.

   *Note: If an individual enrolls during an Annual Enrollment Period but is not in Active Employment on the date his coverage is due to begin because he is on an approved leave of absence, coverage will not start until he returns to Active Employment.*

   *To "enroll" means to make a request for coverage using procedures for enrollment established by the Sponsor.*

   *The Annual Enrollment Period(s) means the period(s) before each policy anniversary so designated by the Sponsor and Liberty during which an Employee may enroll for coverage under this policy.*

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
(Continued)

**Effective Dates of Insurance -** (Continued)

4. Delayed Effective Date for Insurance - The Effective Date of any initial, increased or additional insurance will be delayed for an individual if he is not in Active Employment. The initial, increased or additional insurance will start on the date the individual returns to Active Employment.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
(Continued)

**Family Medical Leave**

An employee will be covered under this policy during any period that he is not in Active Employment because of a Family Medical Leave.

The Employee's coverage will be continued provided the appropriate premium payments are made during the Family Medical Leave. Coverage will be provided at the same benefit levels in effect when he ceased Active Employment. However, any change in this policy's benefit levels that occur while the employee is on Family Medical Leave will apply to the coverage provided under this provision.

If the Employee's coverage ends during a Family Medical Leave because he failed to make the appropriate premium contributions, or voluntarily cancelled coverage, his coverage will be fully reinstated, upon his request, at the end of the Family Medical Leave, subject to the terms and limitations of the Family Medical Leave Act as amended. Such coverage will be at the same benefit levels in force at the time coverage is reinstated. The time insured under this policy before the Employee's Family Medical Leave will be applied, on the date of full reinstatement, for the purpose of satisfying the policy's Pre-Existing Condition Exclusion, when applicable.

For the purpose of the provision, **"Family Medical Leave"** means an approved leave of absence from work provided by the Sponsor according to the 1993 Family and Medical Leave Act.

**Rehire Terms**

If a former Employee is re-hired by the Sponsor within three (3) months of his termination date, all past periods of Active Employment with the Sponsor will be used in determining the re-hired Employee's Eligibility Date. If a former Employee is re-hired by the Sponsor more than three (3) months after his termination date, he is considered to be a new Employee when determining his Eligibility Date.

**Associated Companies**

Companies, corporations, firms or individuals that are subsidiary to, or affiliated with, the Sponsor will be called Associated Companies. The Associated Companies, if any, are listed in the Schedule of Benefits. Employees of Associated Companies will be considered Employees of the Sponsor for purposes of this policy.

As they relate to this policy, all actions, agreements and notices between Liberty and the Sponsor will be binding on the Associated Companies.

If an Associated Company ceases to be an Associated Company for any reason, its Employees will be deemed to have transferred to a class of Employees not eligible for coverage under this policy.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
### (Continued)

**Transfer Provision**

In order to prevent loss of coverage for an individual because of a transfer of coverage, this policy will provide coverage for certain individuals as follows:

FAILURE TO BE IN ACTIVE EMPLOYMENT DUE TO INJURY OR SICKNESS

This policy will cover, subject to premium payments (if applicable), individuals:

1.   covered by the prior plan at the time of transfer; and

2.   who are not in Active Employment due to Injury or Sickness on the Effective Date of the policy.

The benefit payable will be in accordance with the provisions of the prior plan, less any benefit for which the Sponsor of the prior plan is liable. However, in no event will the benefit payable be greater than that which would have been paid under the prior plan's benefit schedule.

DISABILITY DUE TO A PRE-EXISTING CONDITION

If there is a Pre-Existing Condition Exclusion, a benefit may be payable for a Disability, that occurs on or after this policy's effective date, due to a Pre-Existing Condition for an individual who:

1.   was insured under the prior plan, but was not in Active Employment at the time of transfer; or

2.   was in Active Employment and insured under this policy on its Effective Date.

The benefit will be determined as follows:

1.   Liberty will apply this policy's pre-existing condition exclusion.  If the individual qualifies for a benefit, he will be paid according to this policy's benefit schedule.

2.   If the individual cannot satisfy this policy's pre-existing condition exclusion, the prior plan's pre-existing condition exclusion will be applied.

    a.   If the individual satisfies the prior plan's pre-existing condition exclusion, giving consideration towards continuous time insured under both plans, he will be paid according to this policy's benefit schedule.  However, in no event will the benefit payable be greater than that which would have been paid under the prior plan's benefit schedule.

    b.   If he cannot satisfy the pre-existing condition exclusion of this policy or that of the prior plan, no benefit will be paid.

*Note:    Former Employees of DMC Rehab Hospital are to be given prior service credit toward satisfaction of any pre-existing condition exclusions.*

## SECTION 4 - DISABILITY INCOME BENEFITS

### LONG TERM DISABILITY COVERAGE

#### Disability Benefit

When Liberty receives proof that a Covered Person is Disabled due to Injury or Sickness and requires the regular attendance of a Physician, Liberty will pay the Covered Person a Weekly Benefit after the end of the Elimination Period. The benefit will be paid for the period of Disability if the Covered Person gives to Liberty proof of continued:

1.  Disability; and

2.  regular attendance of a Physician.

The proof must be given upon Liberty's request and at the Covered Person's expense.

For the purpose of determining Disability, the Injury must occur and Disability must begin while the Employee is insured for this coverage. In addition, a loss of a license for any reason does not, in itself, constitute Disability.

The Weekly Benefit will not:

1.  exceed the Covered Person's Amount of Insurance; nor

2.  be paid for longer than the Maximum Benefit Period.

The Amount of Insurance and the Maximum Benefit Period are shown in the Schedule of Benefits.

#### Amount of Disability Weekly Benefit

To figure the amount of Weekly Benefit:

1.  Multiply the Covered Person's Basic Weekly Earnings by the Benefit Percentage shown in the Schedule of Benefits.

2.  Take the lesser of:

    a. the amount figured in step (1) above; or

    b. the Maximum Weekly Benefit shown in the Schedule of Benefits; and then

3.  Deduct Benefits from Other Income, (shown in the Benefits from Other Income provision of this coverage), from this amount.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** - (Continued)

**Quick Recovery Program**

When proof is received that a Covered Person is Partially Disabled and has experienced a loss of earnings because of an Injury or Sickness, he may be eligible to receive a Loss of Earnings Weekly Benefit under Liberty's Quick Recovery Program.

To be eligible to receive such benefits, the Covered Person may be employed in his own occupation or another occupation and:

1. must satisfy the Elimination Period; and

2. must be earning 20% or more of his Pre-Disability Earnings.

If the Covered Person is earning less than 20% of his Pre-Disability Earnings, the Disability Benefit will be paid, and all other benefit provisions and terms applicable to Disability will apply as stated in this coverage.

A Weekly Benefit will be paid for the period of Partial Disability if proof is given to Liberty upon request and at the Covered Person's expense of continued:

1. Partial Disability; and

2. regular attendance of a Physician.

For the purpose of determining Partial Disability, the Injury must occur and Partial Disability must begin while the Employee is insured for this coverage. In addition, a loss of a license for any reason does not, in itself, constitute Partial Disability.

**"Partial Disability" or "Partially Disabled"** means as a result of the Injury or Sickness, the Covered Person is:

1. able to perform one or more, but not all, of the material and substantial duties of his own or any other occupation on an Active Employment or a part-time basis; or

2. able to perform all of the material and substantial duties of his own or any other occupation on a part-time basis.

