UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOSEPH ARCHAMBAULT, | ) | |
| Plaintiff | ) | |
| | ) | |
| VS. | ) | CIVIL ACTION |
| | ) | NO. 05-11762-NG |
| LIBERTY LIFE ASSURANCE | ) | |
| COMPANY OF BOSTON, | ) | |
| Defendant | ) | |

**PLAINTIFF'S LOCAL RULE 56.1 STATEMENT
OF MATERIAL  RECORD FACTS**

The Plaintiff makes this statement, pursuant to Local Rule 56.1, as to the material facts

contained in the administrative record which are pertinent to the motion for summary judgment

filed herewith.  Page references to the Administrative Record (AR00001 et seq.), are indicated

in parentheses.

**A.    The Sodexho Marriott ERISA LTD Plan**

1.    At all times relevant prior to November 12, 2000,  the Plaintiff Joseph Archambault, was

an employee of Sodexho Marriott Services, Inc., working as General Manager in food services

(AR00580 and AR 00688), for a bi-weekly salary of $1,596.14 (AR00300 and AR00665-66)

2.    At all times relevant through November 12, 2000, the  Defendant Liberty Life Assurance

Company of Boston (Liberty) provided group long term disability (LTD) coverage to employees

of Sodexho Marriott Services, Inc., under policy number GF3-810-252576-01.  (AR00001

through AR00032), hereinafter referred to as the group  LTD policy.

4.    The group LTD policy  was part of an ERISA benefits plan  and was purchased by

Sodexho Marriott Services, Inc., as "sponsor," for its employees working a minimum of 30 hours

per week to include all salaried associates. (AR00003).

5.     The  benefit payable under the group LTD policy, is 60% of an eligible employee's basic monthly earnings, not to exceed a maximum benefit of $5,000.00  (AR0003).

6.     LTD benefits are payable under the group LTD policy through age 65 for persons whose disability commences prior to age 60.  (AR00003).

7.     "Disability" under the group LTD policy for employees such as Mr. Archambault means the inability to perform all of the material and substantial duties of the claimant's occupation on an active employment basis because of injury or sickness, for the first 24 months after the elimination period.  (AR00005).

8.     After the first 24 months, "disability under the group LTD policy for employees such as Mr. Archambault  means the inability "to perform,  *with reasonable continuity*, all of the material and substantial duties of  (the claimant's ) own or any other occupation for which  he is or becomes reasonably fitted by training, education, experience age and physical and mental capacity."  (AR00006, emphasis added).

9.     The terms "reasonable continuity" and "occupation" are not defined anywhere in the group LTD policy. (AR00001 through 00032).

10.     A claimant under the group LTD policy is required to apply for Social Security disability benefits and any amount received thereby will be deducted from periodic benefits payable by Liberty.   (AR00029  and AR00016).

**B.     The LTD Claim & Termination**

11.     Mr. Archambault's short term disability benefit was allowed by Liberty by notice dated January 3, 2001, with disability commencing as of November 12, 2000, due to his stroke of that date.  Letter, 1/3/01 (AR00665-668).

12.    The LTD claim was initially approved through June 1, 2001, by notice dated April 16, 2001, which requested additional medical information to extend benefits beyond that point. Letter, 4/16/01 (AR00614).

13    Mr. Archambault provided full medical documentation of the LTD claim, as contained in the voluminous claim file, and he was continued on long term disability benefits through April 25, 2005, when Liberty sent him a notice of termination.

14.    Mr. Archambault's primary LTD benefit, at 60 percent of  his prior earnings, was computed as $957.68 bi-weekly, based on prior earnings of $1,596 bi-weekly.  (AR00300).

15.    As required by the LTD plan (AR00016), Mr. Archambault applied for and was awarded Social Security Disability Insurance (SSDI) benefits on May 11, 2001, and Liberty received notice of the award on June 25, 2001.  (AR00570)

16.    Pursuant to the terms of the LTD plan, Mr. Archambault's bi-weekly LTD benefit was reduced by the pro-rated amount of his monthly SDDI benefit of $507.69 to $449.99 bi-weekly. (AR00304).

17.    On April 25, 2005, Liberty gave Mr. Archambault written notice that his bi-weekly LTD benefits were terminated as of April 26, 2005.   That termination notice was based on the physiological restrictions purportedly imposed by Dr.Liguori, which included:

> unable to stand for long periods of time
> unable to walk long distances
> unable to lift/carry over 10 pounds
> unable to use left hand/arm
> unable to climb, bend, stoop, kneel, push or pull

Letter, 4/25/05 (AR00075).

