UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

JOSEPH ARCHAMBAULT,  )
      Plaintiff )
         )
VS.        )   CIVIL ACTION
         )   NO. 05-11762-NG
LIBERTY LIFE ASSURANCE )
COMPANY OF BOSTON,  )
      Defendant )

## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

   The Plaintiff submits the Memorandum of Law in support of his Motion for Summary Judgment filed herewith, stating the reasons why, with reference to the Administrative Record and supporting authorities, he is entitled to summary judgment reversing the Defendant's termination of his long term disability benefits under his employer's ERISA. plan.   References to the Administrative Record (AR00001 et seq.) are indicated in parentheses.

## SUMMARY OF ARGUMENT

A.  Summary  judgment procedure is the appropriate mechanism for deciding ERISA long term disability (LTD) cases where factual issues are determined on the existing administrative record and not by bench or jury trial.

B.  The appropriate standard of review in this case is the "arbitrary and capricious" standard where the LTD plan provides that Defendant has discretionary authority to construe the plan and review the evidence.

(1)  Under the arbitrary and capricious standard, the court must review the defendant's decision to determine whether it is reasonable as supported by the substantial evidence found in the record as a whole.

(2)     When the defendant serves as both the underwriter and administrator of an ERISA LTD plan, the court must determine whether it acted under a conflict of interest in determining whether to accord deference to the administrator's denial of benefits and to determine whether the decision under review was reasonable.

(a)     An improper motive to terminate Mr. Archambault's LTD claim regardless of the severity of his impairments is apparent on the facts of record.

(b)     Liberty's improper motive in denying the LTD claim warrants a less deferential review by the Court and is a relevant factor for determining that the denial of benefits was unreasonable

C.     Defendant's termination of Plaintiff's LTD benefits was unreasonable and was not supported by substantial record evidence no matter what standard of review obtains.

(1)     The court's review is limited to the grounds stated by the Defendant for termination of the LTD claim, as supported or unsupported by the substantial record evidence and the terms of the LTD policy.

(2)     the LTD policy as underwritten and administered by Defendant contains a material term for determining disability, "reasonable continuity," which is not defined in the policy and is therefore subject to construction according to commonsense canons of contract interpretation.

(3)     The substantial record evidence does not support defendant's findings as stated on the termination letter and denial of appeal that Plaintiff has the capacity to perform alternate work with reasonable continuity based on his medically determined restrictions and limitations.

(a)     Mr. Archambault's continued disability from performing any work with reasonable continuity due his neurological impairments, causing spasticity, pain and fatigue, is fully supported by the substantial evidence of record.

(b)    The "evidence" on which Defendant relied for terminating the LTD claim is not substantial evidence as required under the arbitrary and capricious standard of review to reasonably support termination of the LTD Claim.

( i )    The medical "evidence" on which defendant relied does not meet the test of reasonable-ness under the substantial evidence standard because it fails to support a finding that Plaintiff can sustain any work activity with reasonable continuity.

( ii )    The vocational "evidence" on which Defendant relied does not meet the test of reason-ableness under the substantial evidence standard because it is based on non-probative medical evidence and because it fails to support a finding that Plaintiff can sustain any work activity with reasonable continuity within his functional restrictions as determined either by Plaintiff's treating physicians or Defendant's own medical consultant

( iii )    Defendant's termination of Plaintiff's LTD claim was unreasonable because it arbitrarily failed to consider the substantial evidentiary weight of Plaintiff's SSDI award as relevant to his continued disability under the ERISA plan.

D.    Plaintiff is entitled to summary judgment on the substantial evidence of record, to be reinstated for disability benefits under the Sodexho-Marriott LTD Plan with full payment of all past due benefits.

## ARGUMENT

**A.    Summary Judgment Procedure Is The Appropriate Mechanism For Deciding ERISA Long Term Disability Cases Where Factual Issues Are Determined On The Existing Administrative Record And Not By Bench Or Jury Trial.**

Plaintiff's Motion for Summary Judgment, following F. R. Civ. P., Rule 56, procedure, is submitted pursuant to the Court's Order of June 26, 2006, for the filing of dispositive motions by August 15, 2006.   The action is an appeal for judicial review of the Defendant's termination

of Plaintiff's long term disability (LTD) benefit under his employer's ERISA plan, brought

pursuant to 29 U.S.C. Sect. 1132(a).

An action based on denial or termination of LTD benefits, review of factual issues is

limited to the administrative record that was before the plan administrator, where summary

judgment procedure is an appropriate means for adjudication by the District Court.  ***Orndorf  v.***

***Paul Revere Life Insurance Company***, **404 F.3d 510, 517 (1st Cir., 2005).**  In this context,

however, summary judgment is "simply a vehicle for deciding the issue," where the non-moving

party is not entitled to the usual inferences in its favor under Rule 56.  *Id.,* citing  ***Liston v.***

***Unum Corp. Severance Plan***, **330 F.3d 19, 24 (1st Cir., 2003).**

**B.**    **The Appropriate Standard Of Review In This Case Is The "Arbitrary**
**And Capricious Standard" Where The LTD Plan Provides That Defendant Has**
**Discretionary Authority To Construe The Plan And Review The Evidence.**

In ***Firestone Tire & Rubber Co.  v. Bruch***, **498 U.S. 101, 115, 109 S.Ct. 948, 103**

**L.Ed.2d 80 (1989**), the standard of review to be applied by the District Court considering  a

claim denial under an ERISA plan was held to be *de novo,* unless the plan gives the administrator

discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

There is no question that the Defendant Liberty reserved such authority to itself in the policy it

wrote for Plaintiff Joseph Archambault's employer.  See Group Disability Income Policy,

"Interpretation of the Policy" (AR00024).

**(1)**    **Under The Arbitrary And Capricious Standard, The Court Must Review**
**The Defendant's Decision To Determine Whether It Is Reasonable As**
**Supported By the Substantial Evidence Found In The Record As A Whole.**

When an LTD  plan administrator reserves to itself such discretionary authority, the

standard for judicial review is whether the denial or termination of benefits was "arbitrary and

capricious," whether the administrator's decision is "reasonable," based on the substantial

evidence of record.  **_Cook v. Liberty Life Assurance Co. of Boston_**, **320 F.3d 11, 10 (1st Cir., 2003); _Pari-Fasano v. ITT Hartford Life & Accident Ins. Co._, 230 F.3d 415, 419 (1st Cir., 2000).**  This requires consideration of the substantial evidence found in the record as a whole, which means "*all* the evidence" which the administrator had available when it made the decision under review.  **_Cook, supra,_ 320 F.3d at 8**; citing **_Mitchell v. Eastman Kodak Co._, 113 F.3d 433, 440 (3d Cir., 1977)**, emphasis added.

> (**2**)  **When The Defendant Serves As Both The Underwriter And Administrator Of An ERISA LTD Plan, The Court Must Determine Whether It Acted Under A Conflict Of Interest In Determining Whether To Accord Full Deference To A Denial Of Benefits And To Determine Whether The Decision Under Review Was Reasonable.**

In the present case, Liberty serves as both the insurer responsible for payment of LTD benefits under the policy and as the administrator empowered to make  determinations of eligibility for such benefits.   Group Disability Income Policy (AR00001, AR00012 and AR00024).   This is a fact appearing in the administrative record on review, and where the defendant insurer responsible for payment of benefits under an ERISA plan thus serves also as the administrator exercising discretionary authority to determine eligibility for benefits, there is a question whether the administrator's decision is tainted by conflict of interest and the Court must therefore determine whether that is so and whether the administrator's actions may therefore be entitled to a less deferential review by the District Court, **_Doyle v. Paul Revere Life Insurance Company of Boston,_ 144 F.2d 181, 184 (1998)**, or no deference at all.  **_Wright v. R.R. Donnelly & Sons Co. Group Benefits_, 402 F.3d 67, 74 (1st Cir., 2005)**, citing **_Leahy v. Raytheon_, 315 F.3d 11, 16 (1st Cir., 2005)**.

The test is met when the record evidence indicates that the defendant administrator did in fact act upon such conflicting interests when the claim was denied or terminated, "with the

burden on the claimant to show that the decision was improperly motivated." **_Doyle, supra,_ 144 F.2d at 184.** That burden is met in the present case.

> (a)    **An Improper Motive To Terminate Mr. Archambault's LTD Claim Regardless Of The Severit Of His Impairments Is Apparent On The Facts Of Record.**

As outlined in the Statement of Record Facts filed herewith (Section D), Liberty began an attempt to ease Mr. Archambault off his LTD benefit after he met with its vocational consultant in October 2002, almost two years after onset of his disability, to find some alternate employment he could perform. The consultant, Kathleen Baris, noted that Mr. Archambault was well-motivated to pursue some kind of alternate employment but was discouraged by his rejected attempts to catch on as a voice over announcer, but he was open to looking at a variety of options as to some alternate employment. Vocational Assessment Report, (AR00351-352).

Ms. Baris noted, however, that an impediment to employment would be "the claimant's stamina and ability to sustain at least a thirty-hour workweek." (AR00352). Ms. Baris noted that Mr. Archambault suffers side effects related to his medication for spasms, primarily with fatigue, which requires that he lie down and rest. Vocational Assessment Report (AR00349).

After recognizing that Mr. Archambault's concerns about his ability to perform and hold a job were well-founded, as were his concerns about his Social Security disability and HUD housing eligibility, Ms. Baris recommended that if Mr. Archambault were not to pursue some alternate employment "there would have to be *some decision made not to continue to provide assistance. . . .* " Rehabilitation Status Report, 10/12/02 (AR00335, emphasis added). This was a clear recommendation that benefits be terminated if Mr. Archambault did not voluntarily obtain some employment, despite his very realistic concern that he would not be able to sustain any such employment. And that is just what Liberty did.

Liberty continued to push Mr. Archambault toward some alternate employment, despite its recognition that "fatigue (sic) is a *huge* issue for stroke patients." File Note, 12/06/02 (AR00041, emphasis added). On December 9, 2002, Liberty's analyst Tina Damsell, noted that "Medical provided supports (Employee's) inability to perform work at a sedentary level for 8 hours per day" and, further, "(Employee) could not meet gainful by working part time." File Note, 12/09/02 (AR00041).

