UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH ARCHAMBAULT, <br><br> Plaintiff <br><br> v. <br><br> LIBERTY LIFE ASSURANCE COMPANY OF BOSTON <br><br> Defendant | Civil Action No. 05-11762-NG |

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Defendant Liberty Life Assurance Company of Boston ("Liberty Life") submits this Statement of Undisputed Material Facts In Support of Its Motion for Summary Judgment. Defendant hereby states that the following are undisputed material facts taken from the pleadings of record, the Declaration of Paula McGee, and the agreed-upon administrative record concerning Plaintiff Joseph Archambault's claim for disability benefits.[1]

### The Benefits Plan and Long-Term Disability Insurance Policy

1.    At all times pertinent to his claims in this lawsuit, Plaintiff was employed by Sodexho Marriott Services, Inc. ("Sodexho") as a Food Service General Manager. (AR 00688, Complaint par.4).

2.    As part of his employment with Sodexho, Plaintiff was offered coverage under a group disability insurance plan. (See Dec. of McGee, ¶3; AR 00001-32). The plan is an ERISA

---

[1] The complete administrative record and policy for Joseph Archambault were produced to Plaintiff on May 4, 2005 and February 28, 2006, and were filed with the Court on April 14, 2006. The documents contained in the Administrative Record are labeled "AR_____." For the Court's convenience, Defendant is not filing these documents again with the Declaration of Paula McGee.

welfare employee benefit plan. (<u>Id.</u> <u>See</u> <u>also</u> Complaint at ¶4 ). Under the plan, Plaintiff was provided with disability benefits through a policy of insurance -- policy no. GF3-810-252576-01 ("the Policy"). (<u>See</u> Dec. of McGee, ¶3; AR 00001-32). Liberty Life issued the policy and is the insurer for long-term disability benefits under the policy. (<u>See</u> Dec. of McGee, ¶3 ).

3.      Section 7 ("General Provisions") of the Policy states: "Liberty shall possess the authority, in its sole absolute and final discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding." (<u>See</u> Dec. of McGee, ¶6; AR 00024).

4.      Section 2 of the Policy defines "Disability" or "Disabled" as follows:

>       1. For persons other than pilots, co-pilots, and crew of an aircraft:
>
>       i.   **"Disability"** or **"Disabled"** means that during the Elimination Period and the next 24 months of Disability the Covered Person is unable to perform all of the material and substantial duties of his own occupation on an Active Employment basis because of an Injury or Sickness; and
>
>       ii.  After 24 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity. (AR 00005-6).

### Plaintiff's Claim for Long-Term Disability Benefits

5.      In or about November, 2000, Plaintiff applied for long-term disability benefits under Sodexho's Long Term Disability Benefits plan. (AR 00734).

6.      Plaintiff suffered a Cerebrovascular Accident (stroke) in November, 2000. (AR 00712-715)   His last day of work was November 10, 2000. (AR 00736)

7.     In connection with his stroke, Plaintiff applied for short and long-term disability benefits by telephone on or about November 30, 2000. (AR 00056)  At that time, Plaintiff, who was born on May 12, 1951, was 49 years old. (AR 00712).

8.     By letter dated December 5, 2000, Liberty Life acknowledged Plaintiff's application and requested medical information from Plaintiff's primary care physician, Dr. Jose Cariz and from his treating physician coordinating Plaintiff's rehabilitation Dr. Paul Liguori of Whittier Rehabilitation Hospital. (AR 00731-32)

9.     Plaintiff's medical records submitted in connection with his application for benefits indicated that he suffered from hypertension, speech difficulties, spasms of his left limbs, and significant left sided paralysis. Plaintiff required insertion of a pacemaker due to a cardiac arrhythmia. (AR 00625)

10.    On January 3, 2001, Liberty Life approved Plaintiff's claim for LTD benefits based on the "own occupation" definition of disability. (AR 00665, 666, 668) Under the terms of the LTD policy, Plaintiff at that time was approved to receive bi-weekly benefits in the amount of $957.68, less any offsets and deductions.  (AR 00666) The policy also required Plaintiff to apply for Social Security Disability Insurance (SSDI) benefits, the receipt of which would serve as an offset to Plaintiff's bi-weekly benefits. (Id.)

