UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOSEPH ARCHAMBAULT,

       Plaintiff

v.

LIBERTY LIFE ASSURANCE COMPANY OF
BOSTON

       Defendant

Civil Action No. 05-11762-NG

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Liberty Life Assurance Company of Boston ("Liberty Life") moves for summary judgment in its favor on Plaintiff's two-count Complaint on the grounds that there are no material facts in dispute and that it is entitled to judgment as a matter of law. This memorandum, Liberty Life's Statement of Undisputed Material Facts, and the Declaration of Paula McGee are submitted in support of that motion, as is the agreed upon administrative record filed with the Court on April 14, 2006.

## BACKGROUND

Plaintiff, a former Food Service General Manager employed by Sodexho Marriott Services, Inc. ("Sodexho"), brings this action seeking long-term disability ("LTD") benefits under Sodexho's group disability insurance plan. Plaintiff applied for long-term disability benefits after he suffered a stroke in November, 2000. Plaintiff was approved for LTD benefits for an initial 24 month period based on a conclusion that Plaintiff was disabled from performing his own occupation. After the conclusion of the initial 24 month period, Liberty Life continued to pay Plaintiff LTD benefits based on a conclusion that he was disabled from performing the material and substantial duties of any occupation. Plaintiff collected LTD benefits until April 25,

2005, at which time Liberty Life concluded that Plaintiff was no longer disabled from any occupation based upon medical and vocational information in the claims file, including information from Plaintiff's own treating physicians and from vocational consultants, indicating that Plaintiff could perform sedentary tasks without the use of his left arm.  Liberty Life upheld that decision after Plaintiff appealed the denial decision, and after having the denial decision reviewed by an independent physician who conducted a medical peer review of the claims file.

### SUMMARY OF ARGUMENT

Liberty Life is entitled to summary judgment on Count I of Plaintiff's complaint alleging wrongful denial of benefits in violation of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. sec. 1132(a)(1)(B), because the record contains substantial evidence to support Liberty Life's decision to deny such benefits.  Specifically, the administrative record confirms that Plaintiff's own treating physicians stated that Plaintiff was capable of performing sedentary function without the use of his left arm.  Moreover, prior to denying Plaintiff's claim for benefits, Liberty Life conducted a transferable skills analysis of Plaintiff's physical and cognitive abilities and limitations to determine whether Plaintiff possessed transferable skills that could be utilized by Plaintiff in the open job market. That process identified four sedentary occupations that could be performed by Plaintiff using his transferable skills within the physical limitations identified by his physicians. Liberty Life thereafter hired an independent company to conduct a labor market survey ("LMS") to determine whether the four positions existed in Plaintiff's market, and whether a person with Plaintiff's physical capabilities and restrictions could actually perform the functions of the four positions.  The results of the LMS confirmed that the four positions existed in Plaintiff's market and that a person with Plaintiff's physical

restrictions could perform the functions of all four sedentary alternate jobs. Liberty Life therefore denied Plaintiff further LTD benefits based upon the contents of the claims file.

Significantly, while Plaintiff, through predecessor counsel, appealed the denial decision, he did not submit additional medical information in support of his appeal, despite Liberty Life's instruction that he could do so. Liberty Life nevertheless arranged for an independent medical peer review of the denial decision. That independent peer review confirmed that the medical evidence in the claims file supported a conclusion that Plaintiff was capable of performing sedentary functions. After Liberty Life advised Plaintiff's counsel that it was upholding the denial decision, Plaintiff's neurologist, Dr. Kase, submitted a letter stating his opinion that Plaintiff was disabled from working in any occupation. Despite the fact that the letter from Dr. Kase was submitted after the deadline for providing additional medical information and did not have to be considered by Liberty Life, Liberty Life forwarded that letter to the physician who performed the independent peer review for consideration. The reviewing physician considered the letter, but did not change his assessment that the medical information in the claim file supported a conclusion that Plaintiff was capable of performing sedentary functions without the use of Plaintiff's left arm. Taken as a whole, the evidence in the Administrative Record rendered Liberty Life's decision "reasonable" and thus not "arbitrary and capricious." As a result, summary judgment in favor of Liberty Life on Count I is appropriate as a matter of law. To the extent Count II of Plaintiff's Complaint seeks to assert a common law breach of contract claim, Liberty Life is entitled to summary judgment on Count II because it is preempted by ERISA.