The Amount of Loss of Earnings Weekly Benefit payable under Liberty's Quick Recovery Program is described on the following page.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE -** (Continued)

**Amount of Loss of Earnings Weekly Benefit**

If the Covered Person is eligible for benefits under the Quick Recovery Program, during the first 12 months, Liberty will pay a Work Incentive Benefit.

The Work Incentive Benefit will be an amount equal to the Covered Person's Pre-Disability Earnings multiplied by the Benefit Percentage shown in the Schedule of Benefits, without any reductions from earnings.

The Work Incentive Benefit will only be reduced, if the Weekly Benefit payable plus any earnings exceed 100% of the Covered Person's Pre-Disability Earnings. If the combined total is more, the Weekly Benefit will be reduced by the excess amount so that the Weekly Benefit plus the Covered Person's earnings does not exceed 100% of his Pre-Disability Earnings.

After the first 12 months , the Weekly Benefit will be calculated as follows:

1. Subtract the Covered Person's Basic Weekly Earnings received while he is Partially Disabled from his Pre-Disability Earnings.  This figure represents the amount of lost earnings.

2. Multiply the amount of lost earnings by 70%.

3. Multiply the Covered Person's Pre-Disability Earnings by the Benefit Percentage shown in the Schedule of Benefits.

4. The Gross Weekly Benefit will be the lesser of the amount determined in step 2. or 3. above.

5. Deduct Benefits from Other Income *(shown in the Benefits from Other Income provision of this coverage)* from the Gross Weekly Benefit determined in step 4. above.

The Weekly Benefit payable will never be more than the Disability Benefit payable under this coverage.          •

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

### LONG TERM DISABILITY COVERAGE - (Continued)

#### Mental Illness Limitation

The Benefit for Disability due to Mental Illness will not exceed 24 months of Weekly Benefit payments unless the Covered Person meets one of these situations.

1.  The Covered Person is in a Hospital or Institution for Mental Illness at the end of the 24 month period. The Weekly Benefit will be paid during the confinement.

    If the Covered Person is still Disabled when he is discharged, the Weekly Benefit will be paid for a recovery period up to 90 days. If the Covered Person becomes reconfined during the recovery period for at least 14 days in a row, benefits will be paid for the confinement and another recovery period up to 90 more days.

2.  The Covered Person continues to be Disabled and becomes confined for the Mental Illness: (a) after the 24 month period; and (b) for at least 14 days in a row. The Weekly Benefit will be payable during the confinement for the Mental Illness.

3.  The Covered Person is not confined in a Hospital or Institution for Mental Illness, but is actively involved and undergoing Extended Treatment for the condition that caused the initial Disability. The Weekly Benefit will be payable to a Covered Person for up to the Maximum Benefit Period, provided he is:

    a.  undergoing Extended Treatment; and

    b.  eligible and receiving disability benefits under the United States Social Security Act for the same condition causing initial Disability.

In no event will the Weekly Benefit be payable beyond the Maximum Benefit Period, shown in the Schedule of Benefits.

"Extended Treatment" means continued care that is consistent with the American Psychiatric Association's standard principles of treatment, and is in lieu of Hospital or Institutional confinement. The treatment must be approved in writing by a Physician and is one or more of the following conditions: (a) schizophrenic disorder (295); (b) manic disorder, recurrent episodes (296.1); (c) bipolar affective disorder, manic (296.4; (d) bipolar affective disorder, depressive (296.5; (e) bipolar affective disorder, mixed (296.6; (f) bipolar affective disorder, unspecified (296.7; (g) manic depressive psychosis, severe without psychotic features (296.83); (h) manic depressive psychosis, severe with psychotic features (296.84); (i) Unspecified affective psychosis (296.90); (j) paranoid states (297); (k) psychotic disorder not otherwise specified (298.9); (l) senile and presenile organic psychotic conditions (290); (m) amnestic syndrome-korsakoff's psychosis/syndrome non-alcoholic (294.0); (n) other specified organic brain syndromes (chronic) (294.8); (o) organic psychosis (chronic) (294.9);(p) organic personality syndrome (310.01).

"Hospital" or "Institution" means a facility licensed to provide care and Treatment for the condition causing the Covered Person's Disability.

"Mental Illness" means mental, nervous or emotional diseases or disorders of any type.

# SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

### LONG TERM DISABILITY COVERAGE - (Continued)

#### Benefits from Other Income

Benefits from Other Income means those benefits shown below:

1. The amount for which the Covered Person is eligible under:

   a. Workers' or Workmen's Compensation Law;

   b. occupational disease law;

   c. any compulsory benefit act or law; or

   d. any other act or law of like intent.

2. The amount of any disability benefits which the Covered Person is eligible to receive under:

   a. any other group insurance plan of the Sponsor;

   b. any governmental retirement system as a result of his job with the Sponsor.

3. The amount of benefits the Covered Person receives under the Sponsor's Retirement Plan as follows:

   a. The amount of any Disability Benefits, or Retirement Benefits the Covered Person voluntarily elects to receive as retirement payment under the Sponsor's Retirement Plan; and

   b. the amount the Covered Person is eligible to receive as retirement payments when he reaches the later of age 62, or normal retirement age as defined in the Sponsor's plan.

4. The amount of Disability and/or Retirement Benefits under the United States Social Security Act, the Canada Pension Plan, the Quebec Pension Plan, or any similar plan or act, for which the Covered Person received or is eligible to receive.

5. The amount of earnings the Covered Person earns or receives from any vacation pay (unless an employee receives vacation pay upon termination from Sodexho, Inc.), holiday pay, sick leave pay, personal leave pay, or severance pay.

6. The amount of earnings from employment unless the Covered Person is receiving benefits under the Work Incentive Benefit provision.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

### LONG TERM DISABILITY COVERAGE - (Continued)

#### Cost of Living Freeze

After the first deduction for each of the Benefits from Other Income, the Weekly Benefit will not be further reduced due to any cost of living increases payable under the Benefits from Other Income provision of this coverage. This provision does not apply to increases received from any form of employment.

#### Lump Sum Payments

Benefits from Other Income which are paid in a lump sum will be prorated on a weekly basis over the time period for which the sum is given or the Maximum Benefit Period, whichever is less.

#### Prorated Benefits

For any period which a Long Term Disability Benefit is payable that does not extend through a full week, the benefit will be paid on a prorated basis. The rate will be 1/7th of the weekly benefit per day for such period of Disability.

#### Discontinuation of Long Term Disability Benefits

The Weekly Benefit will cease on the earliest of:

1.  the date the Covered Person is no longer Disabled; or

2.  the date the Covered Person dies; or

3.  the end of the Maximum Benefit Period; or

4.  the date any of the conditions stated in the Benefits Administration provision occur; or

5.  the date the Covered Person's current earnings exceed 85% of his Pre-Disability Earnings.

Because the Covered Person's current earnings may fluctuate, Liberty may average earnings over three (3) consecutive months rather than immediately terminating his benefit once 85% of Pre-Disability Earnings has been reached.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE -** (Continued)

**Successive Periods of Disability**

With respect to this coverage, **"Successive Periods of Disability"** means a Disability which is related or due to the same cause(s) as a prior Disability for which a Weekly Benefit was payable.

A Successive Period of Disability will be treated as part of the prior Disability if, after receiving Disability Benefits under this coverage, a Covered Person:

1. returns to his own occupation on an Active Employment basis for less than six continuous months; and

2. performs all the material and substantial duties of his own occupation.

To qualify for a Successive Periods of Disability Benefit, the Covered Person must experience more than a 20% loss of Pre-Disability Earnings.

Benefit payments will be subject to the terms of this coverage for the prior Disability.