18.    The termination notice also referred to Dr. Liguori's further report that lifting and carrying  was limited to 5 pounds maximum, and it also referred to Dr. Liguori's statement that Mr.  Archambault suffered from intermittent fatigue and impaired alertness.  Letter, April 25,

2005 (AR00076).  No reference was made to any neurological impairment affecting Mr.

Archambault's balance or the debilitating effect of pain caused by frequent muscle spasms

of the left upper extremity.

19.     Based on the limited restrictions considered by Liberty, the termination notice identified

four purportedly sedentary occupations which Mr. Archambault would have the ability to

perform in light of his transferable skills:

> -customer service / food sales rep
> -front desk badge security clerk
> -information clerk
> -night auditor

Liberty determined that Mr. Archambault could perform such work with "reasonable continuity,"

but made no reference to the need to take frequent rest breaks during the workday.  Letter, April

25, 2005 (AR00076).

20.     Prior counsel filed an appeal letter with Liberty dated May 2, 2005 (AR00174), and this

was acknowledged by Liberty on May 10, 2005, requesting additional time for review.  Letter,

May 10, 2005 (AR00169).

21.     Prior counsel rejected Liberty's request for additional time, by letter dated May 12, 2005,

which argued that Liberty's termination of benefits was unreasonable because it was based

primarily on the treating cardiologist's restrictions, while the basis for Mr. Archambault's

disability is  "neurological resulting from a stroke and not based on any cardiological issues."

Letter, 5/12/05 (AR00168).  Prior counsel indicated that further documentation would be

provided by Mr. Archambault's neurologist.

22.     On June 22, 2005, after receiving additional medical documentation from the treating

neurologist, Dr. Kase, Libery issued its final denial of Mr. Archambault's appeal,   This was

purportedly based on a further record review by Liberty's medical consultant.  Letter, 6/22/05

(AR0065-67).

23.     Liberty's termination notice made no reference to the fact that Mr. Archambault was

awarded SSDI benefitsr fact. Letter, April 25, 2005 (AR00075-77), and Liberty's final denial of

the appeal made only an oblique reference saying "these provisions are not contingent on

decisions made by the Social Security Administration . . . " with no analysis or explanation as to

how or why the SSDI award might not be relevant in context of its review of Mr. Archambault's

disability claim.  Letter, June 22, 2005 (AR00067).  Mr. Archambault's SSDI award was not

considered as evidence by any of the medical or vocational consultants retained by Liberty, or by

the claims personnel who made the decision to terminate his LTD benefits.

24.     Liberty's denial of the appeal on June 22, 2005, stated that it was a final determination,

on Mr. Archambault's claim, and

>       At this time, his administrative right to review has been exhausted and no further
>       review will be conducted by Liberty Life Assurance Company of Boston.  His claim
>       will remain closed and no further communication or correspondence will be addressed.

Letter, 6/22/05 (AR00066).  The LTD claim is therefore ripe for judicial review under ERISA.

## C.     The Medical Record & Disability

25.     On November 12, 2000, at age 49, Mr. Archambault suffered a severe stroke and was

taken by ambulance from his home to the Berkshire Medical Center.  See ER Department Record

(AR00059) and Discharge Summary (AR00555).   While there, he required implantation of

a pacemaker for severe coronary symptoms including bradycardia.  (AR00557).

26.      On November 20, 2000, Mr. Archambault was transferred from the Berkshire Medical

Center to the Whittier Rehab Hospital for further treatment of his illness which included

diagnoses of "Right pontine infarct with left hemiparesis, dysphagia" and symptomatic

bradycardia with pacemaker implant.  Discharge Summary (AR00593).  The diagnoses remained

the same on discharge, on December 13, 2000, with associated diagnoses included vestibular

dysfunction, autonomic dysfunction, hypoalbuminemia, diminished mobility, diminished ability

to perform self-care and activities of daily living and vocational impairments.  (AR00593).

27.    On discharge from Whittier Rehab Hospital, Mr. Archambault continued to suffer from

significant neurological impairments as a result of his stroke, requiring ongoing therapy, while

his cardio-respiratory difficulties had stabilized.  (AR00594).