Liberty required Mr. Archambault to pursue vocational rehabilitation, and Mr. Archambault cooperated fully. File Notes 1/24/03 and 2/3/03 (AR00040). While Mr. Archambault was making no progress in finding alternate employment, doing only limited volunteer work within his functional restrictions, File Note, 1/30/04 (AR00039), Liberty continued to seek medical documentation to determine that he could perform some kind of sedentary work activity.

On September 3, 2004, Liberty conducted an interview with Mr. Archambault who then reported that he had not been doing volunteer work at the hospital anymore. Mr. Archambault reported that he is severely impaired because he has no function on his left side, walks with an plastic brace that covers his ankle, can walk or stand for only forty-five minutes and naps for three hours during the day. Mr. Archambault reported that he spends the first part of the day recovering from the severe cramps that develop during the night and can do only minimal activities of daily living. File Note, 9/3/04 (AR00038).

Between October 20, 2004, and 3/18/05, Liberty waged an intense campaign of calls and correspondence seeking further medical documentation from Mr. Archambault's physicians to warrant a finding of work capacity, File Notes (AR00035-38), and then, having found a single reference from Dr. Liguori regarding a restriction of lifting or carrying 10 lbs., Restrictions Form, 12/4/04 (AR00247), Liberty pounced., sending form letters to Dr. Cariz and Dr. Bilazarian

asking whether they would agree with those restrictions.  (AR00213 and AR00211).  Both Cariz

and Bilazarian indicated that they agreed "based on the above information" (AR00213) or "based

on the information provided" (AR00208).  Liberty then conducted a transferable skills analysis

in house, which purported to identify four sedentary occupations which Mr. Archambault might

perform within the limitatations indicated by Dr. Liguori, and accepted by Drs. Cariz and Bilaz-

arian.

 This analysis assumed that Mr. Archambault could sustain work activity within the funct-

ional limits described by Dr. Liguori on a full-time basis, where this was never indicated by

Liguori, Cariz or Bilazarian.  On March 30, 2005, Dr. Liguori submitted a letter correcting his

prior Restrictions form to state that:  **"***Due to his imbalance*** it was recommended that Mr.

Archambault not lift or carry objects greater than *five* pounds."  Letter, 3/30/05 (AR00204),

emphases added.  This correction was never provided to either Dr. Bilazarian or Dr. Cariz who

both, clearly, based their agreement as to sedentary work capacity on Dr. Liguori's restrictions,

in obvious deference to him, where the only "information provided" to them was Dr.Liguori's

list of restricitions including the 10 pound restriction for lifting and carrying.  Also, the issue of

maintaining balance was not submitted to Dr. Bilazarian and Dr. Cariz, or to the vocational

analyst.

 Liberty's medical consultant, Dr. Madireddi, provided a lengthy report which, while

concluding that Mr. Archambault could perform sedentary work activity with lifting up to ten

pounds for a full workday, imposed a significant restriction that he would have to stop and take

a rest break, of unspecified duration, "every 60 minutes" throughout the day.  Independent

Peer Review (AR00128).  This significant limitation was not considered by the vocational

analyst who purported to find occupations which Mr. Archambault could perform within his

restrictions and limitations.  See Transferable Skills Analysis & Labor Market Information (AR00183).

There are other material gaps and *non sequiturs* in the substantial record evidence on which Liberty relied, as discussed below as to the unreasonableness of Liberty's decision to terminate Mr. Archambault's LTD benefits, while the above outline serves to illustrate that Liberty's decision was driven by an improper motive.

**(b)**    **Liberty's Improper Motive For Denying The lTD Claim Warrants A Less Deferential Review By The Court And Is A Relevant Factor For Determining That Its Termination Of Benefits Was Unreasonable.**

The manner in which this claim was handled after Liberty's consultant recommended that a decision be made to terminate benefits if Mr. Archambault failed to obtain alternate employment is evidence that Liberty was acting on that recommendation, and that is evidence of an improper motive for terminating the claim.

Although it is not enough merely to show that Liberty was responsible for paying claims while making the decisions which claims to pay, ***Doyle****, supra,* **144 F.3d at 184**, the consultant's recommendation in October, 2002, that the claim be terminated if Mr. Archambault did not obtain employment, irrespective of the medical  evidence as it existed then, and Liberty's subsequent efforts, first to push Mr. Archambault into alternate employment despite his reasonable apprehensions, and then to manipulate the medical and vocational evidence toward a foregone finding of non-disability, clearly betray an improper motive to act in Liberty's own interest as opposed to acting as an impartial arbiter as required by ERISA.

When dealing with a sophisticated business entity such as Liberty, it is rarely if ever that an aggrieved claimant like Mr. Archambault will find the "smoking gun" to establish an improper motive, but that does appear on the facts of this case.  Here, taking into account the

potential for conflict, combined with Ms. Baris's recommendation to terminate benefits despite Mr. Archambault's severe impairments and the several material gaps and *non sequiturs* in the medical and vocational evidence on which Liberty relied, the  decision to terminate Mr. Archambault's LTD benefits sufficiently "strayed outside the bounds of reasonableness to become an abuse of discretion."  See ***Pari-Fasano***, *supra,* **230 F.3d at 419.**

     Despite the possibility that Liberty, as a general proposition, might somehow be motivated by competitive market forces to make appropriate disability determinations, see ***Doyle****, supra,* **144   F.3d at 184**, the specific facts of the present case indicate that Liberty in fact acted with an improper motive.  In this circumstance, irrespective of the applicable standard of review, such apparent conflict is at minimum a factor that must be weighed in determining whether Liberty abused its discretion in terminating Mr. Archambault's LTD benfits.  ***Calvert  v. Firstar Finance, Inc.,*** **409 F.3d  286, 292 (6th Cir., 2005)**, citing ***Firestone****, supra.* **489 U.S. at 115 (1989)**; ***Cozzie v. Metropolitan Life Ins. Co.,*** **140 F.3d 1104 (7th Cir., 1998)**; ***Epright v. Environmental Resources Mgmt. Inc. Health & Welfare Plan,*** **81 F.3d 335 (3rd. Cir., 1996)**.

**C.**    **Defendant's Termination Of Benefits Was Unreasonable And Unsupported By Substantial Record Evidence No Matter What Standard Of Review Obtains**

     As argued above, Liberty's decision to terminate Mr. Archambault's LTD benefit is not entitled to deference on judicial review, despite language in the policy granting discretionary authority to Liberty, because that decision was tainted by a conflict of interest.

     Apart from any such conflict of interest, however, Liberty's decision was unreasonable, arbitrary and capricious *per se* because it was not based on any substantial medical and vocational evidence that Mr. Archambault is capable of performing any gainful work activity with "reasonable continuity" within the Sodexho Marriott LTD plan's definition of total

disability, and it fails to take due account of the substantial record evidence that Mr. Archambault cannot perform any work activity with reasonable continuity.

Under the "arbitrary and capricious" standard of review, which Liberty contends is applicable to the present case, the question is "whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." **_Leahy, supra,_ 315 F.3d. at18.** The basic question is whether the administrator's denial of benefit was "reasonable." See **_Liston, supra,_ 330 F.3d at 24** In the present case, Liberty's termination of Mr. Archambault's LTD benefits was not reasonable because several material gaps and *non sequiturs* in the medical-vocational evidence on which Liberty relied clearly supports a rational determination that Liberty acted arbitrarily in terminating the claim.

1.    **The Court's Review Is Limited To The Grounds Stated By The Defendant For Termination Of The LTD Claim As Supported Or Unsupported By The Substantial Record Evidence And The Terms Of The LTD Policy.**

The Court's review in this matter is limited to the "administrative record," i.e. Liberty's claim file and plan documents, and Liberty is limited to the grounds for denial which it articulated to Mr. Archambault. **_Orndorff, supra,_ 404 F.3d at 515**, citing **_Glista v. Unum Life Ins._ _Co.,_ 378 F.3d 113, 128-129 (1st Cir., 2004)**. Those grounds were stated on Liberty's termination letter of April 25, 2005 (AR00075-00077), and the subseqeuent letter of June 22,2005, finally denying Mr. Archambault's administrative appeal. (AR00065-67).

The termination letter of April 25, 2005, referred only to certain medical documentation from Mr. Archambault's physicians, as follows:

> On December 13, 2004 we received information from Dr. Ligouri which included a completed restrictions form. Dr. Ligouri indicated you had been placed on the following restrictions:

> -unable to stand for long periods of time
> -unable to walk long distances
> -unable to lift/carry over 10 pounds
> -unable to use left h and/arm
> -unable to climb, bend, stoop, kneel, push or pull

(AR00075).  Liberty stated that an additional request was sent to Dr. Liguori to confirm Mr.

Archambault's current restrictions and that "we sent your restrictions" to Dr. Cariz and Dr.

Bilazarian to confirm Dr. Liguori's findings.  (AR00076).   Liberty then stated:

> We received confirmation from Dr. Bilazarian on February 25, 2005 that all restrictions
> that had been placed on you were appropriate.  In addition we received confirmation from
> Dr. Bilazarian that you are able to perform sedentary function without use of your left
> arm.
>
> On March 30, 2005 we received an updated note from Dr. Liguori indicating that your
> lifting restriction had been updated.  It was now noted that you could not lift or carry any
> more than 5 pounds.  Dr. Liguori indicated that you did not have any cognitive or
> memory restrictions other than fatigue and alertness which is intermittent.

(AR00076).    That is the full extent of the medical reasons which Liberty provided for its term-

ination of Mr. Archambault's LTD benefit.

The termination letter also purported to find that Mr. Archambault's restrictions per-

mitted  him to work in alternate occupations, based on the transferability of the skills he poss-

essed in his usual occupation, as follows:

> -customer service / food sales rep
> -front desk badge security clerk
> -information clerk
> -night auditor.

(AR00076).  Liberty added that Mr. Archambault could perform with "reasonable continuity"

the material and substantial duties of those occupations based on his capacity and skill level.

*Id.*  No other factual grounds for terminating the LTD claim were stated.