11.    In or about May, 2001, Plaintiff received notice from the Social Security Administration that he had been approved to receive SSDI benefits in an amount of $1100.00 per month starting in May, 2001. (AR 00570)  Plaintiff notified Liberty Life of that fact in June, 2001. (AR 00568-69)   By letter dated June 27, 2001 Liberty Life advised Plaintiff that his receipt of SSDI benefits would serve as an offset to his LTD benefits payable, and that Plaintiff's

new adjusted gross benefit would be $499.99 bi-weekly on a going forward basis. (AR 00565-66)

12.    In May, 2002, Liberty Life began to provide Plaintiff assistance with vocational rehabilitation by retaining a private rehabilitation counselor. (AR 00397)

13.    By letter dated June 13, 2002, Liberty Life reminded Plaintiff of the fact that the 24 month anniversary date of his claim for LTD benefits under the "own occupation" definition of disability was December 13, 2002, and that his entitlement to LTD benefits after that date would depend upon whether he was disabled form "any occupation." The letter also enclosed various forms that Plaintiff was requested to complete and return to Liberty Life, including an Activities Questionnaire, Claimant Information Form, Supplementary Statement and a Training, Education Experience form. (AR 00303)

14.    Plaintiff completed an Activities Questionnaire on July 5, 2002. (AR 00390-92) In that response, Plaintiff indicated that he is right hand dominant. (AR 00390)

15.    Plaintiff received long term disability (LTD) benefits for the entire 24 month "own occupation" period. By letter dated December 9, 2002, Liberty Life advised Plaintiff that his benefits would continue to be paid as long as he was unable to perform the duties of his own or any occupation for which he has training, education and experience. (AR 00327)

### Plaintiff's Physicians Confirm That Plaintiff Can Perform Sedentary Function Without The Use Of His Left Arm

16.    Plaintiff continued to receive LTD benefits throughout 2003 and 2004. On November 29, 2004, Liberty Life sent a request for updated medical information to one of Plaintiff's treating physicians, Dr. Paul Liguori. (AR 00279) In that letter, Liberty Life asked for copies of all diagnostic tests, office notes and an updated Restrictions Form. (AR 00279) On

that same date, Liberty Life sent requests for updated medical information to two of Plaintiff's

other physicians, Drs. Cariz and Kase. (AR 00250, 251)

17.    On December 10, 2004, Liberty Life sent Dr. Bilazarian, who was also treating

Plaintiff, a request for all updated medical records. (AR 00038)

18.    On or about December 22, 2004, Liberty Life received from Dr. Liguori a

completed Restrictions Form and copies of his consultation notes. In the restrictions form, Dr.

Liguori identified the following restrictions for Plaintiff: (1) unable to stand for long periods of

time; (2) unable to walk long distance; (3) unable to lift/carry objects over 10 pounds; (4) unable

to use left hand/arm; and (5) unable to bend, stoop, kneel, push or pull. (AR 00247, 00037)

19.    On February 23, 2005, Liberty Life sent a request to Dr. Liguori asking him if the

restrictions he provided previously were still valid and whether Dr. Liguori believed that Plaintiff

was capable of performing sedentary function without the use of his left arm. In that letter,

Liberty Life also advised Dr. Liguori of the fact that it had also received information from Dr.

Bilazarian that Plaintiff was not suffering any cognitive deficits. (AR 00229-30)

20.    On February 23, 2005, Liberty Life also sent letters to Drs. Cariz and Bilazarian

asking both if they agreed with the physical limitations on Plaintiff identified by Dr. Liguori, and

whether each believed that Plaintiff was capable of performing sedentary function without the

use of his left arm. (AR 00213)

21.    Dr. Bilazarian responded to Liberty Life's inquiry by fax on February 25, 2005.

(AR 00213) In that response, Dr. Bilazarian indicated that he agreed that Plaintiff could perform

sedentary function without the use of his left arm. (AR 00213)

22.    On March 18, 2005, Liberty Life sent Dr. Cariz a second request seeking his opinion as to whether he believed Plaintiff could perform sedentary function without the use of his left arm.  (AR 00211)

23.    Dr. Cariz responded in writing on March 18, 2005 and stated, "Based on the information provided I agree that [Plaintiff] is capable of sedentary function without the use of his left arm."  (AR 00208)

### Liberty Life Conducts A Transferable Skills Analysis And Requests A Labor Market Survey

24.    On March 18, 2005, Liberty Life also referred Plaintiff's claim for a vocational case management review asking that a transferable skills analysis be conducted to determine if Plaintiff remained disabled from any occupation. (AR 00202)