## ARGUMENT

### I.    Summary Judgment Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Fed. R. Civ. P. 56 advisory committee's note), rev'd and remanded on other grounds, 976 F.2d 77 (1st Cir. 1992); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).    Thus, summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The standard for summary judgment is different in denial of benefits cases under ERISA than in other civil cases.  The First Circuit has explained the standard in these cases as follows: "In an ERISA benefit denial case, trial is usually not an option: in a very real sense, the district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Leahy v. Raytheon Company, 315 F.3d 11, 17-18 (1st Cir. 2002). Indeed, in this context, "the non-moving party is not entitled to the usual inferences in its favor." Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005).  Applying this standard in the instant case, Plaintiff's claim fails as a matter of law, for the reasons set forth below.

### II.    Liberty Life Is Entitled to Summary Judgment Because Its Decision to Deny Plaintiff's Appeal of the Denial of His Long-Term Disability Benefits Was Not "Arbitrary and Capricious"

Summary judgment should be granted in favor of Liberty Life, because Liberty Life's determination of Plaintiff's claim for long-term disability benefits was not "arbitrary and capricious."  The information available to Liberty Life at the time it considered Plaintiff's claim

demonstrates that its decision with respect to Plaintiff's claim was reasonable and not arbitrary and capricious.

A.    **Liberty Life's Determination of Plaintiff's Eligibility for Benefits is Reviewed Under An Arbitrary and Capricious Standard**

In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the United States Supreme Court held that "[c]onsistent with established principles of trust law, we hold that a denial of benefits under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or construe the terms of the plan." Firestone, 489 U.S. at 115. The law in the First Circuit is clear:  "[w]here a benefits plan grants discretionary authority to the plan administrator, [the First Circuit Court of Appeals] review[s] this administrator's decisions to determine whether they are arbitrary and capricious." Sullivan v. Raytheon Co., 262 F.3d 41, 50 (1st Cir. 2001), cert. denied, 534 U.S. 1118 (2002) (citing Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d 415, 418 (1st Cir. 2000) and Terry v. Bayer Corp., 145 F.3d 28, 40 (1st Cir. 1998)). See also Tsoulas v. Liberty Life Assurance Company of Boston, 454 F.3d 69 (1st Cir. 2006), No. 05-2668 slip op. at pp. 12-13 In this case, such discretionary language is present. The Plan expressly states, at Section 7:

> Liberty shall possess the authority, in its sole absolute and final discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

(SOF ¶3)[1]  Such language provides a clear grant of discretionary authority to Liberty Life by allocating to it the right to make factual findings, to determine eligibility for benefits, and/or to interpret the terms of the Plan. See Terry, 145 F.3d at 37 (holding that Plan in that case properly

---

[1] "(SOF ¶__)" refers to Liberty Life's Statement Of Undisputed Material Facts In Support Of Defendant's Motion For Summary Judgment.

granted discretionary authority to Plan Administrator, because it allocated to the Company the right to find necessary facts, determine eligibility for benefits, and interpret the terms of the Plan)[2]

The arbitrary and capricious standard requires this Court to determine only whether an administrator's decision is plausible in light of the record as a whole, or, put another way, whether the decision is within the administrator's authority, reasoned and supported by substantial evidence on the record, that is, evidence reasonably sufficient to support a conclusion. See Pari-Fasano v. ITT Hartford Life & Accid. Ins. Co., 230 F.3d 415, 419 (1st Cir. 2000); Sullivan v. Raytheon Corporation, 262, F.3d 41, 50 (1st Cir. 2001).

"Moreover, the existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary." Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 30 (1st 2001). Under this standard, "'a court is not to substitute its judgment for that of the [decision-maker].'" Terry v. Bayer Corporation, 145 F.3d 28, 40 (1st Cir. 1998). The deciding administrator's decision will be upheld if it is reasonable. See Id.[3]

**B.     Liberty Life's Decision to Deny Plaintiff's Appeal Was Not "Arbitrary and Capricious"**

The Administrative Record in this case contains ample support for the decision to deny Plaintiff's appeal of the denial of his claim for long-term disability benefits. The extensive medical evidence collected as part of Liberty Life's review of Plaintiff's claim for long-term disability benefits not only reasonably supported a determination that Plaintiff was no longer

---

[2] See also Tsoulas v. Liberty Life Assurance Company of Boston, 397 F.Supp.2d 79, n. 11 (D.Me. 2005), aff'd., No. 05-2668, slip op. at 11, (1st Cir. July 11, 2006); Rud v. Liberty Life Assurance Company of Boston, 438 F.3d 772 (7th Cir. 2006); Ellis v. Liberty Life Assurance Company of Boston, 394 F.3d 262, 266 (5th Cir. 2004).