If a Covered Person returns to his own occupation on an Active Employment basis for six continuous months or more, the Successive Period of Disability will be treated as a new period of Disability. The Covered Person must complete another Elimination Period.

If a Covered Person becomes eligible for coverage under any other group Long Term Disability coverage, this Successive Period of Disability provision will cease to apply to that Covered Person.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

### LONG TERM DISABILITY COVERAGE - (Continued)

#### Rehabilitation Incentive Benefit

Liberty will pay an Increased Weekly Benefit while a Covered Person is enrolled and actively participating in a Rehabilitation Program. Liberty must first recommend the Rehabilitation Program before a Covered Person can be considered for this benefit. If Liberty does not recommend Rehabilitation, no benefits are payable under this provision. However, a Weekly Benefit will be payable provided the Covered Person is Disabled or Partially Disabled under the terms of this policy.

To be eligible for a Rehabilitation Incentive Benefit, the Covered Person must:

1.  be Disabled or Partially Disabled and receiving benefits under this policy; and

2.  be enrolled and actively participating in a Rehabilitation Program approved by Liberty.

#### Increased Weekly Benefit - During Rehabilitation

If the Covered Person is eligible for a Rehabilitation Incentive Benefit, the benefit percentage shown in the Schedule of Benefits to calculate his Amount of Insurance Benefits, will be increased to 70%. The increased benefit will begin on the 1st day of the next following bi-weekly Period after Liberty receives written proof of the Covered Person's enrollment and active participation in the Rehabilitation Program.

#### Rehabilitation Limitation

If the Covered Person, at any time, declines to enroll or actively participate in an approved Rehabilitation Program, recommended by Liberty:

1.  no benefit will be paid if he declines to enroll in the Rehabilitation Program; or

2.  benefits will cease on the date he ceases to actively participate in the Rehabilitation Program.

#### Rehabilitation Incentive Benefit Termination

The Rehabilitation Benefit will end on the earlier of the following dates:

1.  the date the Covered Person is no longer Disabled;

2.  the date the Covered Person dies; or

3.  the date any of the conditions stated in the Benefits Administration provision occur; or

4.  the end of the Maximum Benefit Period.

## SECTION 5 - EXCLUSIONS

### GENERAL EXCLUSIONS

This policy will not cover any Disability due to:

1.  war, declared or undeclared or any act of war;

2.  intentionally self-inflicted injuries, while sane or insane;

3.  active Participation in a Riot;

4.  the Covered Person's committing of or the attempting to commit an indictable offense.

5.  Injury or Sickness incurred while the Covered Person is serving on active duty as a member of any armed force of any state or nation;

6.  a condition of impairment that cannot be documented by clinical or laboratory evidence;

7.  any Sponsor's work related Injury or Sickness that occurs at the Sponsor's place of business and for which the Covered Person receives, or is entitled to receive, compensation (including any lump sum amounts) under Workers' or Workmen's Compensation Law, or any other act, law or plan of like intent;

8.  treatment which is not Medically Necessary;

9.  cosmetic surgery;

10. any Disability or Partial Disability that occurs after the Covered Person's participation in this policy ends.

With respect to this provision, **Participation** shall include promoting, inciting, conspiring to promote or incite, aiding, abetting, and all forms of taking part in, but shall not include actions taken in defense of public or private property, or actions taken in defense of the person of the insured, if such actions of defense are not taken against persons seeking to maintain or restore law and order including, but not limited to police officers and firemen.

With respect to this provision, **Riot** shall include all forms of public violence, disorder or disturbance of the public peace, by three or more persons assembled together, whether or not acting with a common intent and whether or not damage to persons or property or unlawful act or acts is the intent or the consequence of such disorder.

With respect to this provision, **Medically Necessary** means treatments:

a.  must be ordered by a qualified Physician as defined by the policy;

b.  must be commonly and customarily recognized by the medical profession as appropriate in the treatment of the diagnosed condition;

c.  must not be educational or experimental in nature; and

d.  must not be provided primarily for medical or other research.

## SECTION 5 - EXCLUSIONS
(Continued)

### LONG TERM DISABILITY COVERAGE

*Note:*   *Former Employees of DMC Rehab Hospital are to be given prior service credit toward satisfaction of the pre-existing condition exclusions.*

### Pre-Existing Condition Exclusion

This Long Term Disability policy does not pay benefits if the Covered Person becomes Disabled as a result of a pre-existing condition.

A pre-existing condition is any medical condition - resulting from an Injury or Sickness *(including pregnancy)* - that the Covered Person has had treatment for *(i.e. consultation, care or services provided or recommended by a Physician)*, in the six months before the Covered Person's coverage takes effect. This includes any condition which was diagnosed *(or for which the Covered Person was tested even if the diagnosis was not made)*, treated or recommended for treatment, or for which drugs or medicines were prescribed or taken.

The pre-existing condition exclusion ends:

1. six months from the effective date of the Covered Person's participation in the policy if the Covered Person was in continuous Active Employment for the six months and if there is no treatment for, or recommendation for treatment of, the condition that caused Disability *(including the taking of medications)* during this time period; or

2. 12 months from the effective date of the Covered Person's participation in the policy if treatment for the condition that caused Disability *(including taking of medications)* is received or recommended during the first six (6) months of participation and the Covered Person has been in Active Employment for these 12 months.

*Note:*   *For hourly associates who have become salaried associates, their length of participation in the Sponsors self-funded Short Term Disability plan will apply toward this policy's pre-existing condition exclusion period if:*

   *a.   the associate was a participant in the Sponsor's self-funded Short Term Disability plan at the time he became a salaried associate; and*

   *b.   the associate enrolled in the fully-insured Long Term Disability policy within 45 days of becoming a salaried associate.*

## SECTION 6 - TERMINATION PROVISIONS

### Termination of Covered Person's Insurance

A Covered Person will cease to be insured on the earliest of the following dates, but without prejudice to any claim originating prior to the time of termination:

1. the date this policy terminates;

2. the date the Covered Person is no longer in an eligible class;

3. the date the Covered Person's class is no longer included for insurance;

4. the last day for which any required Employee contribution has been made;

5. the date employment terminates. Cessation of Active Employment will be deemed termination of employment, except the insurance will be continued for an Employee due to Disability during:

   a. the Elimination Period;
   b. the period during which premium is being waived;
   c. the period during which no benefits are paid under this policy because of a work-related Injury or Sickness; and
   d. the periods stated in the Continuation of Coverage - Leave of Absence provision.

6. the date the Covered Person ceases active work due to a labor dispute, including any strike, work slowdown, or lockout;

7. the date the Covered Person intentionally commits a fraudulent act, including:

   a. permitting any non-Covered Person to use this coverage; or
   b. furnishing incorrect or misleading information when filing a claim; or
   c. furnishing incorrect or misleading information in a statement made for the purpose of obtaining coverage.

Liberty reserves the right to review and terminate all classes insured under this policy if any class(es) cease(s) to be covered.

### Continuation of Coverage - Leave of Absence

The Sponsor may continue the Covered Person's coverage(s) by paying the required premiums, if the Covered Person is given an authorized leave of absence.

Coverage under this provision will end on the date the Covered Person fails to make the required premium contributions. However, coverage may be reinstated without proof of insurability if the Covered Person's request for reinstatement is approved by the Sponsor in accordance with the Sponsor's administrative procedures and the Covered Person pays the necessary premium contributions.

Reinstatement without evidence of insurability will not be guaranteed for any Employee who is seeking coverage after voluntarily electing not to continue participation in the policy, except for those returning from a military leave of absence or Family Medical Leave.