28.    The physicians who have participated significantly in Mr. Archambault's treatment for

stroke-related illness after discharge from Whittier Rehab Hospital are, ranked in order of

importance and relevance to the claim of disabiity, as follows:


|    | Problem | Physician | Specialty | See Record |
|----|---------|-----------|-----------|------------|
| 1. | Physiological | Paul Liguori, M.D. | Physiatry | (AR00315) |
| 2. | Neurological | Carlos Kase, M.D. | Neurology | (AR00315) |
| 3. | Primary Care: | Jose Cariz, M.D. | Internist | (AR00302) |
| 4. | Cardiorespiratory | Seth Bilazarian, M.D. | Cardiology | (AR00316) |

29.    Dr. Liguori, the physiatrist who began treating Mr. Archambault at Whittier Rehab

Hospital, reported on June 7, 2002, that  Mr. Archambault was then

> a 51-year-old male status post right-pontine infarct . . . with resulatant acquiredleft spastic
> hemiplegia.  The patient has ongoing left-sided weakness and spasticity effecting
> mobility, the ability to perform self care and ADL and vocation.  His left-upper extremity
> is nonfunctional.  His condition is considered permanent with the likelihood for
> improvement very poor.
>
>         Mr. Archambault, as a result of the aforementioned issues, requires increased time
> and has difficulty performing self care and activities of daily living.  He requires splinting
> in the left-lower extremity, occasional splinting and support in the upper extremity for
> pain and comfort management along with attempts to perform functional abilities.  Mr.
> Archambault is unable to stand or ambulate for long periods of time.  He is unable to
> effectively carry or lift objects.  The patient is unable to use his left arm for handling and
> grasping objects nor at any functional level. . . .

> In my opinion, Mr. Archambault has reached a medical end-point with the likelihood of further neurological and/or functional recovery being extremely poor.

Report, June 7, 2002. (AR00383). There is no evidence in the record that Mr. Archambault has significantly improved since June 2002.

30.     On May 9, 2003, Dr. Liguori again reported on the sequelae of Mr. Archambault's stroke as follows:

> He remains having limitations with standing, balance and endurance. *Fatigue is an issue.* Spasticity in the left upper and lower extremities also remain an issue. . . . He has had a few *falls* since his last visit, *usually related* to slippery surfaces, *fatigue* and uneven surfaces.
>
> I discussed at length with Mr. Archambault regarding spasticity management and the need to titrate medications as too little with (sic) cause increase in spasticity and too much will contribute to *weakness and fatigue*. . . . We discussed his fatigue as an issue as well, and because of his fatigue, he eliminated Zanaflex in the a.m. and afternoon which did improve somewhat. *He continues to have difficulty with fatigue, attention and concentration, however. He reports having difficulty completing reading a book as he does tire easily.*

OP Follow Up Note, 5/9/03 (AR00297-98, emphases added).

31.     In December 2004, Dr. Liguori reported on Mr. Archambault's functional impairments due to the sequelae of his stroke which included "Spasticity/Contractures," "acquired hemiplegia on left" and "*fatigue*." Dr. Liguori indicated that Mr. Archambault was:

> unable to stand for long periods, unable to walk long distance  unable to lift/carry objects  (more than) 10 lbs. effectively  unable to use left hand/arm  unable to climb, bend,   stoop, kneel, push or pull.

There is no indication on this report as to the specific duration or continuity of Mr.Archambault's capacity for any activity. These restrictions and limitations are supported by objective medical findings described by Dr. Liguori to include:

> Left spastic hemiplegia with non functional left hand/arm  need for orthosis left leg/foot.

Restrictions Form (AR00247).

32.    On March 30, 2005, Dr. Liguori again reported on the sequelae of Mr. Archambault's

stroke as follows:

>        His last office visit was 9/14/04 at which time the patient had been having
> increasing difficulties with gait with increased falls and a decreased left sided
> awareness . . . .
>
>        Based on his last examination Mr. Archambault continues to demonstrate
> significant left sided weakness and subsequent functional deficits.  He ambulates with use
> of a plastic ankle/foot orthosis on the left but is unable to walk long distances or stand for
> long periods of time . . . . Due to his *imbalance* it was recommended that Mr. Archam-
> bault *not lift or carry objects greater than five pounds.*  There is no cognitive or memory
> restriction other than difficulties with fatigue and alertness which is intermittent.

Report, March 30, 2005 (AR00204, emphases added).

34..    Carlos Kase, M.D., is the neurologist treating Mr. Archambault for symptoms following

the stroke on November 20, 2000.  On June 7, 2005, Dr. Kase reported on the sequelae of Mr.