Mr. Archambault filed an appeal from the termination of his LTD benefits, through

prior counsel, which referred to the fact that Liberty had chosen to rely heavily on a cardiolog-

ist's note (Dr. Bilazarian) when dealing with a neurological condition as a basis for termination, that the termination resulted from a mistaken reading of the limits placed upon Mr. Archambault, and that Mr. Archambault's disability was approved by the "federal government," an oblique reference to the successful SSDI claim. Letter, May 2, 2005 (AR00174-75).   The neurologist, Dr. Kase, submitted a narrative report to Liberty, Letter, June 7, 2005 (AR00083-84).  Prior counsel had denied Liberty's request for additional time to review the appeal, referring to the fact that the treating neurologist had agreed to provide additional documentation and again criticizing Liberty's reliance on the cardiologist's response to determine a disability claim based on neurological impairments and not on cardiological issues.  Letter, May 12, 2005 (AR00168).

Liberty's final denial of the administrative appeal, Letter June 22, 2005 (AR00065-67), referred to additional medical information which included only  the narrative report submitted by Dr. Kase.  Letter, June 7, 2005 (AR00083), and Dr. Mardireddi's Addendum to the Peer Review and critique of Dr. Kase's report.  See Addendum, (AR00063-64).  That final denial did not refer to any other medical evidence or any additional vocational evidence.

The final denial made only a passing reference to Mr. Archambault's successful Social Security claim, noting dismissively that it was not "contingent on decisions made by the Social Security Administration," with no explanation why on the facts of the case or under the terms of the policy, the two claims should be treated differently.  (AR00067).  The termination letter of April 25, 2005, made no mention at all of Mr. Archambault's SSDI award.

The Court's review, therefore, must be confined to the reasonableness of Liberty's decision to terminate LTD benfits based on the specific grounds stated in the termination letter of April 25, 2005, and the final denial letter of June 22, 2005, to determine whether those

specific grounds are supported by the substantial evidence of record and are reasonable in light of the definition of disability stated in the Sodexho Marriott LTD plan. See ***Orndorff, supra, 404 F.3d 515***. Plaintiff submits that those grounds for termination are not supported by the substantial evidence of record as clearly appears from a review of the subject LTD policy and the record facts. It is appropriate here to review first the relevant policy terms and then review the record evidence. See ***Doyle*, *supra*, 144 F.3d at 184**.

> **2.      The LTD Policy As Underwritten And Administered By Defendant Contains A Material Term For Determining Disability, "Reasonable Continuity," Which Is Not Defined In The Policy And Is Therefore Subject To ConstructionAccording To Commonsense Canons Of Contract Interpretation.**

The Sodexho-Marriott LTD plan, as underwritten and administered by Liberty, contains the following provision which is material to the issues on this complaint for judicial review: "Disability" under the group LTD policy for employees such as Mr. Archambault who have completed the 24-month "own occupation" term of disability, means the inability "to perform, *with reasonable continuity*, all of the material and substantial duties of (the claimant's ) own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity." (AR00006, emphasis added).

The term "reasonable continuity" is not defined anywhere in the group LTD policy. (AR00001 through 00032). Where such an important term is not defined in an ERISA plan, the reviewing court must apply "common-sense canons of contract interpretation" to accord the language its plain, ordinary and natural meaning, ***Filiatrault v. Comverse Technology, Inc*., 275 F.3d 131  (1ˢᵗ Cir., 2001)**; Only if the term is ambiguous, may the Court refer to external evidence, if any, as to the contracting parties' intent. ***Hughes v. Boston Mutual Life Insurance Company*, 26 F.3d 264, 268 (1ˢᵗ Cir., 1994)**.

It is unnecessary to refer to external evidence of intent in the present case for the Court to determine the meaning of "reasonable continuity."  The term "continuity" is easily defined by reference to its "plain, ordinary and natural meaning."  As commonly understood, the term "continuity" refers to an uninterrupted flow or course of action.[1]

The contract term refers to "reasonable" continuity. but the term "reasonable" has no non-circular, objective definition.  Dictionary references are riddled with tautological definitions, e.g. "using or showing reason," see *Webster's New World Dictionary,* or "endowed with reason," see *OED.*  But there is still no reason for the Court to seek extrinsic evidence as to the parties' intent in order to give meaning to the term "*reasonable* continuity," because reasonableness is the touchstone to which the Court must refer in determining whether or not a disability determination is arbitrary and capricious, i.e. whether it is supported by the substantial evidence of record.  See **_Cook_**_, supra,_ **320 F.3d at 19.**

Like the dictionary definition, it would be tautological for the Court to accept a solipsistic definition from Liberty as to what it means by the term "reasonable" as used in the contract, when deciding whether Liberty's conduct, as controlled by that term, was reasonable based on the substantial record evidence as a whole.   If nothing else, the case law pertaining to "arbitrary

---

[1] This definition is supported by reference to the **_Oxford English Dictionary_**_,_ which defines "continuity" as follows:

> 2(a). Of immaterial things, *actions*, processes, etc.:  The state or quality of being *uninterrupted* in sequence or succession, or in essence or idea, connectedness, coherence, *unbrokenness.*

**_Oxford English Dictionary_**_,_ 3rd Edition, (Oxford University Press, 2004), emphases added.   It is also supported by reference to **_Webster's New World Dictionary of the American Language_**_,_ which defines the term as follows:

> 1.     The state or quality of being continuous; connectedness; coherence.
> 2.     *A continuous flow*, series or succession; *unbroken*, coherent whole
> 3.     *continuous duration.*

**_Webster's New World Dictionary of the American Language_**_,_ 2nd College Edition, David B. Guralnik, Ed. (Simon & Schuster, New York: 1982), emphases added.

and capricious" review reserves findings of reasonableness to the Court as the standard by which a plan administrator's decision is judged on judicial review. See ***Liston. supra,*** **330 F.3d at 24.** If a plan administrator were permitted to define what is "reasonable" in context of its findings, without reference to any specific plan language pertinent to the question, that would amount to the Court's "rubber stamping" the administrator's decision in every case, which would be no review at all.   See ***Donato v. Metropolitan Life Ins. Co.,*** **19F.3d 375, 380 (1ˢᵗ Cir., 1994);** ***Jones v. Metropolitan Life Ins. Co.,*** **385 F.3d 654, 661 (6ᵗʰ Cir., 2004**).

In the absence of specific language in the policy defining what "*reasonable* continuity" means with respect to performing work activity, reference again must be made to what that term is commonly understood to mean.  In the real workaday world for most Americans the work day is eight hours long interrupted by a single, ten-minute "coffee break" in the morning, a lunch break which may be as little as a half-hour, and another ten-minute coffee break in the afternoon.   Federal law does not require an employer to provide either coffee breaks or a lunch break, and in Massachusetts, under Mass. General Laws, c.149, Sect. 100, the only requirement is for a 30-minute lunch break while no coffee breaks are required.

Although not legally required, many employers do, either through enlightened self-interest or under union agreement, provide for a brief morning break, a lunch break and a brief afternoon break.  In the ERISA context, it has been recognized that:

> In order to perform a job satisfactorily, to carry out its duties, a worker must
> be able to perform the tasks it requires from the beginning to the end of the work
> day.  Otherwise, he cannot perform its tasks or carry out its duties.  This is another
> way of saying that the duty of a job is to perform its tasks as many times, and as long
> throughout the work day as the job requires.

***Tippitt v. Reliance Standard Life Ins. Co.,*** **_____  F.3d _____       (11ᵗʰ Cir., 2006),**  Docket No. 05-14005, Memorandum of Opinion, marked "publish," at page 18.  That, subject only to

customary breaks, is the commonly understood meaning of "reasonable continuity" in the workplace, and this is true irrespective of whether the employee's work day may be full time or only part time.[2]  When he is on the job, for however many hours his shift may be, the worker must be able to perform all required tasks as many times and as long as the job requires, and not as determined by his limitations.  If an administrator would find there are specific jobs suitable for a claimant, which permit greater tolerance for employee down-time, that must be based on substantial evidence in the record that is case-specific for such jobs.  See ***Evans v. Unumprovident Corp.***, **434 F.3d 866, 879-880 (6th Cir., 2006).**

**3.    The Substantial Record Evidence Does Not Support Defendant's Findings As Stated On The Termination Letter And Denial Of Appeal That Plaintiff Has The Capacity To Perform Alternate Work With Reasonable Continuity Based On His Medically Determined Restrictions And Limitations.**

Liberty's termination of Mr. Archambault's LTD benefit is not supported by the substantial record evidence, both medical and vocational, and it is contrary to the substantial medical evidence of record which indicates that he is totally disabled from performing any work activity with reasonable continuity.

**(a)    Mr. Archambault's Continued Disability From Performing Any Work With Reasonable Continuity, Due To His Severe Neurological Impairments, Causing Spasticity, Pain And Fatigue, Is Fully Supported By The Substantial Evidence Of Record.**

It is the Claimant's burden to establish by substantial record evidence that he is and remains totally disabled under the subject ERISA plan, ***Boardman v. The Prudential Life Insurance Company of America***, **337 F.3d 9, 16 (1st Cir., 2003)**, and Mr. Archambault has met

---

[2] ***Tippitt*** involved a substantive issue different from those in the present case, concerning an interaction between definitions of partial disability and total disability, based on a "non-equivalence" provision of the subject ERISA plan that does not obtain here.  What is common to both ***Tippitt*** and the present case is the Court's interpretation of ERISA plan terminology regarding employment conditions according to the commonly understood meaning of such terminology.

that burden on the present claim, where an ERISA LTD claimant cannot be required to demonstrate that he is utterly helpless in order to receive benefits, only that he is unable to engage in a remunerative occupation. ***Helms v. Monsanto Company, Inc.,*** **728  F.2d 1416, 1420 (11th Cir., 1984).**

In the present case Mr. Archambault claims disability based on the neurological sequelae of a stroke which has left him severely impaired, with total loss of function in his left arm and hand and significant loss of function in his left leg.  Carlos Kase, M.D., Letter, June 7, 2005 (AR00083).  In addition to these severe neurological motor deficits,  paralysis  Mr. Archambault is affected by frequent "spasms" which are very painful and are attributed to the spasticity of his left limbs as sequelae of the stroke.  *Id.*   Despite treatment with various medications, Mr. Archambault has had only partial relief of his symptoms.  And based on both the motor deficits and the spasms, Dr. Kase has determined that Mr. Archambault is unable to perform, with reasonable continuity, the substantial duties of any occupation or, in other words, "he is completely and permanently disabled for any occupation" by reason of the neurological sequelae of his stroke.  *Id.*