25.    A transferable skills analysis ("TSA") was conducted by Vocational Case Manager Laura Doherty. (AR 00199)  Ms. Doherty reviewed the claim file and summarized her findings in a written report dated March 29, 2005.  In that report, Ms. Doherty acknowledged the physical restrictions identified by Dr. Liguori in his December, 2004 statement, and further based her analysis on a full-time sedentary work capacity with no use of the left arm.  She further noted that Plaintiff was right-hand dominant.  (AR 00199)  As set forth in her report, Ms. Doherty further considered Plaintiff's education and vocational history, including, but not limited to the fact that Plaintiff completed his high school diploma and attended North Adams State College in Business Administration, stopping only 14 credits short of a degree in sociology.  (AR 00199-200)

26.    In her report, Ms. Doherty identified the following transferable skills: (1) ability to understand and communicate nutritional information to desired audience; (2) skilled in providing customer service to ensure customer satisfaction; (3) ability to perform inventory

control and procurement; (4) ability to understand and utilize accounting procedures to reconcile business receipts; (5) ability to influence others' opinions, attitude and judgment; (6) ability to follow and give written and verbal instructions; (7) ability to complete a variety of tasks and respond to change; (8) can use logic and reasoning to identify the strengths and weaknesses or alternative solutions, conclusions or approaches to problems; and (9) document and assess information through entering, transcribing, recording, storing and maintaining information in written or electronic form. (AR 00200)

27.    Based upon her review of the claim file, including Plaintiff's training, education and work experience, and utilizing the capabilities as outlined by Dr. Cariz and Dr. Bilazarian, as well as her labor market research, Ms. Doherty identified the following four (4) sedentary occupations that she believed Plaintiff could perform using his right-dominant arm and given his transferable skills: (1) Customer Service/Food Sales Representative; (2) Front Desk Badge Security Clerk; (3) Information Clerk; and (4) Night Auditor. (AR 00199-201)

28.    On March 30, 2005, after the TSA was conducted by Ms. Doherty, Liberty Life received from Dr. Liguori a letter updating his assessment of Plaintiff's restrictions. In that letter, Dr. Liguori indicated that Plaintiff's last office visit had been on September 14, 2004. Dr. Liguori further stated that based upon his last visit, Plaintiff:

> . . . continues to demonstrate significant left sided weakness and subsequent functional deficits. He ambulates with the use of a plastic ankle/foot orthosis on the left, but is unable to walk long distances or stand for long periods of time with ongoing difficulty climbing, bending, stooping, kneeling, pushing, pulling ascending and descending stairs. Due to his imbalance, it was recommended that Mr. Archambault not lift or carry objects greater than five pounds. There is no cognitive or memory restriction other than difficulties with fatigue and alertness

which is intermittent.  Sitting balance is functional.  Ability to use the right hand for grasping and manipulating objects is functional.  (AR 00204)[2]

29.    On or about April 4, 2005, Liberty Life referred the TSA report prepared by Laura Doherty to Lori Havener of The Windham Group for purposes of conducting a labor Market survey ("LMS") to clarify the actual physical demands of the positions identified by Ms. Doherty in the TSA.  (AR 00198)  In her cover letter to Ms. Havener, Ms. Doherty stated.  "We are specifically trying to determine if [Plaintiff] could perform the occupations of information clerk (tourism booth, hospital, large complex), Front Desk Security Guard, Night Auditor, and Customer Service/Food Sales Representative in the Food industry without the use of his non-dominant arm and lifting of up to 5 lbs. in his dominant arm." (AR 00198)

30.    The LMS was conducted by Susan Delf, a Vocational Case manager for  The Windham Group.  Ms. Delf prepared an 11 page report of her conclusions dated April 14, 2005. (AR  00186-00196)  As set forth in her report, Ms. Delf contacted employers in Massachusetts and nationally to request specific information about the physical requirements of the jobs and whether the jobs could be performed successfully with the use of one (1) arm only.  Additional limitations communicated to those called were no standing for long periods of time, no walking long distances, no lifting or carrying over five pounds, no climbing, bending, stooping, kneeling, pushing or pulling.  (AR 00186)

31.    As set forth at pages 2-3 of Ms. Delf's report (AR00187 - 188 ) five companies were contacted about the Information Clerk position.  All five companies contacted confirmed that the position could be conducted without the use of [Plaintiff's] non-dominant arm, and is consistent with all other restrictions identified.  (Id.)