[3] Because this standard emphasizes reasonableness, the standard recognizes "that in order to find that an insurer had abused its discretion under the contract, [a court] would have to conclude that the insurer's eligibility determination was unreasonable in light of the information available to it." Pari-Fasano, 230 F.2d at 419.

entitled to benefits, but compelled such a determination. At the time of the denial decision, Plaintiff clearly did not meet the definition for "disability" or "disabled" contained in the policy.[4]

Indeed, Plaintiff's own doctors confirmed that Plaintiff could perform sedentary functions without the use of his left arm. Moreover, Liberty Life undertook an extensive review of Plaintiff's claim file, soliciting updated medical records from Plaintiff's physicians, undertaking a transferable skills analysis, commissioning an independent labor market survey, subjecting the claim file and denial decision to an independent medical peer review, and having the peer review physician reconsider his opinion after Liberty Life received a letter from Plaintiff's neurologist after the deadline for such information. Even that letter did not attempt to reconcile the neurologist's opinion with the contrary opinions of Plaintiff's other treating physicians, Drs. Cariz, Bilazarian and Liguori. All of these records and reviews were considered as part of Liberty Life's final decision.

As a result of the substantial time and resources expended on the review of Plaintiff's claim, Liberty Life was able reasonably to determine whether Plaintiff was disabled from performing the material and substantial duties of his own or any occupation. In light of the medical evidence presented to Liberty Life, its decision was imminently reasonable.

### 1.    The Initial Review by Liberty Life

Following Plaintiff's application for LTD benefits and the expiration of a waiting period, Plaintiff received long term disability (LTD) benefits for the entire 24 month "own occupation" period contemplated by section 2 of the LTD policy. Thereafter, by letter dated December 9, 2002, Liberty Life advised Plaintiff that his benefits would continue to be paid as long as he was unable to perform the duties of his own or any occupation for which he has training, education

---

[4] As set forth in SOF ¶4, at the time of the denial decision, the definition of "disability" or "disabled" in the policy required Plaintiff to be unable to perform the material and substantial duties of "any occupation."

and experience. (SOF ¶15)  On November 29, 2004, Liberty Life sent a request for updated medical information to one of Plaintiff's treating physicians, Dr. Paul Liguori. (SOF ¶16)  In that letter, Liberty Life asked for copies of all diagnostic tests, office notes and an updated Restrictions Form on which Dr. Liguori was asked to specify all physical restrictions he had imposed on Plaintiff.  On that same date, Liberty Life sent requests for updated medical information to two of Plaintiff's other physicians, Drs. Cariz and Kase. (Id.) On December 10, 2004, Liberty Life sent Dr. Bilazarian, who was also treating Plaintiff, a request for all updated medical records. (SOF ¶17)

On or about December 22, 2004, Liberty Life received from Dr. Liguori a completed Restrictions Form and copies of his treatment records. (SOF ¶18)  In that form, Dr. Liguori identified the following restrictions for Plaintiff: (1) unable to stand for long periods of time; (2) unable to walk long distance; (3) unable to lift/carry objects over 10 pounds; (4)  unable to use left hand/arm; and (5) unable to bend, stoop, kneel, push or pull. (SOF ¶18)  After receiving that form, Liberty Life sent a request to Dr. Liguori on February 23, 2005, asking him if the restrictions he provided previously were still valid and whether Dr. Liguori believed that Plaintiff was capable of performing sedentary function without the use of his left arm. (SOF ¶19)  In that letter, Liberty Life advised Dr. Liguori of the fact that it had also received information from Dr. Bilazarian that Plaintiff was not suffering any cognitive deficits. (Id.)

On February 23, 2005, Liberty Life also sent letters to Drs. Cariz and Bilazarian asking both if they agreed with the physical limitations on Plaintiff identified by Dr. Liguori, and whether each believed that Plaintiff was capable of performing sedentary function without the use of his left arm. (SOF ¶20) Dr. Bilazarian responded to Liberty Life's inquiry by fax on February 25, 2005. (SOF ¶21)  In that response, Dr. Bilazarian indicated that he agreed that

Plaintiff could perform sedentary function without the use of his left arm. (Id.) Dr. Cariz responded in writing on March 18, 2005 and stated, "Based on the information provided I agree that [Plaintiff] is capable of sedentary function without the use of his left arm." (SOF ¶23)