## SECTION 6 - TERMINATION PROVISIONS
(Continued)

**Policy Termination**

1. Termination of this policy under any conditions will not prejudice any claim which occurs while this policy is in force.

2. If the Sponsor fails to pay any premium within the grace period, this policy will terminate at 12:00 midnight Standard Time on the last day of the grace period. The Sponsor may terminate this policy by advance written notice delivered to Liberty at least 180 days prior to the termination date. This policy will not terminate during any period for which premium has been paid. The Sponsor will be liable to Liberty for all premiums due and unpaid for the full period for which this policy is in force.

3. Liberty may terminate this policy on any premium due date by giving written notice to the Sponsor at least 180 days in advance if:

   a. the number of Employees insured is less than 10; or
   b. less than 100% of the Employees eligible for any non-contributory insurance are insured for it; or
   c. the Sponsor fails:

      i.  to furnish promptly any information which Liberty may reasonably require; or
      ii. to perform any other obligations pertaining to this policy.

4. Termination may take effect on an earlier date if agreed to by the Sponsor and Liberty.

## SECTION 7 - GENERAL PROVISIONS

**Statements**

In the absence of fraud, all statements made in any signed Application are considered representations and not warranties *(absolute guarantees)*. No representation by:

1.  the Sponsor in applying for this policy will make it void unless the representation is contained in the signed Application; or

2.  any Employee in applying for insurance under this policy will be used to reduce or deny a claim unless a copy of the application for insurance, signed by the Employee, is or has been given to the Employee.

**Complete Contract - Policy Changes**

1.  This policy is the complete contract. It consists of:

    a.  all of the pages;
    b.  the attached signed Application of the Sponsor;
    c.  if contributory each Employee's signed application or telephonic enrollment for insurance which are on file with the Sponsor.

2.  This policy may be changed in whole or in part. Only an officer of Liberty together with the Sponsor's Senior Vice President and Chief Human Resources Officer can approve a change. The approval must be in writing and endorsed on or attached to this policy.

3.  No other person, including an agent, may change this policy or waive any part of it.

**Employee's Certificate**

Liberty will provide a Certificate to the Sponsor which will be made available to each Covered Person. It will state:

1.  the name of the insurance company and the policy number;
2.  a description of the insurance provided;
3.  the method used to determine the amount of benefits;
4.  to whom benefits are payable;
5.  limitations or reductions that may apply;
6.  the circumstances under which insurance terminates; and
7.  the rights of the Covered Person upon termination of this policy.

If the terms of a Certificate and this policy differ, this policy will govern.

**Interpretation of the Policy**

Liberty shall possess the authority, in its sole absolute and final discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

## SECTION 7 - GENERAL PROVISIONS
(Continued)

**Furnishing of Information - Access to Records**

1. The Sponsor will furnish at regular intervals to Liberty:

   a. information relative to Employees:

      i.   who qualify to become insured;
      ii.  whose amounts of insurance change; and/or
      iii. whose insurance terminates.

   b. any other information about this policy that may be reasonably required.

   The Sponsor's records which, in the opinion of Liberty, have a bearing on the insurance will be opened for inspection at any reasonable time.

2. Clerical error or omission will not:

   a. deprive an Employee of insurance;
   b. affect an Employee's Amount of Insurance; or
   c. effect or continue an Employee's insurance which otherwise would not be in force.

**Misstatement of Age**

If a Covered Person's age has been misstated, an equitable adjustment will be made in the premium. If the amount of the benefit is dependent upon an Employee's age, the amount of the benefit will be the amount an Employee would have been entitled to if his correct age were known.

A refund of premium will not be made for a period more than 12 months before the date Liberty is advised of the error.

**Notice and Proof of Claim**

1. Notice

   a. Notice of claim must be given to Liberty within 30 days of the date of the loss on which the claim is based, if that is possible. If that is not possible, Liberty must be notified as soon as it is reasonably possible to do so. Such notice of claim will be received in a form or format satisfactory to Liberty.

   b. When Liberty has the notice of claim, Liberty will send the Covered Person its claim forms. If the forms are not received within 15 days after notice of claim is sent, the Covered Person can send Liberty proof of claim without waiting for the form.

# SECTION 7 - GENERAL PROVISIONS
(Continued)

**Notice and Proof of Claim** (Continued)

2.  Proof

    a.  Proof of claim must be given to Liberty. This must be done no later than 30 days after the end of the Elimination Period.

    "**Proof**" means the evidence in support of a claim for benefits (a) in a form or format satisfactory to Liberty; (b) an Attending Physician's statement in a form or format satisfactory to Liberty, completed and signed by the Covered Person's attending physician; and (c) provision by the Attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence that may be required by Liberty in support of a claim for benefits.

    b.  Failure to furnish such proof within such time shall not invalidate nor reduce any claim if it was not reasonably possible to furnish such proof within such time. Such proof must be furnished as soon as reasonably possible, and in no event, except in the absence of legal capacity of the claimant, later than six (6) months from the time proof is otherwise required.

    c.  Proof of continued Disability or Partial Disability, when applicable, and regular attendance of a Physician must be given to Liberty within 30 days of the request for the proof.

**Time of Payment of Claims**

When Liberty receives satisfactory proof of claim, the benefit payable under this policy may be paid at least monthly, depending on the coverage for which claim is made, during any period for which Liberty is liable. Any balance remaining unpaid upon the termination of the period of liability will be paid immediately upon receipt of due written proof.

**Payment of Claims**

The benefit is payable to the Covered Person. But, if a benefit is payable to a Covered Person's estate, a Covered Person who is a minor, or who is not competent, Liberty has the right to pay up to $2,000 to any of the Covered Person's relatives or any other person whom Liberty considers entitled thereto by reason of having incurred expense for the maintenance, medical attendance or burial of the Covered Person. If Liberty, in good faith, pays the benefit in such a manner, Liberty will not have to pay such benefit again.

**Examination**

Liberty, at its own expense, will have the right and opportunity to have a Covered Person, whose Injury or Sickness is the basis of a claim, examined by a Physician or vocational expert of its choice. This right may be used as often as reasonably required.

**Legal Proceedings**

A claimant or the claimant's authorized representative cannot start any legal action:

1.  until 60 days after proof of claim has been given; nor

2.  more than one (1) year after the time proof of claim is required.

Form DOP3-GNP-0003.12/0004                                           General Provisions

## SECTION 7 - GENERAL PROVISIONS
(Continued)

**Right of Recovery**

If a benefit overpayment on any claim occurs, it will be required that reimbursement be made to Liberty within 60 days of Liberty's recognition of such overpayment, or Liberty has the right to reduce future benefit payments until such reimbursement is received.   Liberty has the right to recover such overpayments from the Covered Person or the Covered Person's estate.

**Conformity with State Statutes**

Any provision of this policy which, on its Effective Date, is in conflict with the statutes of the governing jurisdiction of this policy is hereby amended to conform to the minimum requirements of such statute.

**Incontestability**

The validity of this policy shall not be contested, except for non-payment of premiums, after it has been in force for two (2) years from the date of issue.  The validity of this policy shall not be contested on the basis of a statement made relating to insurability by any person covered under this policy after such insurance has been in force for two (2) years during such person's lifetime, and shall not be contested unless the statement is contained in a written instrument signed by the person making such statement.

**Canadian Exposure**

With respect to a Covered Person domiciled in Canada: (a) premium and benefit amounts will be deemed to be expressed in Canadian currency; (b) policy provisions concerning the rights of the Covered Person(s) are subject to applicable provincial statutes; and (c) with respect to benefits, an action under this policy may be brought in any court in the province where the Covered Person is domiciled.