Archambault's stroke as being:

>        stabilized at at current level in which he has weakness of the left upper extremity at the
> level of the shoulder and elbow, with only trace of motion at the wrist and fingers; the
> latter are on a permanent position of flexion, and they can only be extended passively.
> The left lower extremity has mild weakness at the hip level, with moderate weakness of
> knee flexion, and marked weakness for foot dorsi-flexion and plantar flexion.
>
>        *In addition to the motor deficits* described above, he has in addition been affected by
> *frequent "spasms"* of the left limbs *which are painful,* and are ascribed to the result of
> the spasticity of the left limbs, as a sequela of the stroke.  He has been treated with
>
>        various medications for the "spasms," including Baclofen and Zanaflex, with only
> partial relief of his symptoms.
>
>        In view of the issues described above, it is my professional opinion that, on account of
> his motor deficits and the presence of "spasms" of the left limbs, Mr. Archambault is
> *unable to perform, with reasonable continuity, the material and substantial duties of
> any occupation.* . . . I believe that he is completely and permanently disabled for any
> occupation. . . .

Letter, June 7, 2005, (AR00083, emphases added).

35.    Dr. Kase specifically invited Liberty to contact him for any necessary clarification or

further details as to the content of his letter of June 7, 2005  (AR00084).   It does not appear in

the Record that Liberty followed up with Dr. Kase on this matter.   See Claim Notes, No. 88, 6/22/05 (AR00033).

36.     On February 23, Liberty sent a form letter to the treating cardiologist, Seth Bilazarian, M.D., which reported "information" from Dr. Ligouri, identified as a physiologist, that Mr. Archambault "has been placed on the following restrictions:"

> No standing for long periods of time
> No walking long distances
> No lifting or carrying over 10 lbs.
> Unable to use left hand and arm
> No climbing, bending, stooping, kneeling, pushing, pulling.

Letter, 2/23/05 (AR00213).

37.      "Based on the above information," Dr. Bilazarian, as a cardiologist relying on such purported  information from the treating physiologist, agreed that Mr. Archambault "is capable of sedentary function without the use of his left arm."   Again, there is no specific information provided as to the duration or continuity for any activity.  Letter, 2/23/05 (AR00213).

38..    Prior to receiving such "information" from Liberty, Dr. Bilazarian's own most recent Restrictions Forms provided no information as to functional restrictions from a cardiovascular perspective, but did indicate that Mr. Archambault was still at moderate cardiovascular risk. Restrictions Form, 12/20/04 (AR00248).

39.     On March 18, 2005, Liberty sent the same form letter to the internist, Dr. Cariz, reporting the same "information" from Dr. Liguori that Mr. Archambault "has been placed on the following restrictions"  with no indication of duration or continuity.   Letter, 3/18/05 (AR00211).

40.     On March 18, 2005, Dr. Cariz wrote back to Liberty via Fax stating his agreement that Mr. Archambault is capable of sedentary function without the use of his left arm "based on the information provided," with no information of duration or continuity.  Note, 3/18/05 (AR00208).

41.    Prior to receiving such "information" from Liberty, Dr. Cariz's own most recent

Restrictions Forms stated that "Pt. unable to do anything, no grasping, no lifting, no bending,"

for an indefinite term, and attributed this to the objective medical finding of Left Hemiplegia.

Restrictions Form, 3/11/03 (AR00407), and Restrictions Form, 3/29/02 (AR00414).

42.    There is no substantial medical evidence in the Record from any physician who has

either treated or examined Mr. Archambault to indicate that he can perform even sedentary

work activity for any significant length of time or with any reasonable degree of  continuity.

**D.    Plaintiff's Daily Activities & Limitations**

43.    Mr. Archambault's own most recent statement of daily activities, dated December 30,

2004, states that he is able to sit for only 40 to 60 minutes at a time, to stand for 30 minutes and

to walk for 20 minutes.  During a typical day he sits for six hours a day, stands for two hours

and walks for only 20 to 30 minutes.  He naps for 1 1/2 to 2 hours daily and spends nine to ten

hours in bed.   He is able to sit in a car for 45 minutes.  He leaves the house only once a day and

never goes to the mall.  Activities Questionnaire, 12/30/04 (AR00239).

44.    Mr. Archambault does his own grocery shopping, but requires assistance with

transporation, carrying groceries and putting groceries away.  He cooks his own meals and does

the dishes, but requires a helper to do his  housecleaning, washing floors and doing the laundry.