This report from Mr. Archambault's treating neurologist, who has managed "the various complications" resulting from his stroke since November 2000, is substantial evidence by itself that, because of both neurological motor deficits and pain, Mr. Archambault is totally disabled for any occupation.   The test for substantial evidence is whether it is sufficient for a reasonable mind is whether it is "reasonably sufficient to support a conclusion." ***Vlass v. Raytheon Employees Disability Trust,*** **244 F.3d 27, 30 (1st Cir., 2001).**  This is the same test that applies in reviewing Social Security disability determinations, where

> Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

***Currier v. Secretary of H.E.W.*, 612 F.2d 594, 597 (1st Cir., 1980)**; citing ***Richardson v.***
***Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).**

Dr. Kase's report is sufficient, standing alone, to meet Mr. Archambault's burden to
make a *prima facie* case of disability under the substantial evidence standard.  Although pain is
a subjective factor, often not susceptible to objective proof, cf. ***Boardman, supra,* 337  F.3d at
16**, pain may nonetheless be the basis for a finding of total disability from any occupation under
an ERISA plan. ***Buffonge v.The Prudential Insurance Company of America,* 426 F.3d 20, 26
(1st Cir., 2005).**   In the present case, where Mr. Archambault's pain is medically attributed to his
frequent muscle spasms, that is objective evidence of intense pain caused by the involuntary
contracture of the affected muscles, ***Rivera-Torres v. Secretary of HEW*, 837 F.2d 4,6 (1st Cir.,
1988); *Jones v. Secretary of HEW*, 945 F.2d 1365, 1369-70 (6th Cir., 1991); *Mullen v. Bowen,*
800 F.2d 535, 547-548 (6th Cir., 1986)**, as anyone who has ever experienced a leg "cramp" will
readily understand.

Although Dr. Kase's report, standing alone, would be sufficient to establish Mr. Arch-
ambault's total disability under the substantial evidence standard, i.e. it is adequate by itself to
support the conclusion that Mr. Archambault is totally disabled from performing any work
activity with reasonable continuity, as expressly stated therein, contrast ***Doyle, supra,* 144 F.2d
at186,** that report does not stand alone but is fully supported by a wealth of other substantial
evidence in the record that was available to Liberty when it terminated the LTD claim, including
Dr. Liguori's Note of June 27, 2002, which stated:

> The patient has ongoing left-sided *weakness and spasticity* effecting mobility, the ability
> to perform self care and ADL and vocation. *His left upper extremity is nonfunctional.*
> His *condition is considered permanent* with the likelihood of improvement very poor.

He requires splinting in the left-lower extremity, occasional splinting in support in the upper extremity for pain and comfort management along with attempts to perform functional abilities.  Mr. Archambault is unable to stand or ambulate for long periods of time.  He is unable to effectively carry or lift objects.  The patient is unable to use his left arm for handling and grasping objects nor (sic) at any functional level.

Mr. Archambault has reached a medi(c)al end-point with the likelihood of further neurological and/or functional recovery being extremely poor.

Note, June 27, 2005 (AR00383), emphases added.

The medical record is replete with references to Mr.Archambault's continuing severe, debilitating neurological impairments, including painful spasms, significant motor deficits and chronic fatigue.

On September 10, 2003, Mr. Archambault was suffering level 4 pain related to muscle spasms, which were positively identified on physical examination.  He was given a prescription for pain medication.  (AR00268-69).

On May 9, 2003, Dr. Liguori noted that Mr. Archambault remained with limitations for standing balance and endurance.  Fatigue was an issue.  Spasticity in the left arm and leg were an issue.  Mr. Archambault had been falling down, usually related to fatigue and/or slippery or uneven surfaces.  (AR00257).  Dr. Liguori noted that Mr. Archambault has to manage his medication carefully because too little will cause increased spasticity while too much will contribute to his weakness and fatigue.  Zanaflax was eliminated in the afternoon because of fatigue, but Mr. Archambault still had difficulty with fatigue, attention and concentrarion.

On March 30, 2005, Dr. Liguori submitted a letter to Liberty correcting his prior Restrictions form to state that:  "*Due to his imbalance* it was recommended that Mr. Archambault not lift or carry objects greater than *five* pounds."  Letter, 3/30/05 (AR00204), emphasis added.  When last seen in September 2004, Mr. Archambault had been having

difficulty with "increased falls and a decreased left sided awareness."  Based on examination,

Mr. Archambault continued to demonstrate significant left sided weakness and subsequent

functional deficits, including inability to stand or walk for prolonged periods and difficulty

with bending, stooping, kneeling and other basic work related functions.  Dr. Liguori found

no cognitive or memory restrictions other than Mr. Archambault's chronic "difficulties with

fatigue and alertness which are intermittent"  (AR00204), i.e. episodic and not completely

controlled. Cf. ***Buffonge , supra,,* 426 F.3d at 24.**

Dr. Liguori's findings of March 30, 2005, did not suggest any significant improvement

from those of June 7, 2002, when he reported that Mr. Archambault has ongoing left-sided

weakness and spasticity which affects mobility and the ability to perform self care and activities

of daily living, that Mr. Archambault requires increased time for performing normal activites of

daily living, and that he cannot stand or walk for prolonged periods and is unable to effectively

lift or carry objects, all of which were considered permanent with the likelihood of improvement

being very poor.  Letter, 6/7/02 (AR00383).

The vocational evidence of record also shows that Liberty was aware of Mr. Arch-

ambault's severe restriction due to pain and fatigue, and the fact that they prevented him from

engaging in any substantial work activity.  The vocational consultant retained to review the file

in August, 2002, Kathleen Baris, noted that that an impediment to employment would be "the

claimant's stamina and ability to sustain at least a  thirty-hour workweek."  Vocational

Assessment Report (AR00352).   Ms. Baris noted that Mr. Archambault has to take rest after

only an hour and a half of physical activity such as housekeeping, and he suffers side effects

related to his medication for spasms, primarily with fatigue, which requires that he lie down

and rest.  Vocational Assessment Report (AR00349).

Ms. Baris later noted that Mr. Archambault's concerns about his ability to perform and hold a job were well-founded, Rehabilitation Status Report, 10/12/02 (AR00335), which included "fatigue as well as the variability of his symptoms from day to day." Ms. Baris again characterized Mr. Archambault's concerns about his ability to perform in a work environment, from her perspective as a vocational consultant, as being "realistic about his disability in terms of measuring the extent to which he would be able to hold a gainful job in light of his intermittent pain and chronic fatigue. *Id.* (AR00034).

Mr. Archambault's problem with fatigue was also acknowledged by Liberty's claims personnel who recognized that "fatique (sic) is a *huge* issue for stroke patients." File Note, 12/06/02 (AR00041, emphasis added). On December 9, 2002, Liberty's analyst Tina Damsell, noted that "Medical provided supports (Employee's) inability to perform work at a sedentary level for 8 hours per day" and, further, "(Employee) could not meet gainful by working part time." File Note, 12/09/02 (AR00041).

On September 3, 2004, Liberty conducted an interview with Mr. Archambault who then reported that he is severely impaired because he has no function on his left side, walks with a plastic brace that covers his ankle, can walk or stand for only forty-five minutes and naps for three hours during the day. Mr. Archambault reported that he spends the first part of the day recovering from the severe cramps that develop during the night and can do only minimal activities of daily living. File Note, 9/3/04 (AR00038).

A final piece of substantial record evidence which supports Mr. Archambault's continued disability under the LTD plan is the fact that he qualified for Social Security Disability Insurance (SSDI) in May 2001, with notice received by Liberty in June 2001. SSDI Notice of Award, 5/11/01 (AR00570). Although a favorable SSDI ruling is not binding on an ERISA

administrator, it is relevant evidence for determining whether a claimant is or remains totally disabled under an ERISA disability plan. ***Pari-Fasano, supra,* 230 F.3d at 420.**

The above documents of record are substantial evidence, more than sufficient to meet Mr. Archambault's burden to show that he remains totally disabled from performing any work activity with reasonable continuity within the meaning of the Sodexho-Marriott LTD plan. While such substantial evidence of disability may, under the arbitrary and capricious standard of review, be overcome by evidence to the contrary, see ***Gannon v. Metropolitan Life Ins. Co.,* 360 F.3d 211, 213 (1st Cir., 2004),** such contrary evidence must itself be substantial, Non-probative "evidence" will not suffice under the artibrary and capricious standard to support an administrator's denial of benefits. ***Cook, supra,* 320 F.3d at 18. 22,** and the "evidence" on which Liberty based its termination of Mr. Archambault's LTD claim is non-probative because it contains material gaps and *non sequiturs* which preclude it from reasonably supporting Liberty's conclusion that Mr. Archambault is not capable of performing sedentary work activity with reasonable continuity.

**(b)**     **The "Evidence" On Which Defendant Relied Is Not Such Substantial Evidence As Is Required Under The Arbitrary And Capricious Standard Of Review To Reasonably Support Termination Of Plaintiff's LTD Claim.**

Liberty's termination of Mr. Archambault's LTD claim is not supported by substantial record evidence because it is based entirely on material gaps and *non-sequiturs* in the "evidence" on which Liberty relied. There are significant logical disconnects in Liberty's findings on both the medical and vocational record evidence which preclude a finding that the termination of Mr. Archambault's LTD claim was reasonable under the substantial evidence standard.

**( *i* )**  **The Medical "Evidence" On Which Defendant Relied Does Not Meet The Test Of Reasonableness Under The Substantial Evidence Standard Because Fails To Support A Finding That Plaintiff Can Sustain Any Work Activity With Reasonable Continuity As Required By The ERISA Plan.**

The primary medical basis for Liberty's termination of Mr. Archambault's LTD claim, as stated in its Notice of Termination, is:

> On December 13, 2004 we received information from Dr. Ligouri which included a completed restrictions form.  Dr. Ligouri indicated you had been placed on the following restrictions:
>
> -unable to stand for long periods of time
> -unable to walk long distances
> -unable to lift/carry over 10 pounds
> -unable to use left h and/arm
> -unable to climb, bend, stoop, kneel, push or pull

(AR00075).  Liberty stated that an additional request was sent to Dr. Liguori to confirm Mr. Archambault's current restrictions and that "we sent your restrictions" to Dr. Cariz and Dr. Bilazarian to confirm Dr. Liguori's findings.  (AR00076).   Liberty then stated:

> We received confirmation from Dr. Bilazarian on February 25, 2005 that all restrictions that had been placed on you were appropriate.  In addition we received confirmation from Dr. Bilazarian that you are able to perform sedentary function without use of your left arm.
>
> On March 30, 2005 we received an updated note from Dr. Liguori indicating that your lifting restriction had been updated.  It was now noted that you could not lift or carry any more than 5 pounds.  Dr. Liguori indicated that you did not have any cognitive or memory restrictions other than fatigue and alertness which is intermittent.