---

[2] Dr. Liguori's statement that based upon his last examination in October, 2004, "it <u>was</u> recommended that [Plaintiff] not lift or carry objects greater than five pounds" was inconsistent with his December, 2004 note where he identified the lifting restriction at 10 pounds based upon the October, 2004 evaluation. (emphasis added)

32.    As set forth at pages 4-5 of Ms. Delf's report (AR 00189-90), five companies were contacted about a Front Desk Security Guard position. All five companies contacted confirmed that the position could be conducted without the use of [Plaintiff's] non-dominant arm, and is consistent with all other restrictions identified. (Id.)

33.    As set forth at pages 5-7 of Ms. Delf's report (AR 00190-92), five companies were contacted about a Night Auditor position. Once again, all five companies contacted confirmed that the position could be conducted without the use of [Plaintiff's] non-dominant arm, and is consistent with all other restrictions identified. (Id.)

34.    Ms. Delf contacted ten (10) different companies about the Customer Service/Food Sales Representative position, as set forth at pages 7-10 of her report. (AR 00192-195) Six (6) of those ten companies contacted (Crocker & Winsor Seafoods; Aramark/Wear Guard; American Mussel Harvesters, Inc.; Thurston Foods, Inc.; American Frozen Foods; and Added Sales) confirmed that the position could be conducted without the use of [Plaintiff's] non-dominant arm, and is consistent with all other restrictions identified. (Id.)

### Plaintiff's Is Denied Further Benefits

35. By letter dated April 25, 2005, Liberty Life notified Plaintiff of its decision that LTD benefits were no longer payable to Plaintiff. (AR 00179) As set forth in its letter, Liberty Life referenced, among other information, the information contained in Dr. Liguori's December 13, 2004 restrictions form setting forth Plaintiff's physical restrictions; the fact that Dr. Bilazarian agreed with the identified restrictions; Dr. Bilazarian's belief that Plaintiff could perform sedentary function without the use of his left arm; Dr. Liguori's March 30, 2005 note updating his assessment of Plaintiff's limitations; and the results of the TSA and LMS reviews. (AR 00179-181)

36.    The April 25, 2005 letter also advised Plaintiff of his right to request a review of the denial decision within 60 days, and specifically advised Plaintiff to "include documentation such as office notes, test results, updated specific restrictions and limitations from all treating providers as well as any additional information which you feel will support your claim." (AR 00181)

### The Denial Is Reviewed At Plaintiff's Request

37.    By letter dated May 2, 2005, Attorney Michael Bissonnette entered an appearance on behalf of Plaintiff and requested a review of the denial decision. (AR 00177-178) The letter from counsel did not seek to introduce any additional medical information for review and consideration. (Id.)

38.    By letter dated May 4, 2005, Liberty Life acknowledged receipt of Attorney Bissonnette's letter. Liberty Life also enclosed a copy of Plaintiff's claim file, claim notes and LTD policy. (AR 00173) The letter further indicated that Plaintiff's file was being forwarded to Liberty Life's Appeals Unit. (AR 00171-173)

39.    By letter dated May 10, 2005, Liberty Life advised Attorney Bissonnette that it required additional time to render a decision on appeal, based in large part on the fact that Plaintiff's appeal did not provide any additional medical records. Liberty Life requested that Plaintiff "follow up with all [Plaintiff's] treating physicians and have them submit copies of recent office treatment notes, consultations, medications, and any diagnostic test results as soon as possible." (AR 00169-170)

40.    Attorney Bissonnette responded to Liberty Life by letter dated May 12, 2005. (AR 00168) In his letter, Attorney Bissonnette responded to Liberty Life's request that Plaintiff submit additional medical information as follows:

- 10 -

While all Mr. Archambault's neurological providers have agreed to provide any additional documentation to support their unanimous opinion of full disability, it is unfair to require more evidence than you already possess. Your own file contents already prove the case for the claimant and no supplementation is needed. (AR 00168) (emphasis added)

## An Independent Medical Peer Review Is Commissioned As Part Of The Review Process

41.    On May 18, 2005, despite the fact that Plaintiff did not submit any additional medical information to support his appeal, Liberty Life sent Plaintiff's claim file to MLS MedicoLegal Services for an independent medical peer review. (AR 00033) The peer review was conducted by Dr. L. Neena Madireddi, M.D., a Board certified Physiatrist. (AR 00167) By letter dated June 8, 2005, MLS enclosed a 33 page report prepare by Dr. Madireddi. (AR 00099-00132)