On March 18, 2005, Liberty Life also referred Plaintiff's claim for a vocational case management review asking that a transferable skills analysis ("TSA") be conducted to determine if Plaintiff remained disabled from any occupation. (SOF ¶24) That TSA was conducted by Vocational Case Manager Laura Doherty. (SOF ¶25) Ms. Doherty reviewed the claims file and considered Plaintiff's education and vocational history, including, but not limited to, the fact that Plaintiff completed his high school diploma and attended North Adams State College in Business Administration, stopping only 14 credits short of a degree in sociology. (SOF ¶25) Ms. Doherty summarized her findings in a written report dated March 29, 2005, in which she identified the following transferable skills: (1) ability to understand and communicate nutritional information to desired audience; (2) skilled in providing customer service to ensure customer satisfaction; (3) ability to perform inventory control and procurement; (4) ability to understand and utilize accounting procedures to reconcile business receipts; (5) ability to influence others' opinions, attitude and judgment; (6) ability to follow and give written and verbal instructions; (7) ability to complete a variety of tasks and respond to change; (8) can use logic and reasoning to identify the strengths and weaknesses or alternative solutions, conclusions or approaches to problems; and (9) document and assess information through entering, transcribing, recording, storing and maintaining information in written or electronic form. (SOF ¶26) Significantly, none of those transferable skills identified involves any degree of lifting or tasks that were contrary to the restrictions identified by Dr. Liguori.

Based upon her review of the claim file, including Plaintiff's training, education and work experience, and utilizing the capabilities as outlined by Dr. Cariz and Dr. Bilazarian, as well as her labor market research, Ms. Doherty identified the following four (4) sedentary occupations that she believed Plaintiff could perform using his right-dominant arm and given his transferable skills: (1) Customer Service/Food Sales Representative; (2) Front Desk Badge Security Clerk; (3) Information Clerk; and (4) Night Auditor. (SOF ¶27)

On March 30, 2005, after the TSA was conducted by Ms. Doherty, Liberty Life received from Dr. Liguori a letter updating his assessment of Plaintiff's restrictions. In that letter, Dr. Liguori indicated that Plaintiff's last office visit had been on September 14, 2004. Dr. Liguori further stated that based upon his last visit on September 14, 2004, it "was recommended that Mr. Archambault not lift or carry objects greater than five pounds." He also noted that there was "no cognitive or memory restriction other than difficulties with fatigue and alertness which is intermittent. Sitting balance is functional. Ability to use the right hand for grasping and manipulating objects is functional." (SOF ¶28)[5](emphasis added)

The TSA report was then sent for an independent Labor Market Survey ("LMS") to clarify the actual physical demands of the positions identified by Ms. Doherty in the TSA. (SOF ¶29) In her cover letter, Ms. Doherty stated. "We are specifically trying to determine if [Plaintiff] could perform the occupations of information clerk (tourism booth, hospital, large complex), Front Desk Security Guard, Night Auditor, and Customer Service/Food Sales Representative in the Food industry without the use of his non-dominant arm and lifting of up to 5 lbs. in his dominant arm." (SOF ¶29) Thus, while Dr. Liguori did not explain the basis for changing the lifting restriction from 10 pounds to 5 pounds (particularly where both statements

---

[5] Dr. Liguori's statement that based upon his last examination in September, 2004, "it was recommended that [Plaintiff] not lift or carry objects greater than five pounds" was inconsistent with his December, 2004 note where he identified the lifting restriction at 10 pounds based upon the September, 2004 evaluation. (emphasis added)

were based upon the same September, 2004 visit), Liberty Life asked that the LMS be based upon the revised five (5) pound lifting restriction referenced by Dr. Liguori.

The LMS was conducted by Susan Delf, a Vocational Case manager for The Windham Group. Ms. Delf prepared an 11 page report of her conclusions dated April 14, 2005. (SOF ¶30) As set forth in her report, Ms. Delf contacted employers in Massachusetts and nationally to request specific information about the physical requirements of the jobs and whether the jobs could be performed successfully with the use of one (1) arm only. Additional limitations communicated to those called were no standing for long periods of time, no walking long distances, no lifting or carrying over five pounds, no climbing, bending, stooping, kneeling, pushing or pulling. (SOF ¶30)  All five companies contacted about the Information Clerk position confirmed that the position could be conducted without the use of Plaintiff's non-dominant arm, and was consistent with all other restrictions identified. (SOF ¶32) The same is true of the five companies contacted about the Front Desk Security Guard and Night Auditor positions. (SOF ¶¶32-33) In the case of the Customer Service/Food Sales Representative position, Ms. Delf contacted ten Companies. (SOF ¶34) Six (6) of those ten companies contacted confirmed that the position could be conducted without the use of Plaintiff's non-dominant arm, and is consistent with all other restrictions identified. (Id.)