**Workers' Compensation**

This policy and the coverages provided are not in lieu of, nor will they affect any requirements for coverage under any Workers' Compensation Law or other similar law.

## SECTION 7 - GENERAL PROVISIONS
(Continued)

### Benefits Administration

Liberty requires that certain Benefit Administration requirements are met to ensure all claims are investigated carefully and adjudicated according to all relevant policy provisions. Failure to meet such requirements may result in immediate termination of a Covered Person's Disability Benefit.

Disability or Partial Disability Benefit payments will end when any of the following occur:

a. a qualified Physician certifies that the Covered Person is medically able to return to work;

b. the Covered Person refuses treatment or advice which Liberty deems to be medically necessary;

c. the Covered Person refuses to undergo a medical evaluation, including a psychological referral evaluation as required by Liberty;

d. the Covered Person or his Physician does not provide Liberty with required medical information which supports physical or mental impairment that is demonstrated by clinical and laboratory evidence;

e. the Covered Person fails to provide information regarding his eligibility for benefits, including information regarding eligibility for, or receipt of, other income while the Covered Person is Disabled or Partially Disabled;

f. the Covered Person does not reimburse Liberty for advanced payments made to the Covered Person pending a decision regarding Social Security benefits or compensation for a work-related disability;

g. the Covered Person does not reimburse Liberty for benefits received from motor vehicle insurance or payments on behalf of a third party allegedly responsible for his Disability or Partial Disability;

h. when payments received from other income sources exceed what the Covered Person would have been entitled to receive from this policy;

i. the Covered Person refuses a job for which Liberty considers him qualified and medically capable of performing.

### Subrogation

When a Covered Person's Injury or Sickness appears to be someone else's fault, benefits otherwise payable under this policy for loss of time as a result of that Injury or Sickness will not be paid unless the Covered Person or his legal representative agrees:

1. to repay Liberty for such benefits to the extent they are for losses for which compensation is paid to the Covered Person by or on behalf of the person at fault;

2. to allow Liberty a lien on such compensation and to hold such compensation in trust for Liberty; and

3. to execute and give to Liberty any instruments needed to secure the rights under 1. and 2. above.

Further, when Liberty has paid benefits to or on behalf of the injured Covered Person, Liberty will be subrogated to all rights of recovery that the Covered Person has against the person at fault. These subrogation rights will extend only to recovery of the amount Liberty has paid. The Covered Person must execute and deliver any instruments needed and do whatever else is necessary to secure those rights to Liberty.

## SECTION 7 - GENERAL PROVISIONS
(Continued)

**Estimated Benefits**

Liberty may estimate and include, in our computation of insurance benefits, the amount the Covered Person is eligible to receive under any of the plans referred to in the Benefits from Other Income provision of this policy *(except, Retirement Benefits described in item 2.).*

With respect to benefits payable under the Social Security Act, the Covered Person must make application with the Social Security Administration for benefit payments under that plan, when Liberty determines that the Disability will extend beyond a 12 month period. If the Covered Person's Disability extends beyond 12 full months or will end in death, and he does not make application for Social Security disability benefits, Liberty will begin to reduce the Covered Person's benefit by an estimated Social Security disability benefit amount. If the application is denied by the Social Security Administration, and Liberty disagrees with their decision, the Covered Person is obligated to appeal the denial.

Benefit payments from any other source will reduce the benefits payable under this policy if Liberty makes a reasonable determination that the Covered Person:

a.  will be paid upon completion of the claim; or

b.  would have been paid if the Covered Person pursued the claim within the required time.

In the event that Liberty overestimates an amount the Covered Person would have received from any Federal Plan, Liberty will reimburse the Covered Person for such amount plus any interest otherwise payable under the Federal Plan.

## SECTION 7 - GENERAL PROVISIONS
(Continued)

**Special Arrangement - Work Related Benefit Limitation**

Liberty will pay Disability Benefits according to the following special arrangement(s):

1. If a Covered Person becomes Disabled because of a work-related Injury or Sickness that occurred at the Covered Person's other place of employment, Liberty will pay a Disability Benefit without any offsets from Workers' Compensation.

2. If a Covered Person becomes Disabled because of a work-related Injury or Sickness that occurred at the Covered Person's other place of employment, and then becomes Disabled because of a non work-related Disability *(during or concurrent with the work-related Disability)*, Liberty will pay a Disability Benefit without any offsets from Workers' Compensation.

3. If a Covered Person becomes Disabled because of a work-related Injury or Sickness that occurred at the Sponsor's place of employment, and then becomes Disabled because of the non work-related Disability *(during or concurrent with a work-related Disability)*, Liberty will:

   a. pay a Disability Benefit for the non work-related Injury or Sickness; and

   b. will offset with the amount for which the Covered Person is eligible under Workers' Compensation or any other act, law or plan of like intent.

4. No benefit is payable under this policy for any work-related Injury or Sickness that occurs at the Sponsor's place of business and for which the Covered Person receives, or is entitled to receive, compensation (including any lump sum amounts) under any Workers' or Workmen's Compensation Law, or any other act, law, or plan of like intent.

NOTICE:

- With respect to items 1., and 2., above the Waiver of Premium provision of this policy will apply.

- With respect to items 1., 2., and 3., above all other offsets stated in the Benefits from Other Income provision of this policy will apply.

- With respect to items 3., and 4., in order to remain eligible for benefits under this policy, following or during a period of Disability that the Covered Person is eligible for or receiving benefits under Worker' Compensation, the Covered Person must:

   a. continue to make premium contributions during such time; and

   b. satisfy the Elimination Period - Liberty will count only the days Disabled from a non work-related Injury or Sickness to satisfy the Elimination Period.

## SECTION 8 - PREMIUMS

### Premium Rates

Liberty has set the premiums that apply to the coverage(s) provided under this policy. Those premiums are shown in a notice given to the Sponsor with or prior to delivery of this policy.

Liberty may establish new rates for all future premiums as well as the one then due:

1. when the terms of this policy are changed, any such change in policy terms will be made in accord with the General Provisions regarding "Complete Contract - Policy Changes";

2. when a division, or Associated Company is added to this policy; or

3. when the number of Covered Persons changes by 25% or more from the number insured on this policy's Effective Date; or

4. for reasons other than 1., 2., or 3. above, such as, but not limited to a change in factors bearing on the risk assumed. But, the rates may not be changed within the first 12 months following this policy's Effective Date.

No premium may be increased unless Liberty notifies the Sponsor at least 120 days in advance. Premium increases may take effect on an earlier date when both Liberty and the Sponsor agree.

### Payment of Premiums

1. All premiums due under this policy, including adjustments, if any, are payable by the Sponsor on or before their due dates at Liberty's Administrative Office, or to Liberty's agent. The due dates are specified on the first page of this policy.

2. Premium payment calculations will be based on the coverage(s) provided under this policy. Both are determined by the definition of Basic Weekly Earnings.

3. All payments made to or by Liberty shall be in United States dollars, except with respect to Canadian residents covered under this policy. All payments made to or by Liberty for such individuals must be in Canadian funds.

4. If premiums are payable on a monthly basis, premiums for additional or increased insurance becoming effective during a policy month will be charged from the next premium due date.

5. The premium charge for insurance terminated during a policy month will cease at the end of the Sponsor's pay period in which such insurance terminates. This manner of charging premium is for accounting purposes only. It will not extend insurance coverage beyond a date it would have otherwise terminated as shown in the "Termination of Covered Person's Insurance" provision of this policy.