He tries to read but after reading he "soon forget(s) all of content."  Activities Questionnaire,

12/30/04 (AR00239).

 45.    Mr. Archambault describes the following limitations on his ability to perform work-

related activities:

> I am unable to lift, squat, reach.  *Must alternate between sit & stand frequently.*
> Balance is a large problem, *chronic fatigue – muscle cramps*.  Unable to grasp
>
> L side. Unable to use left side, tire easily – poor balance – memory lapses,
> concentration. . . .

Activities Questionnaire, 12/30/04 (AR00240).

46.    Mr. Archambault also provided information to Liberty's claims personnel on September 3, 2004, that he is severely impaired because he has no function on his left side which permits him to do only minimal activities of daily living and, even with such minimal activity, he tires easily and must take naps for up to three hours during the day. File Note, 9/3/04 (AR00038).

47.    Mr. Archambault's description of his fatigue and postural limitations is fully consistent with Dr. Liguori's  physiological findings.  Mr. Archambault's description of his symptoms, including fatigue and painful cramping, is fully consistent with Dr. Kase's neurological findings. And there is no substantial medical evidence in the Record from any treating or examining physician contrary to such findings.

### E.    **Liberty's Medical Review**

48.    Liberty hired L. Neena Madireddi, M.D., a physiatrist working for a corporate medical evaluation firm, to conduct a review of Mr. Archambault's  extensive medical record.  Dr. Madireddi spent a total of two hours and ten minutes "reviewing and analyzing" Mr. Archambault's extensive medical record.    Independent Peer Review,  June 7, 2005, page 32 (AR00131).

49.    Dr. Madireddi recognized that  "there is not specific and detailed restrictions placed upon Mr. Archambault by his attending physicians," and having never examined Mr. Archambault herself nonetheless concluded that his functional level "would be consistent with the sedentary level as defined by the U.S. Department of Labor Dictionary of Occupational Titles, which is defined as

> exerting up to *ten* pounds of force occasionally and/or a negligible amount of force frequently or constantly to lift, carry, push, pull or otherwise move objects, including the human body.  Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. . . .

Independent Peer Review, page 31 (AR00130, emphasis added).

50.    Dr. Madireddi opined that some of the limitations listed by Mr. Archambault in his

activities questionnaire are inconsistent with objective medical findings, but does not specify

which limitations or how this might be so.  Independent Peer Review, page 32 (AR00131)

51. .    Dr. Madireddi opined that Mr. Archambault would have restrictions for lifting and

carrying a maximum of 20 pounds on an occasional basis and ten pounds on a frequent basis

using his right extremity only.  Pushing and pulling activities with the right upper extremity

should be restricted to 20 pounds on an occasional basis and ten pounds on a frequent basis.

Independent Peer Review, page 28 (AR00127).

52.    Dr. Madireddi has never examined Mr. Archambault, and there is no substantial medical

evidence in the Record from any treating or examining physician to support the opinion that he

can lift or carry 20 lbs. with his right hand.   To the contrary, there is substantial evidence in

the record from treating physicians, including Dr. Liguori and Dr. Kase, that Mr. Archambault

has significant balance and mobility problems which affect his  ability to lift or carry anything

with either his right or left hand.   Liguori Letter, 3/30/05 (AR00204).

53.    Dr. Madireddi opined that sitting activities would not be significantly restricted and

Mr. Archambault could perform  sitting throughout the course of an eight-hour workday, and

standing and walking to a total of four hours out of an eight-hour workday.   Independent Peer

Review, page 29 (AR00128).  There is no substantial medical evidence in the Record from any

treating or examining physician to support the opinion that Mr. Archambault can sit, stand or

walk for such extended periods or with such continuity.

54.    In discussing Dr. Liguori's note of December, 2004, Dr. Madireddi states that "it was

felt that this was full-time sedentary work capacity with no use of the left arm," apparently

imputing this to Dr. Liguori.  Independent Peer Review, page 10 (AR00109).  This is

contradicted  by Dr. Liguori's actual note of 12/4/04 which does not state that Mr. Archambault

has the capacity for full time activity within the significant functional limitations he describes,

but which does state that Mr. Archambault is limited by "fatigue"  Restrictions Form (AR00247),

and by Dr. Liguori's more narrative of March 30, 2005, which affirms that Mr. Archambault

has "difficulties with fatigue and alertness" on an intermittent basis.  Letter, 3/30/05 (AR00204).