(AR00076).    That is the full extent of the medical reasons which Liberty provided for its termination of Mr. Archambault's LTD benefit.

This "evidence" as cited in the termination notice does not rise to the level of substantial evidence because it is non-probative on an essential, material issue under the Sodexho-Marriott LTD plan –Mr. Archambault's capacity to perform any work activity with "reasonable continuity."  The cited report from Dr. Liguouri, a form evaluation completed on December 4, 2004,

refers only to "restrictions," i.e. what Mr. Archambault *cannot* do. The form does not ask, and Dr. Liguori does not say that Mr. Archambault *can* perform any work activity within those restrictions with any degree of continuity in a work setting. Restrictions Form, 12/4/04 (AR00247).

The form makes no indication as to any degree of sustained activity, and it makes no reference to "work" as opposed to simple "sedentary activity" such as reading a book at home. Mr. Archambault in fact does such limited, non-productive sedentary "activity," e.g. preparing his meals or reading a book (AR00239), and he cannot do even such limited activities of daily living without suffering from episodic bouts of pain, due to spasticity, and fatigue which requires that he nap between one-and-a-half to three hours a day. Dr. Liguori's "restriction" to limited "sedentary activity" is entirely consistent with Mr. Arch-ambault's actual daily routine, and it says absolutely nothing about his having the capacity to *sustain* any level of activity in a *work* setting. Those critical factors under the "reason-able continuity" criterion are not addressed in Dr. Liguori's "restrictions," and therefore those restrictions cannot be read as indicating that Mr. Archambault can perform with reasonable continuity in a work setting. See **_Doyle, supra,_** **144 F.3d at 186.**

There thus exists here a gaping void between Dr.Liguori's "restrictions" and Liberty's conclusion as stated in the termination notice that Mr. Archambault might perform the duties of certain enumerated occupations "with reasonable continuity." A treating doctor's listing of functions which a claimant *cannot* perform does not create an inference that an activity not on the list is one which the claimant *can* perform. **_Buffonge, supra,_** **436 F.3d at 29.**

Dr. Liguori's stated findings on this form, in context of the record as a whole, are contrary to a finding that Mr. Archambault might perform any work, with any degree of

continuity within his physiological restrictions, as it clearly refers to Mr. Archambault's

"Spasticity/contractures" and "fatigue."  (AR00247).  These are the same factors to which Dr.

Liguori referred in his Note of May 9, 2003, which stated:

> He remains having limitations with standing, balance and endurance.  *Fatigue is an issue.*
> Spasticity in the left upper and lower extremities also remains an issue. . . . He has
> had a few *falls* since his last visit, *usually related* to slippery surfaces, *fatigue* and uneven
> surfaces.

> I discussed at length with Mr. Archambault regarding spasticity management and  the
> need to titrate medications as too little with (sic) cause increase in spasticity and too
> much will contribute to *weakness and fatigue.* . . . We discussed his fatigue as an issue as
> well, and because of his fatigue, he eliminated Zanaflex in the a.m. and afternoon which
> did improve somewhat.  *He continues to have difficulty with fatigue, attention and*
> *concentration, however.  He reports having difficulty completing reading a book as he*
> *does tire easily.*

OP Follow Up Note, 5/9/03 (AR00297-98, emphases added).  Nothing in Dr. Liguori's

"Restrictions" Form of 12/4/04 recants or qualifies these limitations in any way.

Mr. Archambault's spasticity and fatigue are also the factors on which Liberty's

vocational consultant, Ms. Baris, had previously found that Mr. Archambault's concerns

about the effect of his fatigue and variable symptoms on his ability to work were "realistic."

(AR00334-335).   Dr. Liguori's "Restrictions" form of December 4, 2004, do not in any way

minimize the effect of Mr. Archambault's chronic fatigue which was previously acknowledged

by Liberty's claims personnel, stating that "fatigue (sic) is a *huge* issue for stroke patients."  File

Note,  12/06/02 (AR00041, emphasis added).

These same factors, the fatigue and the spasms, are the basis on which Liberty's analyst

Tina Damsell previously acknowledged that "Medical provided supports (Employee's) inability

to perform work at a sedentary level for 8 hours per day" and, further, "(Employee) could not

meet gainful by working part time."  File Note, 12/09/02 (AR00041).  Again, nothing in Dr.

26

Liguori's "Restrictions" form of 12/4/04 can reasonably be interpreted as altering that prior finding by Liberty's analyst in any way.

The "confirmations" of Dr. Liguori's "restrictions" from Dr. Cariz and Dr. Bilazarian, similarly, are not substantial evidence that Mr. Archambault might perform any work activity any degree of continuity because they also do not indicate that Mr. Archambault can peform work activity within the stated restrictions on a sustained basis. The form letter sent to them merely referred to Dr. Liguori's "restrictions," and did not ask for any comment on how long Mr. Archambault might be able to perform within those severely limited restrictions. Letter, 3/18/05 (AR00211-212) and Letter, 2/23/05 (AR00213-214). Dr. Bilazarian and Dr. Cariz were not asked to comment on this material issue, and they did not do so in their responses to Liberty.

Dr. Bilazarian is a cardiologist and his treatment has been limited to Mr. Archambault's cardiovascular problems, not the neurological problems which are the basis of this LTD claim. Prior counsel objected on this basis to Liberty's reliance on Dr. Bilazarian's acceptance of Dr. Liguori's restrictions. Letter, 5/12/05 (AR00168). This objection is well founded as to the probative value of Dr. Bilazarian's opinion to the extent it refers to his own December 9, 2004, finding that "Mr. Archambault did not have any cognitive deficits and that all other morbid conditions were stable" (AR20013). Those findings are not pertinent to Mr. Archambault's disability claim which is based entirely on his severe neurological deficits and not at all on his cardiovascular status. See ***Zavora v. Paul Revere Life Ins. Co.,*** **145 F.3d 1118, 1123 (9th Cir., 1998)**; ***Kunin v. Benefit Trust Life Ins.,*** **910 F.2d 534, 538 (9th Cir., 1990); *Monroe v. Pacific Telesis Group Comprehensive Disability Benefits Plan,* 971 F. Supp. 1310, 1314-15 (C.D. Cal., 1997).** To the extent Dr. Bilazarian's "confirmation" is based on his own

cardiovascular assessment of Mr. Archambault's physical capabilities, it is non-probative on the this neurologically based disability claim because it is not relevant.

A more fundamental flaw in Liberty's reference to Dr. Bilazarian's "confirmation" is that it is based primarily on the functional "restrictions" stated in Dr. Liquori's "restrictions form" which, as discussed above, does not provide the necessary bridge between Mr. Archambault's physiological restrictions and the ability to perform any work activity with reasonable continuity in light of his neurologically based spasms and fatigue. Nor does Dr. Bilazarian's "confirm-ation" itself, just a brief notation on the form letter sent to him, provide any reasonable factual basis on which to find that Mr. Archambault has the stamina to perform any work activity with reasonable continuity. Letter, 2/23/05 (AR00213).

The same flaw obtains in Dr. Cariz' "confirmation" of Dr. Liguori's "restrictions," where the form letter he received referred to the above "information" from Dr. Liguori and from Dr. Bilazarian, and made no reference at all to any of Dr. Cariz' own prior findings. Letter, 3/18/05 (AR00211). Dr. Cariz replied with a brief note on a prescription pad saying:

> *Based on the information provided* I agree that Mr. Archambault is capable of sedentary function without the use of his left arm.

Note, 3/18/05 (AR00208), emphasis added. Dr. Cariz does not say for how long Mr. Archam-ault might perform any degree of sedentary function. Dr. Cariz does not indicate in any way that Mr. Archambault is capable of performing with reasonable continuity in a work setting and, again, such a finding is contraindicated by Dr. Cariz' own prior findings as to the disabling effect of Mr. Archambault's left hemiplegia which stated: "Pt. unable to do anything, no grasping, no lifting, no bending." Restrictions Form, 3/11/02 (AR00418).

There is a further flaw in Liberty's reliance on Dr. Liguori's "Restrictions" form and the confirmations by Dr. Bilazarian and Dr. Cariz. The restrictions noted by Dr. Liguori on

December 4, 2004, indicated no lifting or carrying greater than 10 pounds, with no explanation

why.  Restrictions Form (AR00247).  Subsequently, on March 30, 2005, Dr. Liguori submitted

a narrative which indicated that Mr. Archambault was limited to lifting *five* pounds at most,

and this was due to Mr. Archambault's neurological problem with balance.  Letter, 3/30/05

(AR00204).

There is no indication here that Dr. Liguori was improperly influenced to change

his finding, where this occurred before Liberty notified Mr. Archambault that the claim would be

terminated, an this report was submitted to Liberty as a correction and supplement for the

prior "Restrictions" form, in response to Liberty's form letter which invited further comment

with reference to his prior "restrictions" and the "information" received from Dr. Bilazarian.

Letter, 2/23/05 (AR00205).  See ***Cook, supra,*** **at 20.**  Dr. Liguori's correction was received by

Liberty prior to its termination of the claim, as indicated on the termination notice of April 25,

2005, acknowledging receipt, Termination Notice (AR00076), but no follow-up was sent to Dr.

Bilazarian or Dr. Cariz for further "confirmation."

This is another material gap in the substantial evidence because the requirements for

"sedentary" work activity include the ability to lift and carry up to 10 pounds, not five pounds

at most. This fact was expressly recognized by Liberty's own review physician, Dr. Mardireddi,

who referred to the U.S. Department of Labor, Dictionary of Occupational Titles, definition of

"sedentary" work activity:

> exerting up to *ten pounds* of force occasionally and/or a negligible amount of
> force frequently or constantly to lift, carry, push, pull or otherwise move
> objects. . . .  Jobs are sedentary if walking and standing are required only occasionally
> and other sedentary criteria are met.