42.    As set forth at pages 1-7 of the report, Dr. Madireddi identified the medical documentation reviewed dating back to the date of injury in 2000. Dr. Madireddi also summarized the medical information encompassed by his review of the file at pages 11-24 of his report. (AR 00110-123) Dr. Madireddi also specifically considered the restrictions identified by Dr. Liguori in December, 2004, as well as the fact that Dr. Cariz agreed that Plaintiff was capable of performing sedentary function without the use of his left arm, and the March 30, 2005 letter from Dr. Liguori referencing the 5 pound lifting restriction. (AR 00109, 00121).

43.    In his conclusions, Dr. Madireddi states his opinion that with his left upper extremity only, Plaintiff should be restricted from performing any activities above, at or below shoulder level. (AR 00127) He further expressed his opinion that using both upper extremities, Plaintiff would be capable of performing lifting and/or carrying activities up to 10 pounds on an occasional basis consistent with that of a sedentary strength level. (AR 00128) Dr. Madireddi concluded that "the available medical evidence supports that [Plaintiff] would be able to perform

work within a sedentary level according to the U.S. Department of Labor Dictionary of Occupational Title criteria." (AR 00129) Dr. Madireddi quoted the definition of sedentary work as being "exerting up to ten pounds of force occasionally and/or a negligible amount of force frequently or constantly to lift, carry, push, pull or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and other sedentary criteria are met." (AR 00130)

### The April 25, 2005 Denial Is Upheld

44.    By letter dated June 10, 2005, Liberty Life advised Plaintiff's counsel that it was upholding its denial of benefits decision in April, 2005, following the review of that decision requested by Plaintiff. (AR 00088-00094) The letter itself set forth the basis upon which the denial decision was upheld. Specifically, while Liberty Life explained that while Plaintiff had the opportunity to submit additional medical information following the April 25, 2005 letter, he elected not to do so. (AR 00088). Liberty Life also explained that it considered the restrictions imposed by Dr. Liguori in December, 2004,and March, 2005, and the statements by Drs. Cariz and Bilazarian in February and March , 2005 that they believed Plaintiff was capable of performing sedentary function without the use of his left arm. (Id., AR 00089)

45.    The June 10, 2005 denial letter also acknowledged receipt of Dr. Liguori's March 30, 2005 letter in which he referenced a five pound lifting restriction. (AR 00090) Pages 3-5 of the June 10, 2005 letter (AR 00090-92) also set forth excerpts from the independent peer review conducted by Dr. Madireddi. The letter also explained to Plaintiff that his file had been referred to a vocational consultant to identify any alternative occupations for which Plaintiff was qualified, and that the consultant identified numerous transferable skills and four alternative

occupations for which Plaintiff would be qualified even given his medical restrictions. It further confirmed that 21 of 25 employers contacted in connection with the labor market survey confirmed that Plaintiff would be able to perform those occupations. (AR 00093)

46.    The June 10, 2005 letter confirmed the denial of benefits decision. It further advised Plaintiff of his right to challenge the final decision pursuant to ERISA. (AR 00094)

47.    On June 13, 2005, Liberty Life received a letter from Plaintiff's neurologist, Dr. Carlos Kase.(AR 00083). In that letter, Dr. Kase stated that Plaintiff was his patient. However, the letter did not state when he last treated Plaintiff. 9AR 00083-84) Dr. Kase stated in his letter that:

> In addition to the motor deficits described above, [Plaintiff] has in addition been affected by frequent "spasms" of the left limbs, which are painful, and are ascribed to the result of the spasticity of the left limbs, as a squela of the stroke. He has been treated with various medications for the "spasms," including Baclofen and Zanaflex, with only partial relief of his symptoms.