By letter dated April 25, 2005, Liberty Life notified Plaintiff of its decision that LTD benefits were no longer payable to Plaintiff. (SOF ¶35)  As set forth in its letter, Liberty Life referenced, among other information, the information contained in Dr. Liguori's  December 13, 2004 restrictions form setting forth Plaintiff's physical restrictions;  the fact that Dr. Bilazarian agreed with the identified restrictions; Dr. Bilazarian's belief that Plaintiff could perform sedentary function without the use of his left arm; Dr. Liguori's March 30, 2005 note updating

his assessment of Plaintiff's limitations; and the results of the TSA and LMS reviews. (Id.) The April 25, 2005 letter also advised Plaintiff of his right to request a review of the denial decision within 60 days, and specifically advised Plaintiff to "include documentation such as office notes, test results, updated specific restrictions and limitations from all treating providers as well as any additional information which you feel will support your claim." (SOF ¶36)

### 2.    Plaintiff's Appeal of Liberty Life's Initial Denial

On May 2, 2005, Attorney Michael Bissonnette sent a letter to Liberty Life entering an appearance on behalf of Plaintiff and requesting a review of the denial decision. (SOF ¶37) The letter from counsel did **not** seek to introduce any additional medical information for review and consideration. (Id.) By letter dated May 4, 2005, Liberty Life acknowledged receipt of Attorney Bissonnette's letter. Liberty Life also enclosed a copy of Plaintiff's claim file, claim notes and LTD policy. (SOF ¶38) The letter further indicated that Plaintiff's file was being forwarded to Liberty Life's Appeals Unit. (Id.)

By letter dated May 10, 2005, Liberty Life advised Attorney Bissonnette that it required additional time to render a decision on appeal, based in large part on the fact that Plaintiff's appeal did not provide any additional medical records. Liberty Life requested that Plaintiff "follow up with all [Plaintiff's] treating physicians and have them submit copies of recent office treatment notes, consultations, medications, and any diagnostic test results as soon as possible." (SOF ¶39) Attorney Bissonnette responded to Liberty Life by letter dated May 12, 2005. (SOF ¶40) In his letter, Plaintiff's counsel responded to Liberty Life's request that Plaintiff submit additional medical information as follows:

> While all Mr. Archambault's neurological providers have agreed to provide any additional documentation to support their unanimous opinion of full disability, it is unfair to require more evidence than you already possess. Your own file

contents already prove the case for the claimant <u>and no supplementation is</u> <u>needed.</u> (SOF ¶40) (emphasis added)

Significantly, even though Plaintiff was advised that the denial decision was based in part upon information contained in the records of Drs. Liguori, Cariz and Bilazarian, Plaintiff did not, after the denial decision, seek to introduce any additional information from those doctors clarifying, modifying or recanting their earlier treatment records and medical opinions. Thus, Plaintiff cannot credibly claim that Liberty Life's interpretation of those records was unreasonable, arbitrary or capricious.

### a.    The Independent Medical Peer Review

On May 18, 2005, despite the fact that Plaintiff did not submit any additional medical information to support his appeal, Liberty Life sent Plaintiff's claim file to MLS MedicoLegal Services for an independent medical peer review. (SOF ¶41) The peer review was conducted by Dr. L. Neena Madireddi, M.D., a Board certified Physiatrist. (<u>Id.</u>) By letter dated June 8, 2005, MLS enclosed a 33 page report prepare by Dr. Madireddi. (<u>Id.</u>) Dr. Madireddi summarized the medical and vocational information encompassed by his review of the file in his report. (SOF ¶42) Dr. Madireddi specifically considered the restrictions identified by Dr. Liguori in December, 2004, as well as the fact that Dr. Cariz agreed that Plaintiff was capable of performing sedentary function without the use of his left arm, and the March 30, 2005 letter from Dr. Liguori referencing the 5 pound lifting restriction. (<u>Id.</u>).

In his conclusions, Dr. Madireddi stated his opinion that with his left upper extremity only, Plaintiff should be restricted from performing any activities above, at or below shoulder level. (SOF ¶43) He further expressed his opinion that using both upper extremities, Plaintiff would be capable of lifting and/or carrying activities up to 10 pounds on an occasional basis consistent with that of a sedentary strength level. (<u>Id.</u>) Dr. Madireddi concluded that "the

available medical evidence supports that [Plaintiff] would be able to perform work within a sedentary level according to the U.S. Department of Labor Dictionary of Occupational Title criteria." (Id.)[6]

### b.    The April 25, 2005 Denial Is Upheld

By letter dated June 10, 2005, Liberty Life advised Plaintiff's counsel that it was upholding its denial of benefits decision in April, 2005, following the review of that decision requested by Plaintiff. (SOF ¶44) The letter itself sets forth the basis upon which the denial decision was upheld. Specifically, while Liberty Life explained that Plaintiff had the opportunity to submit additional medical information following the April 25, 2005 letter, he elected not to do so. Liberty Life also explained that it considered the restrictions imposed by Dr. Liguori in December, 2004 and in March, 2005, and the statements by Drs. Cariz and Bilazarian in February and March, 2005 that they believed Plaintiff was capable of performing sedentary function without the use of his left arm. (Id.) Liberty Life also summarized the report of the independent peer review conducted by Dr. Madireddi in which he concluded that Plaintiff was capable of performing sedentary work without t he use of his left arm. CHANGE SOF (SOF ¶¶44-45)

### c.    Liberty considered additional medical information after June 10, 2005, even though it was not timely submitted.