6. If premiums are payable on other than a monthly basis, premiums for additional, increased, reduced or terminated insurance will cause a prorated adjustment on the next premium due date.

# SECTION 8 - PREMIUMS

(Continued)

**Payment of Premiums - (Continued)**

7. Except for fraud and premium adjustments, refunds or charges will be made only for:

   a. the current policy year; and

   b. the immediately preceding policy year.

## Grace Period

This is the 55 days following a premium due date, other than the first, during which premium payment may be made. During the grace period this policy shall continue in force, unless the Sponsor has given Liberty written notice 31 days in advance of discontinuance of this policy.

## Waiver of Premium

Premium payments for a Covered Person are waived during any period for which benefits are payable. If coverage is to be continued, premium payments must be resumed following a period during which they were waived.

GF3-810-252576-01 R (1) Effective January 1, 2002

## AMENDMENT ___9___

It is agreed the following changes are hereby made to this policy:    GF3-810-252576-01

### ADDITIONS

Form DOP3-PRE-0002 R (1)

### DELETIONS

Form DOP3-PRE-0002

The Effective Date of this change is <u>January 1, 2002</u>.

The changes will only apply to Disabilities or Partial Disabilities which start on or after the Effective Date of this change.

This policy's terms and provisions will apply other than as stated in this amendment.

Dated this <u>14th</u> day of <u>February</u>, 2002.

Issued to and Accepted by:

<u>Sodexho, Inc.</u>
**Sponsor**

By_____

**Signature and Title of Officer**

**Liberty Life Assurance Company of Boston**

FormDOP3-ADM-0004



Liberty Life Assurance Company of Boston
Disability Claims
P.O. Box 1525
Dover, NH 03821-1525
Phone No.: (800) 210-0268
Secure Fax No.: (603) 743-6422

April 25, 2005

Joseph Archambault
52 Fred Bell Way
Apt C
Wellsfleet, MA 02667-0000

RE:    Long Term Disability Benefits
       Sodexho
       Claim #: 670351

Dear Mr. Archambault:

We are writing in regard to your claim for disability benefits. We have completed a thorough review of your continued eligibility for disability benefits, and have determined that benefits are no longer payable. Sodexho's Long Term Disability Policy requires that to receive benefits beyond 24 months, or December 12, 2002, you must meet the following definition of disability.

*"Disability" or "Disabled" means:*

> *if the Covered Person is eligible for the 24 Month Own Occupation benefit, "Disability" or "Disabled" means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and*
>
> *ii.   thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.*

In order to evaluate whether or not you met the above change in the definition of disability, we requested medical information from your physician(s).

We requested updated medical documentation from Dr. Ligouri in November 2004. On December 13, 2004 we received information from Dr. Ligouri which included a completed restrictions form. Dr. Ligouri indicated you had been placed on the following restrictions:

- unable to stand for long periods of time
- unable to walk long distance
- unable to lift/carry over 10 pounds
- unable to use left hand/arm
- unable to climb, bend, stoop, kneel, push or pull

On February 23, 2005 we sent an additional request to Dr. Ligouri to confirm your current restrictions. In addition, we sent your restrictions to Dr. Cariz and Dr. Bilazarian to determine if they had placed you on any additional restrictions and to confirm that you were able to perform sedentary function without the use of your left hand and arm.

We received confirmation from Dr. Bilazarian on February 25, 2005 that all restrictions that had been placed on you were appropriate. In addition, we received confirmation from Dr. Bilazarian that you are able to perform sedentary function without use of your left arm.

On March 30, 2005 we received an updated note from Dr. Liguori indicating that your lifting restriction had been updated. It was now noted that you could not lift or carry any more than 5 pounds. Dr. Liguori indicated that you did not have any cognitive or memory restrictions other than fatigue and alertness which is intermittent.

We then referred your file to a Vocational Specialist to conduct a vocational analysis of your current capabilities, training, education and experience. The results show your transferable skills include:

- ability to understand and communicate nutritional information to desired audience
- skilled in providing customer service to ensure customer satisfaction
- ability to perform inventory control and procurement
- ability to understand and utilize accounting procedures to reconcile business receipts
- ability to influence others opinions, attitudes, and judgment
- ability to follow and give written and verbal instructions
- ability to complete a variety of tasks and respond to change
- can use logic and reasoning to identify the strengths and weaknesses or alternative solutions conclusions, or approaches to problems
- documents and assesses information through entering, transcribing, recording, storing, and maintaining information in written or electronic form.

Based on this information you have the ability to perform the following occupations:

- customer service / food sales rep
- front desk badge security clerk
- information clerk
- night auditor

We have determined that you could perform with reasonable continuity the material and substantial duties of these occupations based on your capacity and skill level.

Therefore you do not meet Sodexho's definition of disability beyond April 25, 2005 and we must deny your claim for further benefit consideration, and your claim is closed as of April 26, 2005.

This claim determination reflects an evaluation of the claim facts and Policy provisions. We reserve the right to make a determination on any additional information that may be submitted.

Under the Employee Retirement Income Security Act of 1974 (ERISA), you may request a review of this denial by writing to:

The Liberty Life Assurance Company of Boston
Attn: Kati Cronholm
Disability Claims
P.O. Box 1525
Dover, NH 03821-1525

The written request for review must be sent within 60 days of the receipt of this letter and state the reasons why you feel your claim should not have been denied. In your request for review, include documentation such as office notes, test results, updated specific restrictions and limitations from all treating providers as well as any additional information which you feel will support your claim. You may request to review pertinent claim file documents upon which the denial of benefits was based. If Liberty Life does not receive your written request for review within 60 days of your receipt of this notice, our claim decision will be final, your file will remain closed, and no further review of your claim will be conducted. Under normal circumstances, you will be notified of the final decision within 60 days of the date that your request is received. If there are special circumstances requiring delay, you will be notified of the final decision no later than 120 days after your request for review is received.

Nothing in this letter should be construed as a waiver of any Liberty Life Assurance Company of Boston rights and defenses under the above captioned Policy, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

If you have any questions about this determination please call me.

Sincerely,

*Kathryn Cronholm*

Kati Cronholm
Disability Claims Case Manager II
Phone No.: (800) 210-0268 Ext. 30066
Secure Fax No.: (603) 743-6422



Liberty Life Assurance Company of Boston
Disability Claims
P.O. Box 1525
Dover, NH 03821-1525
Phone No.: (800) 210-0268
Secure Fax No.: (603) 743-4794

June 10, 2005

Bissonnette Law Offices
Attorneys and Counselors at Law
Attn: Mr. Michael Bissonnette
99 Church Street
Chicopee MA 01020

**RE: Appeal for Long Term Disability Benefits**
**Policyholder:** Sodexho, Inc.
**Claimant:** Mr. Joseph Archambault
**Social Security #:** 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
**Claim Number:** 670351

Dear Mr. Bissonnette:

We have completed our review of your request for reconsideration of Mr. Archambault's long-term disability benefits and have determined we are unable to alter our original decision to deny benefits beyond April 25, 2005.