55.     In discussing Dr. Liguori's treatment records, Dr. Mardireddi noted that on March 9,

2003, "spasticity management was discussed, as well as fatigue,"  Independent Peer Review,

page 20 (AR00119), but  neglected Dr. Liguori's note of May 9, 2003, which specifically

described the effect of Mr. Archambault's medication on the interaction of spasticity with

weakness and fatigue.  Follow Up Note, 5/9/03, page 2 (AR00298).  This significant issue is

nowhere considered by Dr. Mardireddi in her review of the medical records.  Independent Peer

Review, Summary of Medical Documentation, pages 11- 22 (AR00110-121).

56.     Dr. Madireddi qualified her opinion as to the duration and continuity of Mr. Archamb-

ault's capacity for sedentary work activity by adding:  "At a frequency of *every 60 minutes* he

should be afforded the opportunity *to rest and take a break.*"   Independent Peer Review,

page 29 (AR00128, emphasis added).

57.     Dr. Madireddi submitted an Addendum on June 17, 2005, to the Independent Peer

Review in response to Dr. Kase's report of June 7, 2005. Addendum (AR00060-64).  Despite Dr.

Kase's express invitation for follow up with him as to any questions or clarifications (AR00084),

Dr. Madireddi did not do so.

58.     Dr. Madireddi did take account of Dr. Kase's findings to the extent of  recognizing Mr.

Archambault's documented spasms and weakness of the left upper extremity, and therefore

corrected the initial findings of the Independent Peer Review to state.

> it appears that Mr. Archambault will not be able to lift and carry 10 pounds with his left upper extremity due to his documented "spasms" and identified weakness. . . . Therefore, I would restrict him from lifting and carrying anything at all with his left hand only. . . .

Addendum, page 4 (AR00063).

59. Again, in the Addendum, Dr. Madireddi failed to take account of the fact that Mr. Archambault's documented spasms occur without any necessary connection to his activity level, and therefore must be controlled by his prescribed medication which contributes to his weakness and fatigue, as noted by Dr. Liguori (AR00298).

60. Again, in the Addendum, Dr. Madireddi failed to take account of the fact that Dr. Liguori's restriction for lifting and carrying any amount of weight applies to both upper extremities because the problem is not physiological as to relative arm strength but is neurological as affecting Mr. Archambault's balance (AR00204).

61. In the Addendum, Dr. Madireddi also failed to provide any analysis, with reference to any specific medical evidence of record, to contradict the fact that Mr. Archambault's frequent, documented spasms cause debilitating pain, as stated by Dr. Kase (AR00083), which is another neurological basis for disability.

**F.    Liberty's Vocational Review**

62. On March 29, 2005, a Transferable Skills Analysis was performed by Laura Doherty, MRC, CRC, a Vocational Case Manager employed by Liberty. Ms. Doherty identified transferable skills which could be applied by Mr. Archambault to certain sedentary occupations, based solely on Dr. Cariz' and Dr. Bilazarian's agreement with the restrictions purportedly imposed by Dr. Liguori, which included:

> No standing for long periods of time
> No walking long distances

No lifting or carrying *over 10 lbs.*
Unable to use left hand and arm
No climbing, bending, stooping, kneeling, pushing, pulling.

Transferable Skills Analysis & Labor Market Information (AR00183).

63.     Applying only those specific restrictions, together with Mr Archambault's transferable

skills, Ms. Doherty identified four specific "occupational alternatives" as follows:

Customer Service/Food Sales Rep.
Front Desk Badge Security Clerk
Information Clerk
Night Auditor

Transferable Skills Analysis & Labor Market Information (AR00184).

64..    Ms. Doherty' vocational analysis did not take account of Mr. Archambault's neurological

impairments including frequent spasticity with debilitating pain, as documented by Dr. Kase,

imbalance caused by any lifting or carrying as documented by Dr. Liguori, and frequent

fatigue related to medications used to control spasms as documented by Dr. Liguori.

65.     Ms. Doherty's vocational analysis also failed to take account of Dr. Mardireddi's

restriction that Mr. Archambault would have to stop working every hour during the workday

to take a rest break of unspecified duration.

66.     On 4/4/05, Ms. Doherty referred the claim for a labor market survey on the four

occupations she had identified to Windham Group, but she altered the restriction for lifting

and carrying to only 5 pounds instead of the 10 pound criterion she adopted for identifying

those ocupations.    Referral, 4/4/05 (AR00198).