Independent Peer Review (AR00130), emphasis added.  Mr. Archambault agrees this is a correct

statement of the definition of "sedentary" work activity, with the proviso that "occasionally"

means lifting and carrying up to one third of time during the workday,[3] and therefore even if Dr. Liguori's "restrictions" and the derivative "confirmations" relied on by Liberty could be read as referring to sedentary *work* activity, they cannot be reasonably read as indicating that Mr. Archambault has the capacity for sedentary work within the other restrictions found by Dr. Liguori.

The arbitrary and capricious standard gives discretion to an ERISA plan administrator to find the facts pertinent to a claim based on the substantial record evidence.  This is a standard of reasonableness which requires that the administrator's findings be based on some actual evidence in the record, where "evidence contrary to an administrator's decision does not make that decision unreasonable, *provided substantial evidence supports the decision*." ___Wright v. R.R. Donnelly & Sons Company Group___, **402 F.3d 67, 74 (1st Cir., 2005),** emphasis added.

Medical reports are not substantial evidence as to a material issue on a disability claim if they do not expressly address that issue.  See **___Doyle___, supra, 144 F.3d at 186**, holding that the claimant's medical records as to his symptoms were not substantial evidence of disability where they expressed no opinion as to whether the symptoms were sufficiently severe to prevent him from returning to work.  In the present case, similarly, Liberty cannot rely on Dr. Liguori's "Restrictions" form, or the purported confirmations of those restrictions by Dr. Bilazarian and Dr. Cariz, to establish that Mr. Archambault has the capacity for any *sustained* sedentary activity in a *work setting,* because those records state no opinion as to those critical issues  --neither directly nor by implication as in response to an inquiry on point.

---

[3] See **___Lopes v. Metropolitan Life Ins. Co.,___** 332 F.3d 1, 3 fn.2 (1st Cir., 2003), referring to the DOT definition of "sedentary" work:  "Sedentary Work – Exerting up to 10 pounds of force occasionally (Occasionally:  activity or condition exists up to 1/3 of the time) . . . ."  Emphasis is added.

The standard for substantial evidence is the same for both parties on an ERISA claim, and deferential judicial review under the arbitrary and capricious standard does not allow an administrator to simply make up or assume the facts necessary to support a denial of benefits, against the clear weight of the record evidence as a whole.  See ***Buffonge, supra,*** **436 F.3d at 30**. That is what Liberty did in an attempt to bridge the gap between Dr. Liguori's "Restrictions" form and the plan's criterion of "reasonable continuity" of performance in a work setting when it terminated Mr. Archambault's LTD claim.  The issue here is Mr. Archambault's stamina, as affected by his fatigue and frequent painful spasms, with respect to his ability to do any  work activity, sedentary or light, with reasonable continuity throughout a work day. Nothing in Dr. Liguori's "Restrictions" form, or the "confirmations" by Drs. Bilazarian and Cariz, states that he can do so, and the substantial record evidence as a whole clearly indicates that he cannot.

Liberty's letter denying Mr. Archambault's administrative appeal referred to further medical documentation from Dr. Kase and the "independent peer review conducted by Dr. Madireddi, Letter, June 22, 2005 (AR00065-67), and it is assumed that any additional grounds for termination stated there may also be considered on judicial review within the rule of ***Orndoff, supra***, **404 F.3d at 515**; and ***Glista, supra***, **378 F.3d at 128-129**.  However, such additional grounds for terminating the claim also fail the test of reasonableness under the arbitrary and capricious standard of review.

Dr. Kase's report reconfirmed that Mr. Archambault is "completely and permanently disabled for any occupation" due to his motor deficits and spasms in both left limbs  (AR00065). The termination notice stated that Dr. Kase's narrative was forwarded to the "consulting physician (Dr. Madireddi) who reviewed (the) initial appeal," who concluded that the medical

evidence "continues to support that (Mr. Archambault) can still lift and carry 20 pounds with the right extremity on an occasional basis and 10 pounds frequently." Letter, 6/22/05 (AR00065-66). Liberty's reliance on Dr. Madireddi's two reports is not reasonable for several reasons.

Dr. Madireddi conducted a record review only, taking all of two hours and ten minutes to review the voluminous medical records on file, and another 43 minutes writing her initial 32-page report. Independent Peer Review (AR00131), and has never examined Mr. Archambault personally. See ***Buffonge***, *supra,* **426 F.3d at 26,** rejecting the opinion of a non-examining review physician who spent only three hours reviewing records and preparing a report.

Dr. Madireddi's opinion that Mr. Archambault has the capacity to perform *sustained* sedentary work activity is not supported by any physician or therapist who has examined Mr Archambault, and it is contrary to the stated opinions of the two physicians who are primarily involved in treating the permanent and severely debilitating neurological symptoms of his stroke. The opinion of a review physician who has not personally oexamined the claimant may in some cases rise to the level of substantial evidence, as in ***Gannon***, *supra,* **360 F.3d at 214**, where the review physician's conclusions were supported by the specific findings of a therapist who had examined the claimant, and where there was thus a conflict in the substantial medical evidence of record as against the contrary opinion of the clamant's treating physicians. But where there is no such conflict, where the only substantial and *probative* medical evidence runs in the claimant's favor as in the present case, the review physician's contrary opinion is subject to doubt. See ***Orndorff***, *supra,* **404 F.3d at 526.**

In every case, a non-examining review physician's report must be judged by the standard of reasonableness in context of the record as a whole, see ***Bufonge***, *supra,* **426 F.3d at 243**, and a review physician's report is therefore not automatically entitled to substantial evidentiary

weight.  The reports of a claimant's treating physicians, although not entitled to any greater weight than a non-treating physcian's opinion, may not be arbitrarily or summarily disregarded by a plan administrator.  ***Black & Decker Disability Plan v. Nord.,*** **538 U.S. 822, 834, 123 S.Ct. 1965, 1967, 155 L.Ed2d 1034 (2003)**.

It therefore follows that an administrator cannot reasonably rely on the report of a review physician who arbitrarily dismisses the findings of a claimant's treating physicians, with no reasoned analysis based on the medical record as a whole, as in the present case.  Mr. Archambault does not claim that the opinions of his treating physicians are entitled *per se* to any greater weight than the findings of Liberty's review physician, contrary to the ***Black & Decker*** rule.  But they are entitled to controlling weight in this case because they clearly support Mr. Archambault's disability claim, while the review physician's contrary findings are not supported by, and are contrary to all the substantial medical evidence of record pertaining to Mr.  Archambault's disabling neurological impairments.

Dr. Madireddi's opinion that Mr. Archambault is not disabled is based on clear errors and misinterpretations of the medical records she purported to review.  In the initial "peer review," Dr. Madireddi summarized Dr. Liguori's note of December 2004, as follows:

> no standing for long periods of time, no walking long distances, no lifting or carrying over 10 pounds, unable to use the left arm and hand and no climbing, bending, stooping kneeling, pushing or pulling.  The claimant is right-hand dominant and *it was felt that this was a full-time sedentary work capacity* with no use of the left arm.

Independent Peer Review (AR00109), emphasis added.  This is a flat out misstatement of Dr. Liguori's restrictions.  Nowhere does Dr. Liguori indicate that he feels Mr. Archambault is capable of "full-time sedentary work capacity."

Dr. Madireddi claimed that the available medical documentation "does not provide detailed restrictions placed upon Mr. Archambault by his attending physicians. (AR00129). This is in error as Dr. Liguori's Restrictions Form of December 4, 2004, pertinent to this neurologically based disability claim, was based on diagnoses including "CVA," "Spasticity/ Contracture," "Acquired Hemiplegia on Left" and "Fatigue," and Dr. Liguori stated several specific functional restrictions for standing, walking, lifting, bending, stooping, kneeling and other functions that might be relevant in a work environment. (Restrictions Form, 12/4/04 (AR00247).

If Dr. Madireddi's reference to unspecific restrictions refers to the lack of any stated time limits on the December 2004 report, that only begs the question where Dr. Liguori was not asked to state time limits. A medical evaluation that states only restrictions cannot be read as implying that the claimant is capable of performing activities that are neither asked about nor addressed in the evaluation. ***Buffonge, supra,*** **436 at 29**. Given Liberty's awareness that a major component of Mr. Archambault's disability is chronic fatigue, see File Note, 12/9/0 (AR00041), it is pertinent to ask why information as to such a material issue would not have been sought by Liberty when directing an inquiry to his treating physician.

Liberty's failure to seek specific information from Dr. Liguori as to Mr. Archambault's stamina, as affected by his chronic fatigue, suggests that Liberty did not want to hear Dr. Liguori's opinion on that matter. The inference is warranted that Liberty did not want to have such additional information in the file because it was trying to terminate the claim and it already knew that Mr. Archambault's stamina for sustained work activity was severely compromised. See File Note, 12/09/02 (AR00041). The administrator of an ERISA LTD plan, as a "trustee," has a duty to take the initiative to obtain such reasonably available information

pertinent to a disability claim, ***Toland v. McCarthy*, 499 F. Supp. 1183, 1190 (D. Mass., 1980),** and LTD insurers routinely use pre-printed forms seeking time-specific evaluations from physicians as to the claimant's endurance for work activities.  The lack of such inquiry in the present case is suspect, as evidencing Liberty's improper motive for terminating the claim, where Mr. Archambault's endurance is a fundamental issue under the "reasonable continuity" criterion of the LTD plan, and Liberty's conflict of interest is a relevant factor to consider in this context. See ***Calvert**, supra,* **409 F.3d at 292.**

Whatever the reason may be for Liberty's failure to seek time-specific information pertaining to Mr. Archambault's restrictions, improper motive or mere incompetence, Dr. Madireddi's comment that Dr. Liguori's December 4, 2004, did not state specific restrictions is not a reasonable basis for either her or Liberty to discount his opinion as to the disabling effects of  Mr. Archambault's spasticity, pain and chronic fatigue.  Nor is it a reasonable basis for her or Liberty to invent a finding as to the capacity for sustained work activity that is not directly supported by Dr. Liguori's report or any other substantial medical evidence of record.