> In view of the issues described above, it is my professional opinion that, on account of his motor deficits and the presence of "spasms" of the left limbs, [Plaintiff] is unable to perform, with reasonable continuity, the material and substantial duties of any occupation. For this reason, I respectfully request that you re-evaluate [Plaintiff's] situation, since I believe that he is completely and permanently disabled for any occupation, on account of the situation described above. (AR 00083)

The letter from Dr. Kase did not specifically address the restrictions identified by Plaintiff's other treating physicians, Drs. Liguori, Cariz and Bilazarian, or the conclusions of Drs. Cariz and Bilazarian that Plaintiff was capable of performing sedentary function without the use of his left arm. Dr. Kase's statement about spasticity is not consistent with Dr. Liguori's observation in September, 2004 that Plaintiff's "spasticity issues/tone are fairly stable" (AR 00217) It also did not reconcile Plaintiff's failure to mention spasticty issues in the December 30, 2004, limitations form that Plaintiff completed, in which he identified the reasons he believed he could not

perform any occupation as unable to use his left side, tires easily, poor balance, memory lapses, concentration and unable to harness emotions satisfactorily. (AR 00240)

48. Despite the fact that the period for submitting additional information had passed, Liberty Life nevertheless sent Dr. Kase's letter to MLS to be forwarded to Dr. Madireddi. (AR 00134) Liberty Life specifically asked whether the letter from Dr. Kase would change Dr. Madireddi's assessment of Plaintiff's claim, and if Dr. Madireddi could prepare a supplemental report. (AR 00134)

49. Dr. Madireddi reviewed the letter from Dr. Kase and issued a supplemental six page report dated June 17, 2005. (AR 00078-82) In the supplemental report, Dr. Madireddi summarized the information provided by Dr. Kase, and specifically acknowledged the reference in Dr. Kase's letter to "spasms," and Dr. Kase's opinion that Plaintiff was completely and permanently disabled from any occupation. (AR 00079-80)

50. Dr. Madireddi concluded that based on the additional information, including information about the "spasms", he was willing to change his initial conclusion that Plaintiff could lift, push and pull a maximum of 10 pounds with his left extremity to a restriction that Plaintiff not lift or carry anything at all with his left hand only. (AR 00081). However, Dr. Madireddi did not change his assessment that the medical evidence "continues to support that [Plaintiff] can still lift and carry 20 pounds with the right extremity on an occasional basis and 10 pounds frequently." (AR 00081, emphasis added) He further noted that the medical evidence continued to support that Plaintiff:

> Can sit for six hours in an eight hour workday, and is capable of standing and walking for a maximum four hours in an eight-hour workday. He would need the opportunity to rest after standing and walking 60 minutes, given that he has moderate weakness of the left lower extremity proximally and marked weakness distally. Balancing activities would still be restricted, and he should avoid squatting and kneeling activities in total. He would be capable of climbing steps

on an occasional basis with a handrail, and he cannot use his left foot for controls
but could do so with his right foot. (AR 00081)

Dr. Madireddi concluded his supplemental report by acknowledging that while Dr. Kase felt that

Plaintiff was totally disabled, Dr. Madireddi believed that the medical evidence continued to

support that Plaintiff was capable of performing a full-time sedentary occupation within the

restrictions set forth in his report. (AR 00082)

     51.    By letter dated June 22, 2005 to Plaintiff's attorney, Liberty Life notified

Plaintiff's attorney of the fact that it received the letter from Dr. Kase and that it had forwarded

that letter to Dr. Madireddi, even though the letter from Dr. Kase had not been received in a

timely manner. (AR 00065) The June 22, 2005 letter sets forth excerpts from Dr. Madireddi's

supplemental report, including the reference to "spasms," Dr. Kase's belief that Plaintiff

continued to be totally disabled from any occupation, and Dr. Madireddi's disagreement with that

opinion. (AR 00066). Liberty Life advised counsel that "based on the medical information

contained in [Plaintiff's] file, including the physician peer review, [Plaintiff] does not meet the

definitions of the Sodexho Operations LLC's long-term disability policy, and that Liberty Life's

position remained unchanged." (AR 00066) It underscored to Plaintiff's counsel that Plaintiff's

administrative right to review the decision was exhausted and that no further review by Liberty

Life would be conducted.

Respectfully submitted,

LIBERTY LIFE ASSURANCE COMPANY
OF BOSTON

By its attorneys,


/s/Guy P. Tully_____
Guy P. Tully, BBO# 555625
Richard W. Paterniti, BBO #645170
JACKSON LEWIS LLP
75 Park Plaza
Boston, MA 02116
(617) 367-0025

August 18, 2006

### CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2006, a copy of the foregoing was served by electronic mail and through the ECF system on Plaintiff's counsel.

/s/ Guy P. Tully_____
Jackson Lewis LLP

- 16 -