On June 13, 2005, after the date by which additional information was supposed to have been submitted by Plaintiff, Liberty Life received a letter from Plaintiff's neurologist, Dr. Carlos

---

[6] Dr. Madireddi quoted the definition of sedentary work as being "exerting up to ten pounds of force occasionally and/or a negligible amount of force frequently or constantly to lift, carry, push, pull or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and other sedentary criteria are met." (Id.)

Kase. In that letter, Dr. Kase stated that Plaintiff was his patient. However, the letter did not state when he last treated Plaintiff. (SOF ¶47) Dr. Kase stated in his letter that:

> In addition to the motor deficits described above, [Plaintiff] has in addition been affected by frequent "spasms" of the left limbs, which are painful, and are ascribed to the result of the spasticity of the left limbs, as a squela of the stroke. He has been treated with various medications for the "spasms," including Baclofen and Zanaflex, with only partial relief of his symptoms.

> In view of the issues described above, it is my professional opinion that, on account of his motor deficits and the presence of "spasms" of the left limbs, [Plaintiff] is unable to perform, with reasonable continuity, the material and substantial duties of any occupation. For this reason, I respectfully request that you re-evaluate [Plaintiff's] situation, since I believe that he is completely and permanently disabled for any occupation, on account of the situation described above. (SOF ¶47)

The letter from Dr. Kase did not specifically address the restrictions identified by Plaintiff's other treating physicians, Drs. Liguori, Cariz and Bilazarian, or the conclusions of Drs. Cariz and Bilazarian that Plaintiff was capable of performing sedentary function without the use of his left arm. Indeed, Dr. Kase's opinion about the spasticity is not consistent with Dr. Liguori's observations in his September 14, 2004 consultation with Plaintiff. In his September 14, 2004 consultation note, Dr. Liguori stated that "Spasticity issues/tone are fairly stable." It also does not address Plaintiff's failure to reference spasticity issues in his self identified restrictions form dated December 30, 2004. (SOF ¶47)

Despite the fact that the period for submitting additional information had passed, Liberty Life nevertheless sent Dr. Kase's letter to MLS to be forwarded to Dr. Madireddi. (SOF ¶48) Liberty Life specifically asked whether the letter from Dr. Kase would change Madireddi's assessment of Plaintiff's claim, and if Dr. Madireddi could prepare a supplemental report. (Id.) Dr. Madireddi reviewed the letter from Dr. Kase and issued a supplemental six page report dated June 17, 2005. (SOF ¶49) In the supplemental report, Dr. Madireddi summarized the

information provided by Dr. Kase, and specifically considered the reference in Dr. Kase's letter to "spasms," and Dr. Kase's opinion that Plaintiff was completely and permanently disabled from any occupation. (Id.)

Dr. Madireddi concluded that based on the additional information, including information about the "spasms", he was willing to change his initial conclusion that Plaintiff could lift, push and pull a maximum of 10 pounds with his left extremity to a restriction that Plaintiff not lift or carry anything at all with his left hand only. (SOF ¶50). However, Dr. Madireddi did not change his assessment that the medical evidence "continues to support that [Plaintiff] can still lift and carry 20 pounds with the right extremity on an occasional basis and 10 pounds frequently." (Id., emphasis added) He further noted that the medical evidence continued to support that Plaintiff:

> Can sit for six hours in an eight hour workday, and is capable of standing and walking for a maximum four hours in an eight-hour workday. He would need the opportunity to rest after standing and walking 60 minutes, given that he has moderate weakness of the left lower extremity proximally and marked weakness distally. Balancing activities would still be restricted, and he should avoid squatting and kneeling activities in total. He would be capable of climbing steps on an occasional basis with a handrail, and he cannot use his left foot for controls but could do so with his right foot. (Id.)

Dr. Madireddi concluded his supplemental report by acknowledging that while Dr. Kase felt that Plaintiff was totally disabled, Dr. Madireddi believed that the medical evidence continued to support that Plaintiff was capable of performing a full-time sedentary occupation within the restrictions set forth in his report. (Id.)