As stated in our April 25, 2005, letter, the Sodexho Operations LLC Long Term Disability policy, under which he is covered, states:

*"Disability" or "Disabled", with respect to Long Term Disability, means:*

    *1.    For persons other than pilots, co-pilots, and crewmembers of an aircraft:*

        *i.    "Disability" or "Disabled" means during the Elimination Period and the next 24 months of Disability the Covered Person is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness; and*

        *ii.    After 24 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.*

The basis for this denial has been outlined in our letter of April 25, 2005; refer to the enclosed copy. At that time, Mr. Archambault was provided the opportunity to submit additional medical and/or vocational information, which he felt would support his ongoing disability. We received your appeal

Joseph Archambault
June 10, 2005
Page 2 of 7

request, on his behalf, on May 4, 2005; however, there was no additional documentation included. Your letter also requested a copy of his file, which was sent to you on May 4, 2005. On May 10, 2005, we sent a follow up request stating that we are in the process of reviewing Mr. Archambault's file and asked for any additional records wished to be submitted with his appeal. On May 16, 2005, we received your return letter indicating, "While all Mr. Archambault's neurological providers have agreed to provide any additional documentation to support their unanimous opinion for full disability, it is unfair to require more evidence that you already possess. Your own file contents already prove the case for the claimant and no supplementation is needed." Therefore, we continued with our appeal review based on the medical information currently contained in his file.

Mr. Archambault's last day worked was November 10, 2000, and his date of disability was November 12, 2000. He filed a claim for a Cerebrovascular Accident and he satisfied the Elimination Period on December 20, 2000. Therefore, on December 20, 2002, he experienced the change in definition of disability, from the ability to perform the material and substantial duties of his own occupation to the ability to perform *any other occupation* for which he is qualified. This is an ongoing claim investigation and acceptance beyond the 24th month does not equate to acceptance until the maximum duration.

The medical information contained in his file includes office treatment notes from Drs. Cariz, Campbell, Yurfest, Liguori, Funk, Brede, Bilazarian, Yoo, Kareem, Cusick, Limes, Siegal, Sheys, and Kabawat, as well as lab studies, physical and occupational therapy reports, diagnostic test results (MRI's, etc.) and medications. Based on the medical information contained in his file, we conducted our claim investigation.

Prior to denial, based on the medical information contained in his file, his complete file was referred to Managed Disability Services. We received updated medical information from Dr. Liguori (Physical Medicine and Rehabilitation) on December 9, 2004. Dr. Liguori stated he has imposed the following restrictions, from November 2000 through current: unable to stand for long periods of time, unable to walk long distance, unable to lift/carry objects over 10 pounds, unable to use left hand/arm, unable to climb, bend, stoop, kneel, push or pull. It is also noted that there were no cognitive deficits.

On February 23, 2005, we faxed a letter to Dr. Cariz and to Dr. Bilazarian informing them of the limitations that Dr. Liguori had placed on Mr. Archambault. We asked them if they agreed that Mr. Archambault would be capable of performing sedentary work without the use of his left arm. Also on February 23, 2005, we sent a follow-up request to Dr. Liguori asking if the restrictions he provided were still valid. On February 25, 2005, Dr. Bilazarian responded, that he agrees with these limitations. On March 18, 2005, we sent a second request to Dr. Cariz asking if he agreed with the functional capacity Dr. Liguori outlined. Dr. Cariz faxed a response back on March 18, 2005, which stated, "Based on the information provided I agree that Mr. Archambault is capable of sedentary function without the use of his left arm."

Joseph Archambault
June 10, 2005
Page 3 of 7

Dr. Liguori responded on March 30, 2005, which stated:

> Mr. Joseph Archambault is a 53-year-old male with a history of pontine CVA in November 2000 with chronic permanent left spastic hemiplegia. His last office visit was 9/14/04 at which time the patient had been having increasing difficulties with gait and increased falls and a decreased left sided awareness prompting recommendations for a follow up brain imaging study the results of which I have not seen nor have I followed up with Mr. Archambault regarding this issue.
>
> Based on his last examination Mr. Archambault continues to demonstrate significant left sided weakness and subsequent functional deficits. He ambulates with use of a plastic ankle/foot orthosis on the left but is unable to walk long distances or stand for long periods of time with ongoing difficulty climbing, bending, stooping, kneeling, pushing, pulling, ascending and descending stairs. Due to his imbalance it was recommended that Mr. Archambault not lift or carry objects greater than five pounds. There is no cognitive or memory restriction other than difficulties with fatigue and alertness which is intermittent. Sitting balance is functional. Ability to use the right hand for grasping and manipulating objects is functions.

In order to provide a full and fair appeal review, we referred his complete file, to Managed Disability Services. This medical review concluded that his file should be referred for a physician peer review. His file was reviewed by L. Neena Madireddi, M.D., Board Certified in Physiatrist. Following the medical review, Dr. Madireddi answered the following questions:

*Please provide a description of claimant's impairments, if any, and outline how any impairment translates to restrictions and limitations on physical activities.*

Based upon review of the available medical evidence, Mr. Archambault's primary impairments are due to his history of right pontine CVA with resultant left-sided hemiparesis, left upper extremity affected more than the right upper extremity. The medical evidence supports that he has mild sensory loss on the left side, which would affect his left upper extremity in terms of use. He does have evidence of left-sided hemiparesis and is using a left leg brace due to balancing problems. He is significantly impaired and is using his left arm more than his left leg. As a result of the physical impairments, as supported within the enclosed medical evidence, he is restricted in performing standing, walking, balancing, reaching, pushing, pulling, as well as lifting and carrying heavy items. The medical evidence supports detailed restrictions in regards to his overall level of functionality as requested in Question Number 2.

*If you feel restrictions and limitations are warranted at this time, please outline the restrictions and limitations and the medical basis for any restrictions and limitations. Please provide an expected duration of any restrictions and limitations you have provided.*

As outlined above, Mr. Archambault does have impairments post right pontine CVA with resultant left-sided hemiparesis with the left upper extremity affected more than the right upper extremity. As a result of his physical impairments, he would have restrictions in performing lifting and carrying a maximum of 20 pounds on an occasional basis and ten

pounds on a frequent basis utilizing his right upper extremity only (this depends upon the type of object being carried and/or lifted). Pushing and pulling activities with the right upper extremity should be restricted to 20 pounds on an occasional basis and ten pounds on a frequent basis. With his right upper extremity, he has no impairments in relationship to handling, fingering, or feeling activities. It should be noted that Mr. Archambault is right hand dominant. In regards to his left upper extremity, the medical evidence supports mild sensory loss on the left side, which does significantly affect his left upper extremity use. As such, lifting and carrying activities with the left upper extremity would be restricted to ten pounds on an occasional basis. Pushing and/or pulling activities with the left upper extremity should be restricted to a maximum of ten pounds. With the left upper extremity only, Mr. Archambault should be restricted from performing any activities above, at, or below shoulder level. Mr. Archambault does have marked limitations with the left upper extremity with activities such as handling, fingering, and feeling, and as such would be unable to perform such activities with the left hand. Utilizing both upper extremities, the medical evidence would support that Mr. Archambault would be capable of performing lifting and/or carrying activities up to ten pounds on an occasional basis consistent with that of a sedentary strength level. Likewise, pushing and/or pulling activities with both upper extremities should be restricted to ten pounds on an occasional basis. Reaching above, at, or below shoulder level should also be restricted utilizing both upper extremities to ten pounds on an occasional basis. Sitting activities would not be significantly restricted and Mr. Archambault could perform sitting throughout the course of an eight-hour workday provided that customary work breaks are provided throughout the course of the day. Standing and walking activities should be restricted to a total of four hours out of an eight-hour workday. At a frequency of every 60 minutes he should be afforded the opportunity to rest and take a break.