67.     Again, Ms. Doherty did not refer to Mr. Archambault's neurological impairments,

including frequent spasticity with debilitating pain, imbalance caused by any lifting or carrying,

and frequent fatigue, or Dr. Mardireddi's restriction  that Mr. Archambault would have to stop

working every hour during the workday to take a rest break of unspecified duration.  (Referral,

4/4/05, AR00198).

68.    Susan Delf, M.Ed., C.R.C., of Windham Group prepared an 11 page Labor Market

Survey purporting to locate jobs existing in California, New Jersey, New York, Arizona,

Colorado, Arkansas, Washington,  Illinois, as well as Massachusetts and New England,

within the four occupations identified to her by Ms. Doherty.  Ms. Delf reported that each

of these jobs was consistent with all the restrictions  identified by Ms.Doherty. Labor Market

Survey (AR00186-196).

69.    Ms. Delf's report lists the functional restrictions identified to her by Ms. Doherty as

including only the following:

> the use of one arm only. . . no standing for long periods of time, no walking long
> distances, no lifting or carrying over 5 pounds, no climbing, bending, stooping,
> kneeling, pushing, or pulling.

Labor Market Survey (AR00186).

70..    All the positions as surveyed by Ms. Delf were identified as "full-time,"  and Ms. Delf's

Labor Market Survey did not take account of Dr. Mardireddi's restriction that Mr. Archambault

would have to stop every hour during the workday and take a rest break of unspecified duration.

Labor Market Survey (AR00186).

71.    Ms. Delf's report did not take account of Mr. Archambault's neurological impairments

 including frequent spasticity with debilitating pain, as documented by Dr. Kase, imbalance

caused by any lifting or carrying as documented by Dr. Liguori, and frequent fatigue related to

medications used to control spasms as documented by Dr. Liguori.

**G.    Liberty's Conflict Of Interest Re. Termination of Benefits**

 72.    Liberty is both the insurer responsible for benefits payable under the group LTD policy

(AR00001) and the administrator empowered to make determinations of eligibility for long term

disability benefits under the group LTD policy.  (AR00012 and AR00024).

73.    Liberty began its attempt to ease Mr. Archambault off his LTD benefit by having him meet with its vocational consultant in July 2002, almost two years after onset of his disability, to find some alternate employment he could perform.  The consultant, Kathleen Baris, MA, CAGS, CRC, noted that Mr. Archambault was well-motivated to pursue some kind of alternate employment and had in fact completed training in voice-over announcing, which he began prior to the stroke, and had made several unsuccessful attempts on his own to get employment in that field.  Vocational Assessment Report, 8/10/02 (AR00350).

74.    Mr. Archambault was discouraged by his rejected attempts to catch on as a voice over announcer, but he was open to looking at a variety of options as to some alternate employment.  Vocational Assessment Report, (AR00351-352).  Ms. Baris noted, however, that an impediment to this would be "the claimant's stamina and ability to sustain at least a thirty-hour workweek."  (AR00352).  During this meeting, Ms. Baris noted that Mr. Archambault suffers side effects related to his medication for spasms, primarily with fatigue, which requires that he lie down and rest.   Vocational Assessment Report (AR00349).  She also noted that the fatigue his speech becomes somewhat slurred.  (AR00348).

75..    Ms. Baris met with Mr. Archambault again on October 16, 2002, just one month before the "own occupation" disability standard was to end.  In her report, she notes that Mr. Archambault's "medical status remains unchanged since our last meeting."  Rehabilitation Status Report, 10/21/02 (AR00332).

76.    Ms. Baris reported that, although Mr. Archambault was motivated to seek some alternate employment,

> he is quite concerned about factors such as the impact on his (LTD) benefit, the impact on his Social Security, as well as the impact on the housing situation.  He will be in HUD housing and will not be able to earn greater than a certain amount without putting his placement there in jeopardy.

Rehabilitation Status Report (AR00334).

77.     Ms. Baris again noted that Mr. Archambault was very sincere about trying to do some

meaningful work again, but she also recognized that:

> He is trying to be realistic about his disability in terms of measuring the extent to
> which he would be able to hold a gainful job.  His concerns about the impact on  his
> benefits and various other situations from a financial perspective would be factors
> he would have to consider very seriously.

Rehabilitation Status Report (00334-335).

78.     Then, after recognizing that Mr. Archambault's concerns about his ability to perform

and hold a job were well-founded, as were his concerns about his Social Security disability and

HUD housing eligibility, Ms. Baris recommended that if Mr. Archambault were not to pursue

some alternate employment "there would have to be *some decision made not to continue to*

*provide assistance* from a financial perspective."  Rehabilitation Status Report, 10/12/02

(AR00335, emphasis added).