Dr. Madireddi opined that Mr. Archambault could lift and carry a maximum of 20 pounds occasionally on an occasional basis and ten pounds on a frequent basis using his right arm only.  Peer Review, 6/7/05 (AR00127) and Addendum, 6/17/05 (AR00063).   She stated that Mr. Archambault could do this using his right arm only, recognizing that he has no function in his left arm.    Here, Dr. Madireddi completely ignores the reason why Dr. Liguori restricts Mr. Archambault for lifting and carrying even five pounds, let alone ten or twenty.  That is because, due to the severe left-sided hemiplegia, lifting even minimal weight with his right hand will cause him to lose his balance as indicated by Dr. Liguori's Note of March 30, 2005. (AR00204).

Mr. Archambault's balance problem. which causes him to fall occasionally due to fatigue as well as lifting and carrying, is long-standing as indicated by Dr. Liguori's report of May 9, 2003.  This is not an orthopedic question of musculo-skeletal strength, where Mr. Archambault may well have the *strength* to lift 20 pounds with his right arm.  It is, rather, a neurological question of losing his *balance* when Mr. Archambault attempts to manipulate any appreciable weight with his right arm, and Dr. Madireddi's opinion as to the capacity to lift 20 pounds with the right arm is therefore clearly erroneous and contradicted by the only substantial medical evidence on point in the record.   The fact that Mr. Archambault may retain sufficient strength in his right arm to lift 20 pounds, or even more, is irrelevant to the claim as presented to Liberty.

Dr. Madireddi acknowledged Dr. Kase's findings that in addition to Mr. Archambault's motor deficits, he is affected by frequent spasms of the left limbs, which are painful as a result of the spasticity secondary to the stroke, which render him unable to perform with reasonable continuity the substantial duties of any occupation.  Addendum (AR00061-62)  Then,without any reasoned analysis, Dr. Madireddi states in conclusory fashon that "medical evidence continues to support that he can still lift and carry 20 pounds with the right extremity on an occasional basis and 10 pounds frequently" Addendum (AR00063).  This is an outright misstatement.  Dr. Madireddi does not refer to any medical record or report which indicates that Mr. Archambault has the capacity to lift twenty pounds, or to do any work activity on a sustained basis, and there is no *probative* medical report in the record which indicates he can lift and carry even ten pounds.

Further, Dr. Madireddi summarily dismisses Dr. Kase's finding of disability based on frequent spasms and pain without providing any reasoned analysis, and without reference to any

contrary findings by other physicians or therapists who have examined Mr. Archambault. Contrast **_Gannon, supra._** This is unreasonable, where Dr. Kase's opinion as to the disabling effect of Mr. Archambault's spasticity and pain is based on several years of treatment and direct observation, see **_Buffonge,supra,_** **426 F.3d at 26**, where the spasticity, or involuntary contraction of Mr. Archambault's musculature, is an objectively determined cause of debilitating pain, see **_Rivera-Torres, supra,_** **837 F.2d at 6,** and where Dr. Kase expressly states that the pain and spasticity are so severe as to prevent Mr. Archambault from engaging in any sustained work activity. Contrast **_Doyle, supra,_** **144 F.3d at 186.**

Dr. Madireddi dismisses Mr. Archambault's complaints of pain and fatigue in similar summary fashion, stating that "Overall, the medical evidence would support that Mr. Archambault's self-reported limitations are somewhat overstated and are not entirely consistent with the available medical evidence. Peer Review (AR00131). Dr. Madireddi provides no analysis, and makes no specific reference to the substantial medical evidence, to support this conclusion. And it is clearly erroneous based on review of the record as a whole, where the substantial medical evidence from the physicians who are primarily responsible for treating Mr. Archambault's neurological symptoms, Dr. Liguori and Dr. Kase, clearly do support his self-reported symptoms and deficits. Dr. Cariz, also, the last time he provided a physical capacities evaluation, clearly supported Mr. Archambault's complaints by saying "patient unable to do anything, no grasping, no lifting, no bending." Restrictions Form, 3/11/02 (AR00407).

Dr. Madireddi purports to make allowance for Mr. Archambault's fatigue by qualifying his capacity for sustained sedentary activity with a requirement that after every sixty minutes he must rest and take a break for an unspecified period of time. Peer Review (AR0028). This finding is not reasonable from a medical perspective because it does not take account of the

variable nature of Mr. Archambault's fatigue which is intermittent, Dr. Liguori, Letter, March 30, 2005 (AR00204), meaning that it occurs with some frequency but with no predictability. Further, the medication which Mr. Archambault takes to control his pain and spasms, increases his fatigue.  Dr. Liguori, Follow Up Note, 5/0/03 (AR00298).

Dr. Madireddi also fails to take account in this restriction of the fact that the rest breaks Mr. Archambault requires during a normal day of minimal activity at home involve sleeping from one-and-a-half to three hours.  Activities Questionnaire, 12/30/04 (AR00239) and File Note, 9/3/04 (AR00038).  When Mr. Archambault is fatigued, he requires sleep, which is an eminently reasonable response to fatigue, and there is no substantial medical evidence to the contrary.   Thus, within Dr. Madireddi's restriction that Mr. Archambault must rest after every hour of work, that would require six fifteen minute naps on the job just to get his minimum one-and-a-half hour daily regimen of sleep during an 8-hour work day.

This is clearly an unreasonable basis on which to find that Mr. Archambault is capable of sustained sedentary work activity, and it negates Dr. Madireddi's opinion as a basis that Mr. Archambault can perform any work activity with reasonable continuity from a vocational perspective, where there is no evidence in the record of any occupations which might accommodate such a restriction, as discussed above.

With respect to Dr. Madireddi's "Independent Peer Review" this case is closely on point with **_Buffonge, supra_**, where Dr. Madireddi's review is based on "parsing" and in large measure disregarding without any reasoned analysis the findings of the physicians who had examined Mr. Archambault. See **426 F.3d at 26.**  Dr. Madireddi's review, therefore, is not entitled to any substantial evidentiary weight in support of Liberty's termination of Mr. Archambault's LTD claim.

**( *ii* )    The Vocational "Evidence" On Which Defendant Relied Does Not Meet The Test Of Reasonableness Under The Substantial Evidence Standard Because It Fails To Support A Finding That Plaintiff Can Sustain Any Work Activity With Reasonable Continuity Within His Functional Restrictions As Determined By The Medical Evidence.**

Relying on Dr. Liguori's initial "Restrictions" form, which included lifting no more than ten pounds, Liberty's in-house "Vocational Case Manager," Laura Doherty, purported to identify several jobs which Mr. Archambault might perform within the restrictions indicated by Dr. Liguori.   Ms. Doherty interpreted Dr. Liguori's  restrictions as implying, for the purpose of  her vocational review, that Mr. Archambault had "up to a full-time sedentary work capacity with no use of the left arm."  Transferable Skills Analysis & Labor Market Information, 3/29/05 (AR00183).   As discussed above, this was clearly erroneous, where neither Dr. Liguori's "Restrictions" form nor any other substantial medical evidence in the record supports a finding that Mr. Archambault has the capacity for any sustained work activity, even part time.

In the transferable skills analysis, Ms. Doherty identified certain "transferable skills" which Mr. Archambault would possess based on his prior work history. (AR00184). There is no dispute as to these findings, but Mr. Archambault's transferable skills are all based on his prior work experience as listed, and not any other "training" as indicated by Ms. Doherty in passing, where he has had no specialized training related to the transferable skills identified in her analysis. The transferable skills identified by Ms. Doherty, and the "occupational alternatives" she identified based on such skills are all as stated on Liberty's termination notice, Letter, April 25, 2005 (AR00076).  For purposes of this review, Liberty is confined to those specific occupational alternatives as grounds for its termination of Mr. Archambault's LTD claim. ***Ordnoroff*, *supra*, 404 F.3d at 514**; ***Glista*, *supra*, 378 F.3d at 128-129.**

Based on the restriction to lifting no more than 10 pounds as indicated by Dr. Liguori's "Restrictions" form, and Ms. Doherty's erroneous assumption that this implied the capacity to perform sustained, full-time work activity, it is conceded that these occupations were correctly identified by Ms. Doherty as "sedentary" (AR00184),within the DOT definition, which means that the occupations may require lifting and carrying up to ten pounds "occasionally" or one-third of the time during the work day.

On March 30, 2005, Dr. Liguori corrected and clarified his "restrictions," stating that Mr. Archambault cannot lift or carry objects greater than five pounds due to his neurologically impaired balance. Letter, 3/30/05 (AR00204). But Ms. Doherty did not alter her analysis as to the "sedentary" occupational alternatives she purported to find for Mr. Archambault, even though Dr. Liguori's corrected restriction no longer conformed to the ten pound lifting and carrying criterion of the DOT definition for sedentary jobs.

Instead, on April 4, 2005, Ms. Doherty referred her transferable skills analysis to an outside contractor, Windham Group, to conduct a market survey for these "sedentary" jobs. Her referral letter stated that she enclosed the Transferable Skills Analysis she had prepared Letter, 4/4/05 (AR00198), which as far as appears in the record specifically referred to Dr. Liguori's ten pound restriction for lifting and carrying.

Then, on April 14, 2005, Susan Delf of Windham Group sent a "Labor Market Survey" to Ms. Doherty, which referred to "no lifting or carrying over 5 pounds," among other restrictions. Letter, April 14, 2005 (AR00186), emphasis added. It is not apparent on the record whether the change from a ten pound restriction on the referral to a five pound restriction on the Survey was based on some communication between Ms. Doherty and Ms. Delf, or whether it resulted from an after-the-fact alteration of the Survey. In either case, it casts

doubt on the accuracy and veracity of the vocational analysis and Survey where jobs defined as "sedentary," with lifting up to ten pounds, were somehow transformed into less than sedentary jobs with lifting no more than five pounds, with no further vocational analysis or reference to the DOT. This is another instance where Liberty's conflict of interest suggests an improper motive to terminate the claim, which may be considered on judicial review as to the reasonableness of Liberty's decision. ***Calvert, supra,*** **409 F.3d at 292.**

Apart from any improper motive in this context, the transferable skills analysis and the labor market survey are nullified by fatal gaps where they erroneously assume that Mr. Archambault has the capacity for sustained full-time sedentary work, where they fail to take account of Mr. Archambault's difficulty with lifting and carrying any weight over five pounds due to his imbalance and where, even if Dr. Madireddi's assessment were based on substantial evidence, they fail to take account of her restriction to one hour intervals interrupted by rest periods.