By letter dated June 22, 2005 to Plaintiff's attorney, Liberty Life notified Plaintiff's attorney of the fact that it received the letter from Dr. Kase and that it had forwarded that letter to Dr. Madireddi, even though the letter from Dr. Kase had not been received in a timely manner. (SOF ¶51) The June 22, 2005 letter set forth excerpts from Dr. Madireddi's supplemental report, including the reference to "spasms," Dr. Kase's belief that Plaintiff continued to be totally

disabled from any occupation, and Dr. Madireddi's disagreement with that opinion. (Id.).
Liberty Life advised counsel that "based on the medical information contained in [Plaintiff's]
file, including the physician peer review, [Plaintiff] does not meet the definitions of the Sodexho
Operations LLC's long-term disability policy, and that Liberty Life's position remained
unchanged." (Id.) It underscored to Plaintiff's counsel that Plaintiff's administrative right to
review the decision was exhausted and that no further review by Liberty Life would be
conducted.

### 3.    Liberty Life's Decision Was Reasonable and Not Arbitrary and Capricious

The foregoing claims history unequivocally establishes that Liberty Life's determination
was reasonable and was amply supported by the records and reports contained in the claims file.
The claims file is replete with evidence and analysis that Plaintiff did not meet the policy's
definition of disability. The claims file also demonstrates the thorough review process followed
in evaluating Plaintiff's claim. Indeed, as set forth above, Plaintiff's claim was denied only after
Plaintiff's own treating physicians opined that Plaintiff was capable of performing sedentary
function without the use of his left arm. Moreover, the transferable skills analysis and labor
market survey factored into account Plaintiff's physical restrictions. The transferable skills
identified were not dependent upon Plaintiff being able to lift, bend, stoop, push or pull. Nor did
they contemplate anything other than sedentary tasks. Liberty Life voluntarily subjected its
denial decision to an independent medical peer review, the results of which confirmed that the
medical information in the claim file supported a conclusion that Plaintiff could perform
sedentary function without the use of Plaintiff's left arm. The physician who performed the peer
review also considered the opinion of Dr. Kase that Plaintiff remained totally disabled. Thus,
Liberty Life's determination is supported by ample evidence on the record and is based upon that

evidence.[7]    Plaintiff did not, and cannot, demonstrate that, after this extensive review process, the determination of Liberty Life is anything other than reasonable and plausible.  Because it is reasonable, the determination must stand under the arbitrary and capricious standard of review. It is equally well-settled that Plaintiff cannot demand that the opinion of Dr. Kase be given any more deference than the opinions of Dr. Madireddi.  See Black & Decker v. Nord, 123 S.Ct. 1965 (2003).[8]

At best, Plaintiff can only show that the opinion of Dr. Kase conflicted with that of Dr. Madireddi and Plaintiff's three other treating physicians, Drs. Cariz, Bilazarian and Liguori. Conflicting opinions, however, do nothing more than raise the potential presence of conflicting or contradictory evidence, the presence of which the First Circuit has clearly explained is not, in and of itself, enough to make the administrator's decision unreasonable and therefore arbitrary. See Vlass v. Raytheon Employee's Disability Trust, 244 F.3d 27, 30 (1st Cir. 2001); Leahy v. Raytheon Company, 315 F.3d 11 (1st Cir. 2002).  In addition, the fact that conflicting evidence exists further supports the Court's use of the deferential standard of review provided under ERISA.    Under this standard, "the court is to not substitute its judgment for that of the [decisionmaker]."  Terry v. Bayer Corporation, 145 F.3d 28, 40 (1st Cir. 1998).  In this Circuit, where conflicting medical records could lead to conflicting decisions regarding whether a plaintiff is disabled, a court should defer to the decisionmaker as long the record contains

---

[7]  See Brigham v. Sun Life of Canada, 183 F. Supp.2d 427, 437 (D. Mass. 2002), affirmed by, 317 F.3d 72 (1st Cir. Mass. 2003) (finding that the existence of contrary medical assessments by plaintiff's treating physicians does not change the analysis under the arbitrary and capricious standard); Chandler v. Raytheon Employees Disability Trust, 53 F. Supp.2d 84, 91 (D. Mass. 1999), affirmed by, 229 F.3d 1133 (2000) (same).