Mr. Archambault does have evidence of left sided hemiparesis and is utilizing a left leg brace and activities such as balancing should be restricted in total. Stair climbing should be restricted to an as needed basis with the usage of handrails. The medical evidence does not support any visual impairment. Activities such as climbing ropes, ladders, or scaffolding should be restricted in total. Activities such as squatting, kneeling, bending, and twisting should be restricted to an occasional basis. Utilizing his left foot for repetitive foot control should be restricted in total. However, he would be able to utilize his right foot for right foot control activity without restrictions. In terms of driving activities, he would be able to utilize a car on an occasional basis with regular steering mechanism. However, if there were further adaptations to his automobile, he would be able to drive a car without restrictions. The available medical evidence supports that Mr. Archambault would be able to perform work within a sedentary level according to the U.S. Department of Labor Dictionary of Occupational Title criteria.

In terms of the duration for the restrictions as outlined above, the medical evidence would support that due to the history of a stroke that occurred over three years ago, the restrictions as outlined above would be considered permanent in nature.

*Please comment on the restrictions and limitations provided by the attending physician. Are they consistent with the medical information provided?*

The available medical documentation does not provide detailed restrictions placed upon Mr. Archambault by his attending physicians. There was a Restrictions Form completed in approximately December of 2004 (however, there is no specific date). In this form, there are not specific restrictions; however, the disabling diagnosis is listed as "CVA." This is completed by his cardiologist, Dr. Seth Bilazarian, M.D. Mr. Archambault's primary care physician, Jose Cariz, M.D. completed a Restrictions Form; however, this was approximately three years ago in March of 2002. In this form, Dr. Cariz outlines that Mr. Archambault would be "unable to do anything, no grasping, no lifting, no bending." Although there is not specific and detailed restrictions placed upon Mr. Archambault by his attending physicians, the medical evidence would support that his current functional level would be consistent with the sedentary level as defined by the U.S. Department of Labor Dictionary of Occupational Titles, which is defined as "exerting up to ten pounds of force occasionally and/or a negligible amount of force frequently or constantly to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and other sedentary criteria are met."

*Are the claimant's self-reported limitations clinically supported and substantiated based upon your review of the medical information?*

In terms of self-reported limitations, Mr. Archambault completed a detailed Activities Questionnaire in December of 2004. In this form, Mr. Archambault states that he is able to sit for 45 to 60 minutes at a time, stand for 30 minutes at a time, and walk for 20 minutes at a time. Throughout the course of a normal day, Mr. Archambault states that he can sit for a maximum of six hours out of a day, stand for a total of two hours out of a day and walk for a total of 20 to 30 minutes out of a day. It lists that he does take a nap for approximately 1 ½ to 2 hours in the afternoon. Mr. Archambault lists himself as being right-hand dominant. He requires assistance with carrying groceries into the house, putting groceries away, washing floors, cleaning bathrooms, vacuuming and doing the laundry. However, he lists that he is able to perform his self-hygiene activities and other activities of daily living. He states that he is "unable to lift, squat, reach, must alternate between sitting and standing frequently. Balance is a large problem. Chronic fatigue, muscle cramps, unable to grasp, left side." Although the medical evidence does support a significant impairment that would impact his overall level of functionality, the medical evidence would support that he would be capable of performing work within the sustained sedentary capacity defined by the U.S. Department of Labor Dictionary of Occupational Titles. He self-reports that he is limited in his ability to perform some activities of daily living, as well as limitations with carrying and lifting. This is consistent with the medical information available as outlined in Question Number 2 above. However, with these limitations, some of which are inconsistent with objective medical findings, Mr. Archambault retains the sustained functional capacity to work within the sedentary category of work within the restrictions as outlined in Number 2 above on a full-time basis. Overall, the medical evidence would support that Mr. Archambault's self-reported limitations are somewhat overstated and are not entirely consistent with the available medical evidence.

Joseph Archambault
June 10, 2005
Page 6 of 7

Additionally, his file was reviewed by a vocational consultant to identify alternative occupations for
which he is qualified. This vocational assessment considers his transferable skills compared with his
limitations. The results of this report indicate he has acquired, based on his education, training, and
work history, the following transferable skills:

- Ability to understand and communicate nutritional information to desired audience,
- Skilled in providing customer service to ensure customer satisfaction,
- Ability to perform inventory control and procurement,
- Ability to understand and utilize accounting procedures to reconcile business
  receipts,
- Ability to influence others opinions, attitude, and judgment,
- Ability to follow and give written and verbal instructions,
- Ability to complete a variety of tasks and respond to change,
- Can use logic and reasoning to identify strengths and weaknesses of alternative
  solutions, conclusions, or approaches to problems,
- Documents and assesses information through entering, transcribing, recording,
  storing, and maintaining information in written or electronic form.

These skills would allow him to perform the following, but not limited to vocational alternatives:

1. Customer Service/Food Sales Representative
2. Front Desk Badge Security Clerk
3. Information Clerk
4. Night Auditor

Furthermore, we conducted additional labor market research to confirm his ability to perform these
occupations. The physical restrictions, as stated above, were used to determine if he would be
qualified for these occupations. This survey contacted a total of 25 employers. All five of the
employers contacted for the Information Clerk position, all five employers contacted for the Front
Desk Security position, all five employers contacted for the Night Auditor position, and six of the
ten employer contacted for the Customer Service/Food Sales Representative position stated that he
would be a qualified applicant, based on his skills and his physical capacity. In summary, 21 of the
25 employers contacted confirmed he would be able to perform the occupations. Therefore, it is
reasonably expected that these occupations are found to be commensurate with his pre-disability
income and exist in the local economy.

Our role in reviewing his file is to determine whether his medical condition and the medical
documentation contained in his file supports that he is unable to perform the material and
substantial duties of his own or any other occupation, for which he is qualified. We are not required
to ensure the availability of these occupations or that he return to Active Employment with his
former employer in the same or different position.

Although he continues to experience some symptoms, the medical information, including the
physician peer review and the vocational assessment, contained in his file does not support

Joseph Archambault
June 10, 2005
Page 7 of 7

complications or restrictions or limitations severe enough to prevent him from performing the material and substantial duties of any other occupation for which he is qualified. Therefore, he does not meet the definitions under the terms of the Sodexho Operations LLC's long-term disability policy, and benefits beyond April 25, 2005, are not payable.

This claim determination reflects an evaluation of the claim facts and policy provisions.

Under the Employee Retirement Income Security Act (ERISA) Appeal guidelines, Mr. Archambault was entitled to appeal the determination made by Liberty Life Assurance Company of Boston (Liberty), and to submit any additional information wished to be considered as part of the appeal. Liberty has conducted a full and fair review of your appeal and accompanying materials, and has determined that the denial of benefits will be maintained.

At this time, his administrative right to review has been exhausted and no further review will be conducted by Liberty and his claim will remain closed. He may request to receive, free of charge, copies of all documents relevant to his claim. He has the right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review.

Nothing in this letter should be construed as a waiver of any Liberty Life Assurance Company of Boston rights and defenses under the above captioned policy, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

Determinations made by Liberty Life Assurance Company of Boston are based on the provisions outlined in the Sodexho Operations LLC policy. These provisions are not contingent on decisions made by the Social Security Administration nor the Workers' Compensation Carrier.

We have rendered our final determination of this claim and will now close our file.

Sincerely,

Chuck Johnson
Appeal Review Consultant
Phone No.: (800) 210-0268 Ext. 30184
Secure Fax No.: (603) 743-4794


Enclosure:     April 25, 2005 – denial letter

Cc:            Joseph Archambault                    *with enclosure*
               52 Fred Bell Way – Apt C
               Wellfleet MA  02667