79.     This is a clear recommendation that benefits be terminated if Mr. Archambault did

not voluntarily obtain some employment, despite his very realistic concern that he would not be

able to sustain any such employment. And that is what Liberty did.

80.     Liberty continued to push Mr. Archambault toward some alternate employment, despite

its recognition that "fatigue (sic) is a *huge* issue for stroke patients."  File Note, 12/06/02

(AR00041, emphasis added). On December 9, 2002, Liberty's analyst Tina Damsell, noted that

"Medical provided supports (Employee's) inability to perform work at a sedentary level for 8
hours per day" and, further, "(Employee) could not meet gainful by working part time."  File

Note, 12/09/02 (AR00041).

81.     Liberty required Mr. Archambault to pursue vocational rehabilitation,  and Mr. Archamb-

ault cooperated fully.  File Notes 1/24/03 and 2/3/03 (AR00040).  He inquired about volunteer-

ing with the Cape Cod Rehabilitation Hospital, but encountered a bureaucritic snag regarding HIPAA, File Note, 6/3/03 (AR00040), and he inquired about volunteering at other hospitals. File Note, 8/14/03 (AR00040).

82.    While Mr. Archambault was making no progress in finding alternate employment. doing only limited volunteer work within his functional capacity, File Note, 1/30/04 (AR00039), Liberty actively began to seek medical  documentation to determine that he could perform some kind  of sedentary work activity. In December 2003, Liberty followed up with Dr. Cariz who reported that Mr. Archambault was having problems with his medication and was complaining of increased spasm and pain in the left arm.  File Note, 12/29/03 (AR00039).

83.    Liberty also followed up with Dr. Liguori, who reported that Mr. Archambault continued with treatment and there were no changes. File Note, 3/8/04 (AR00039),

84.    On September 3, 2004, Liberty conducted an interview with Mr. Archambault who then reported that he had not been doing volunteer work at the hospital anymore.  Mr. Archambault reported then that he is severely impaired because he has no function on his left side, walks with an plastic brace that covers his ankle, can walk or stand for only forty-five minutes and naps for three hours during the day.  Mr. Archambault reported that he spends the first part of the day recovering from the severe cramps that develop during the night and can do only minimal activities of daily living.  File Note, 9/3/04 (AR00038).

85.    Between October 20, 2004, and 3/18/05, Liberty conducted a virtual blitz of calls and correspondence seeking further medical documentation from Mr. Archambault's physicians, File Notes (AR00035-38), and having found a single reference from Dr. Liguori regarding a restriction of lifting or carrying 10 lbs., Restrictions Form, 12/4/04 (AR00247), then sent form letters to Dr. Cariz and Dr. Bilazarian asking whether they agreed with those restrictions.

(AR00213 and AR00211),.  Both Cariz and Bilazarian indicated that they agreed "based on the above information" (AR00213) or "based on the information provided."  (AR00208).

86.     Liberty then conducted a transferable skills analysis in house, which identified four sedentary occupations which Mr. Archambault might perform within the limitations indicated by Dr. Liguori, as rubber-stamped by Drs. Cariz and Bilazarian, significant for restriction of lifting and carrying ten pounds which is the standard for sedentary occupations recognized by the U. S. Department of Labor.  See Dr. Mardireddi, Independent Peer Review (AR00130).

87.     On March 30, 2005, Dr. Liguori submitted his letter correcting his prior Restrictions form to state that:  "*Due to his imbalance* it was recommended that Mr. Archambault not lift or carry objects greater than five pounds."  Letter, 3/30/05 (AR00204).

88.     Dr. Liguori's correction was never provided to either Dr. Bilazarian or Dr. Cariz who both, clearly, based their agreement as to sedentary work capacity on Dr. Liguouri's restrictions, in obvious deference to him, where the only "information provided" to them was Dr.Liguouri's list of restricitions including the 10 pound restriction for lifting and carrying.  Also, the issue of maintaining balance was not submitted to Dr. Bilazarian and Dr. Cariz.


Dated:  August 18, 2006                    For the Plaintiff,

                                           /s/   Richard K. Latimer

                                           Richard K. Latimer, BBO #287840
                                           222 Main Street, Box 710
                                           Falmouth, MA  02541
                                           (508) 548-7006
                                           rklaw@cape.com