Even if the change from ten pounds to five pounds were valid for the jobs identified in the Labor Market Survey, based on interviews with actual employers, there is no evidence that Mr. Archambault could perform any of those jobs with Dr. Madireddi's restriction for taking a rest break every hour. This question was not put to Ms. Delf, and she did not put it to any of the employers she purportedly contacted. This is another material break in the "evidence" Liberty relied on to terminate Mr. Archambault's LTD claim.

As discussed above, the criterion of "reasonable continuity" in the performance of any job usually requires sustained work activity throughout the work shift, full or part time, with only one break each shift if any. Jobs usually require that work be done when the employer requires that it be done, and not at the convenience of the employee. ***Tippitt, supra,*** Memorandum at 18. It may be that some jobs exist which would permit the employee to take

a rest break every hour, which in Mr. Archambault's case would require a sofa or cot on which he could nap.  But, if so, that is something that would have to be affirmatively shown on the record evidence.

   In the present case, neither Ms. Doherty nor Ms. Delf nor any of her several employer contacts have indicated that such an accommodation could be made for Mr. Archambault in an actual work environment, which is very unlikely.  Consider the job of "Front Desk Badge Security Clerk," for example  (AR00184), which necessarily requires that the employee be vigilant *continuously* during his shift, and even a ten minute rest break away from his station may jeopardize the employer's security.   The same is true for "Information Clerk,' where an employer's patrons will have little patience waiting  ten minutes or so for the information clerk to get back from his hourly nap.

   The transferable skills analysis and the market survey are therefore entitled to no evidentiary weight in support of\ Liberty's termination of Mr. Archambault's LTD claim because there is a significant, material gap in the evidence between Mr. Archambault's restrictions as determined by Liberty's own review physician and the requirement  for reasonable continuity in any job that actually exists within Mr. Archambault's restrictions. See ***Doyle, supra,*** **144 F.3d at 186**.  Without any showing that Mr. Archambault could perform some actual job within Dr. Mardireddi's requirement for frequent rest breaks throughout the day, no reasonable mind could conclude that he can perform any work activity with "reasonable continuity" within the meaning of the Sodexho Marriott LTD plan.

### ( *iii* )   **Defendant's Termination Of Plaintiff's LTD Claim Was Unreasonable Because It Arbitrarily Failed To Consider The Substantial Evidentiary Weight Of Plaintiff's SSDI Award As Relevant To His Disability.**

It is well settled that an ERISA disability claimant's award of SSDI benefits is not conclusive on an ERISA plan administrator, except where the "statutory criteria are identical to the criteria set forth in the insurance plan," **_Pari-Fasano, supra,_** **230 F.3d at 420.**  In the present case, the relevant criteria for determining disability under the Sodexho-Marriott LTD plan are substantially identical to the SSDI statutory definition of disability.

> The Sodexho-Marriott LTD plan, insofar as it is relevant to the termination of Mr. Arch-
>
> ambault's benefits, refers to "any occupation" disability as requiring that the claimant be: unable to perform, with reasonable and continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, *education, experience, age and physical and mental capacity.*

Group Disability Income Policy (AR00006), emphasis added.   This language is not *verbatim* with the definition of disability found in the Social Security Act, but it is not materially different from that definition, where "disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a period of not less than 12 months.

42 U.S.C. Sect. 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his *age, education and work experience*, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. Sect. 423(d)(2)(A), emphasis added.

In both contexts, the claimant must be disabled from performing his own or any other occupation for which he is qualified by reason of age, education and experience.  The Sodexho-

Marriott Plan also refers to "training," but that is not a material difference in the present case where Mr. Archambault has no specific training, other than provided by his work experience, which contributed to the transferable skills which Liberty's vocational analyst identified.

In both contexts, disability is based on both physical and mental impairments. Under the Sodexho-Marriott plan, disability based solely on "mental illness" is subject to a 24-month maximum benefit payment (AR00015), but that is not relevant to the present case where Mr. Archambault's disability is based entirely on neurological impairments.

The policy refers to "reasonable continuity" in performing "all the material and substant-ial duties" of the claimant's own or any other occupation, but those criteria, if anything, are more lenient than the statutory requirement that the claimant be unable to perform "any. . . substantial gainful work" that exists in the national economy. It is difficult to discern any real difference here as may be relevant to Mr. Archambault's LTD claim.

***Paris Fasano*** refers to identity between the statutory criteria for determining disability and those set forth in the plan, which substantially obtains in the present case. Also, there is no material difference in the way disability is evaluated. The Social Security Adminstration determines many, but not all cases according to published "Medical Vocational Guidelines," colloquially known as the "Grid." 20 C.F.R. Pt. 404, Subpt. P, App. 2. But the Grid is not a collection of arbitrary "rules" which govern Social Security disability determinations.

The Medical Vocational Guidelines are, instead, an embodiment of administratively notice fact concerning the transferability of skills to occupations within the several exertional categories defined by the DOT, see ***Heckler v. Cambpell***, **461 U.S. 458 (1983)**, which is the same inquiry made by Liberty's vocational analyst in the present case. In this context, the Medical Vocational Guidelines have been recognized by the First Circuit as more reliable than

reliance on vocational analysts, where they provide

> not only a more efficient way to resolve the "other jobs" issue, but also
> (insofar as the knowledge of individual vocational experts is not complete)
> a more accurate one.

**_Sherwin v. Secretary of Health & Human Services,_** **685 F.2d 1, 4 (1st Cir., 1982)**.  Here,

the Grid takes account of the same factors considered by Liberty on the present claim, i.e.

the claimant's age, education, work experience and residual work capacity, and only

offers guidance, not a strict "rule," for determining disability cases like the present one

which involve combined impairments.  *Id.*

Some SSDI claims are determined under the "Listing of Impairments," 20 C.F.R.,

Pt. 404, Subpart P, App. 1, where only medical findings are considered.  This is a listing of

of specific impairments which, if supported by the record medical evidence, are considered

so severe that the claimant has no residual functional capacity to perform *any* gainful work

activity.  If a claimant's condition meets the criteria of a listed impairment, he is considered

vocationally helpless, and no skill transferability need be considered.  A finding under the

Listing of Impairments is not binding on an ERISA plan administrator, **_Pari-Fasano_, _supra_,**

but if a claimant's SSDI award were based on a listed impairment it would have to be of

such severity that an ERISA plan administrator's contrary finding would be questionable

under the standard of  reasonableness that applies on review under the arbitrary and capricious

standard.

Given such close similarity between the statutory and policy definitions of disability,

and between the medical-vocational issues considered in both contexts, this case would

appear to be one of the "rare" ones where the Social Security determination of disability should

be accorded substantial, if not "controlling" weight.  Cf. **_Pari-Fasano, supra._**  In any case,

even where such substantial similarity between the plan and the statute is not shown, a favorable

SSDI determination is relevant to a related ERISA claim and is entitled to some evidentiary

weight. ***Pari-Fasano***, **230 F.3d at 420**; ***Gannon***, ***supra***, **360 F.3d at 215**, upholding the

defendant administraor's reliance on a negative SSDI decision as substantial evidence that

the claimant did not meet the plan definition of "disabled."

In the present case, Liberty completely disregarded Mr. Archambault's highly relevant

SSDI award in the findings stated in the termination notice. Letter, 4/25/05 (AR00075). This

relevant fact appears nowhere in Liberty's medical or vocational analyses from and after

September 2004 when it began to manufacture the "evidence" it relied on to terminate Mr.

Archambault's LTD claim.

The only reference Liberty made to the SSDI award was its brief, dismissive

comment in the denial of Mr. Archambault's appeal saying only that "these provisions are not

contingent on decisions made by the Social Security Adminstration. . . ," Letter, 6/22/05

(AR00067) with absolutely no reasoned explanation why its findings as to Mr. Archambault's

disability should be any different from that made by SSA using substantially the same criteria

and based on identical medical and vocational facts. Such disregard and cavalier dismissal of

Mr. Archambault's SSDI award is a further indication that Liberty acted with an improper

motive to terminate the LTD claim. See ***Calvert***, ***supra***, 409 F.3d at 292.

>    **D.**    **Plaintiff Is Entitled To Summary Judgment On The Substantial Evidence
>            Of Record, To Be Reinstated For Disability Benefits Under The Sodexho-
>            Marriott LTD Plan With Full Payment Of All Past Due Benefits.**

As appears from the foregoing, Mr. Archambault has met his burden of proof to show

that he is totally and permanently disabled from performing any work activity with reasonable

continuity, within the meaning of the Sodexho-Marriott LTD plan. He has also met his burden to

show that Liberty's termination of his LTD benefits as of April 26, 2005, Letter, 4/25/05 (AR00076), was arbitrary and capricious as unreasonable, as not supported by substantial evidence and as the product of an improper motive to terminate the claim by selectively manipulating "evidence" on which to base a decision to terminate the claim.

The appropriate remedy in this case, is an order that Liberty reinstate Mr. Archambault's LTD claim, with payment of all benefits past due, where Liberty's termination of benefits was not only based on a conflict of interest affecting its decision making, cf. ***Buffonge, supra***, 426 F.3d at 31, but was also clearly unreasonable based on the substantial evidence of record. ***Cook, supra,* 320 F.3d at 24**.   Here, where Mr. Archambault's claim is fully supported by the substantial medial evidence of record, and where Liberty's termination of benefits was not based on evidence which withstands the test of reasonableness, Liberty should not get "a second bite at the apple when its first decision was simply contrary to the facts." *Id.*

Mr. Archambault's disability benefit was $449.99 bi-weekly after deduction of the SSDI set-off.  LTD Claim Worksheet, 12/13/02 (AR00304).   From April 26, 2005, through August 25, 2006, a period of 70 weeks, thirty-five payments of $449.99 are past due on the claim totaling $15,750.  This past due amount is increasing bi-weekly and damages, interest and attorneys fees must be assessed accordingly when judgment is entered.


Dated:   August 18, 2006                    For the Plaintiff,


                                            /s/   Richard K. Latimer

                                            Richard K. Latimer, BBO #287840
                                            222 Main Street, Box 710
                                            Falmouth, MA  02541
                                            (508) 548-7006
                                            rklaw@cape.com