[8]  In Black & Decker, the Supreme Court clearly held that "ERISA does not require plan administrators to accord special deference to the opinions of treating physicians."  Id. at 1966.  In discussing its rationale for not adopting the "treating physician rule," the Supreme Court noted that a treating physician may have biases in favor of his/her patient and "in a close case, may favor a finding of "disabled.""  Id. at 1971.  As a result, the Supreme Court held that courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  Id. at 1972.

evidence reasonably sufficient to support the decisionmaker's conclusion. See Pari-Fasano v. ITT Hartford Life and Accid. Ins. Co., 230 F.3d 415, 419 (1st Cir. 2000). The First Circuit in Leahy clearly articulated this deference given to plan decisionmakers when it emphasized:

> Disability, like beauty, is sometimes in the eye of the beholder . . . We have held before, and today reaffirm, that the mere existence of contradictory evidence does not render a plan fiduciary's determination arbitrary and capricious. Indeed, when the medical evidence is sharply conflicted, the deference due to the plan administrator's determination may be especially great.

Leahy, 315 F.3d at 18-19 (citations omitted).

## III.    Plaintiff's State Law Contract Claim Is Preempted By ERISA

Liberty Life is entitled to summary judgment on Count II of Plaintiff's Complaint alleging breach of contract. While it is captioned as breach of contract, Count II specifically alleges that Liberty Life is liable under 29 U.S.C. §1132(a)(1)(B). (Complaint ¶11) In that form, Count II is entirely duplicative of Count I, and Liberty Life is entitled to summary judgment on Count II for the same reasons set forth above.

To the extent that Count II alleges a common law breach of contract claim, Liberty Life is also entitled to summary judgment because such a common law claim is preempted by ERISA. It is well-settled that ERISA contains a broad preemption provision, which is uniformly recognized as "the most sweeping federal preemption statute ever enacted by Congress." Sejman v. Warner-Lambert Co., 845 F.2d 66, 68 (4th Cir. 1988). The preemption provision states that ERISA shall "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." § 514(a) of ERISA, 29 U.S.C. §1144(a). State law is defined in the statute as including "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." § 514(c)(1) of ERISA, 29 U.S.C. §1144(c)(1). Based on the broad interpretation given the phrase "relate to" by the Supreme Court, Plaintiff's contract claim in this action undeniably "relate[s] to" an employee benefits plan governed by ERISA, because it is

based upon Liberty Life's denial of her claim for long-term disability benefits. Therefore, Count II is preempted.[9]

## CONCLUSION

For the reasons set forth above, Defendant Liberty Life Assurance Company of Boston respectfully requests that the Court grant summary judgment in its favor on Plaintiff's Complaint in its entirety.

Respectfully submitted,

LIBERTY LIFE ASSURANCE COMPANY OF BOSTON,

By its attorneys,

/s/ Guy P. Tully
Guy P. Tully, BBO# 555625
Richard Paterniti, BBO #645170
JACKSON LEWIS LLP
75 Park Plaza
Boston, MA 02116
(617) 367-0025

CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2006, a copy of the foregoing was served by electronic mail and through the ECF system on Plaintiff's counsel.

/s/ Guy P. Tully
Jackson Lewis LLP

---

[9] The phrase "relate to" was interpreted by the Supreme Court and "given its broadest common-sense meaning such that a state law 'relates to' a benefit plan . . . 'if it has a connection with or reference to such a plan.'" Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 739 (1985) overruled in part on other grounds, Ky. Ass'n of Health Plans, Inc. v. Miller, 538 U.S. 329 (2003). The Supreme Court further emphasized that the preemption clause was not limited to "state laws specifically designed to affect employee benefits plans." Shaw v. Delta Air Lines, 463 U.S. 85, 97 (1983). "[C]ommon law causes of action . . . based on alleged improper processing of a claim for benefits . . . undoubtedly meet the criteria for preemption under §514(a)." Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 47 (1987). The First Circuit has consistently affirmed dismissals on ERISA preemption grounds of state law claims similar to that brought by Plaintiff. See e.g., Danca v. Emerson Hosp., 9 F.Supp.2d 27 (D. Mass. 1998), aff'd, 185 F.3d 1 (1st Cir. 1999) (affirming dismissal of state law tort claims preempted by ERISA). The First Circuit has specifically affirmed dismissal of contract claims on the basis of ERISA preemption. See Hampers v. W.R. Grace & Co., 202 F.3d 44, 51-53 (1st Cir. 2000) (affirming dismissal of state law contract claims as preempted by ERISA); Carol v. Reed Rolled Thread Die Co., 49 F.3d 790, 795 (1st Cir. 1995) (upholding dismissal of state law claim for breach of contract as preempted by ERISA); Wickman v. Northwestern Nat'l Ins. Co., 908 F.2d 1077, 1082, cert. denied, 498 U.S. 1013 (1st Cir. 1990) (affirming dismissal of state law breach of contract claim as preempted by ERISA).