UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOSEPH ARCHAMBAULT, | ) | |
| Plaintiff | ) | |
| | ) | |
| VS. | ) | CIVIL ACTION |
| | ) | NO. 05-11762-NG |
| LIBERTY LIFE ASSURANCE | ) | |
| COMPANY OF BOSTON, | ) | |
| Defendant | ) | |

**PLAINTIFF'S  AMENDED MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

The Plaintiff submits the Memorandum of Law in support of his Motion for Summary

Judgment filed herewith, stating the reasons why, with reference to the Administrative Record

and supporting authorities, he is entitled to summary judgment reversing the Defendant's

termination of his long term disability benefits under his employer's ERISA plan.   References

to the Administrative Record (AR00001 et seq.) are indicated in parentheses.

**ARGUMENT**

A.    **The Appropriate Standard Of Review In This Case Is The "Arbitrary And
Capricious Standard" Where The LTD Plan Provides That Defendant Has
Discretionary Authority To Construe The Plan And Review The Evidence,
Subject To Diminished Deference Due To Defendant's Conflict Of Interest.**

The Long Term Disability (LTD) policy purchased by Plaintiff's employer grants discret-

ion to Defendant for interpreting the policy and determining eligibility for benefits (AR00024).

Therefore Defendant's termination of Plaintiff's LTD claim is subject to judicial review under

the "arbitrary and capricious" standard, *Firestone Tire & Rubber Co.  v. Bruch,* **498 U.S. 101,**

**115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989),** i.e. whether the administrator's decision was "reas-

onable," as based on the substantial evidence of record,  *Pari-Fasano v. ITT Hartford Life &*

***Accident Ins. Co.***, **230 F.3d 415, 419 (1st Cir., 2000),** which requires review the record as a whole, i.e. "*all* the evidence" which the administrator had when making the decision under review. ***Cook v. Liberty Life Assurance Co. of Boston***, **320 F.3d 11, 10 (1st Cir., 2003);**

Liberty serves as both the insurer responsible for payment of LTD benefits under the ERISA plan and the administrator empowered to make determinations of eligibility for such benefits. (AR00001, AR00012 and AR00024). In this circumstance, the Court must determine whether the decision to terminate benefits was tainted by conflict of interest and whether the administrator's actions may be entitled to a less deferential review by the District Court, ***Doyle v. Paul Revere Life Insurance Company of Boston***, **144 F.2d 181, 184 (1998)**, or no deference at all. ***Wright v.R.R. Donnelly & Sons Co. Group Benefits***, **402 F.3d 67, 74 (1st Cir., 2005)**.

Liberty's improper motive to terminate Plaintiff's LTD claim, regardless of the severity of his impairments, is apparent on the record. As outlined in Plaintiff's Rule 51.6 Statement of Material Record Facts (Plaintiff's Rule 56.1 Statement), filed herewith, Section G, Liberty began an attempt to ease Plaintiff off his LTD benefit after he met with its vocational consultant, Kathleen Baris, in October 2002, to find some alternate employment he could perform. Ms. Baris noted that an impediment would be "the claimant's stamina and ability to sustain at least a thirty-hour workweek" (AR00352), and that he suffers side effects related to medication for spasms, primarily with fatigue, which requires that he lie down and rest. Report (AR00349).

Despite recognizing such well-founded concerns about Plaintiff's ability to perform and hold a job Ms. Baris recommended that if he were not to pursue some alternate employment "there would have to be *some decision made not to continue to provide assistance. . . .* " Report (AR00335), emphasis added. This was a clear recommendation that benefits be terminated if Plaintiff did not find suitable work, despite very realistic concern that he could not do so.

Liberty continued to push Plaintiff toward alternate employment, despite recognizing that "fatique (sic) is a *huge* issue for stroke patients." File Note,12/06/02 (AR00041), emphasis added. Analyst Tina Damsell, noted that "Medical provided supports (Employee's) inability to perform work at a sedentary level for 8 hours per day" and, further, "(Employee) could not meet gainful by working part time." File Note (AR00041). Still, Liberty required that Plaintiff pursue vocational rehabilitation, File Notes 1/24/03 and 2/3/03 (AR00040), while it continued to seek medical documentation to determine that he could perform some kind of work activity.

Between October 20, 2004, and 3/18/05, Liberty waged an intense campaign of calls and correspondence seeking further medical documentation from Plaintiff's physicians to support a finding of work capacity, File Notes (AR00035-38). Then, having obtained a single reference from Dr. Liguori regarding a restriction of lifting or carrying 10 lbs., Restrictions 12/4/04 (AR00247), Liberty pounced. Letters were sent to Dr. Cariz and Dr. Bilazarian asking them to agree with those restrictions (AR00213 and AR00211), "based on the above information" (AR00213 and AR00208). Liberty then conducted a transferable skills analysis which identified four sedentary occupations which Plaintiff might perform, erroneously assuming that Plaintiff could sustain work activity within the functional limits described by Dr. Liguori on a full-time basis, which was never indicated by Liguori, Cariz or Bilazarian.

On March 30, 2005, Dr. Liguori submitted a letter correcting his Restrictions form to state that: **"*Due to his imbalance* it was recommended that Plaintiff not lift or carry objects greater than *five* pounds" (AR00204), emphases added. This correction was never provided to either Dr. Bilazarian or Dr. Cariz who both based their agreement as to sedentary work capacity chiefly on Dr. Liguori's prior restrictions.

Liberty's medical consultant, Dr. Madireddi, provided a lengthy "Independent Peer Review" which stated that Plaintiff might perform sedentary work activity with lifting up to ten pounds for a full workday, but imposed a significant restriction that he would have to stop and take a rest break, of unspecified duration, "every 60 minutes" throughout the day. (AR00128). This limitation was not considered by the vocational analyst who listed occupations which Mr. Archambault might perform within his restrictions and limitations.  See Transferable Skills Analysis & Labor Market Information (AR00183).

The manner in which this claim was handled after Liberty's consultant recommended that a decision be made to terminate benefits if Plaintiff failed to obtain alternate employment is evidence that Liberty was acting on that recommendation, and that is evidence of an improper motive for terminating the claim.   Where the record facts in this case thus betray an improper motive to act in Liberty's own interest, as opposed to acting as an impartial ERISA fiduciary, Liberty's decision to terminate Plaintiff's LTD benefits sufficiently "strayed outside the bounds of reasonableness to become an abuse of discretion."[1]  See **_Pari-Fasano, supra,_** **230 F.3d at 419.**

**B.** **Defendant's Termination Of Benefits Was Unreasonable And Unsupported By Substantial Record Evidence No Matter What Standard Of Review Obtains**

Apart from any conflict of interest, Liberty's decision was unreasonable, arbitrary and capricious *per se* because it was not based on any substantial medical and vocational evidence that Plaintiff  is capable of performing any gainful work activity with "reasonable continuity"

---

[1] Despite the possibility that Liberty, as a general proposition, might somehow be motivated by competitive market forces to make appropriate disability determinations, see **_Doyle_**, **_supra,_** **144  F.3d at 184**, the specific facts of the present case indicate that Liberty in fact acted with an improper motive.  In this circumstance, such apparent conflict is at minimum a factor that must be weighed in determining whether Liberty abused its discretion in terminating Mr. Archambault's LTD benfits.  **_Calvert  v._** **_Firstar Finance, Inc.,_**  **409 F.3d  286, 292 (6th Cir., 2005)**, citing **_Firestone, supra._** **489 U.S. at 115 (1989)**; **_Cozzie v. Metropolitan Life Ins. Co.,_** **140 F.3d 1104 (7th Cir., 1998)**; **_Epright v._** **_Environmental Resources Mgmt. Inc. Health & Welfare Plan,_** **81 F.3d 335 (3rd. Cir., 1996)**.

within the LTD plan's definition of total disability, and it fails to take due account of the substantial record evidence that Plaintiff cannot sustain any work activity with reasonable continuity. Under the "arbitrary and capricious" standard, the question is "whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." ***Pari-Fasano, supra,*** **230 F.3d at 419.**  The basic question is whether the administrator's denial of benefit was "reasonable." See ***Liston, supra,*** **330 F.3d at  24**  In the present case, Liberty's termination of Plaintiff's LTD benefits was not reasonable because several material gaps and *non sequiturs* in the evidence on which Liberty relied clearly supports a rational determination that Liberty acted arbitrarily.

The Court's review in this matter is limited to the grounds for terminating the claim which Liberty stated to the Plaintiff. ***Orndorff, supra,*** **404 F.3d at 515**, citing ***Glista v. Unum Life Ins. Co.,*** **378 F.3d 113, 128-129 (1st Cir., 2004)**.  Those grounds appear on the termination letter of April 25, 2005 (AR00075-00077), referring only to Dr. Liguori's "restrictions," the purported "confirmations" of those restrictions by Drs. Bilazarian and Cariz, and four specific occupations identified by Liberty's vocational analalyst.  See  Plaintiff's Rule 51.6 Statement, Paras.17-19.  Liberty added that Mr. Archambault could perform with "reasonable continuity" the material and substantial duties of those occupations based on his capacity and skill level. *Id.* No other factual grounds for terminating the LTD claim were stated.

Plaintiff filed an appeal from the termination of his LTD benefits, through prior counsel, which referred to the fact that Liberty had chosen to rely heavily on a cardiologist's note (Dr. Bilazarian) as a basis for termination when dealing with a neurological condition, that the termination was based on a mistaken reading of the limits placed upon Plaintiff  and that Plaintiff's

disability was approved by the "federal government," Letter, May 2, 2005 (AR00174-75).

Liberty's letter of June 22, 2005, finally denying Plaintiff's appeal referred only to Dr.Kase's report which expressly stated that Plaintiff was disabled by pain related to his frequent spasms, and a statement by Liberty's medical consultant, L. Neena Madireddi, M.D., purporting to refute Dr. Kase's report by saying, without any analysis, "the medical evidence continues to support" a finding of sedentary work capacity with stated limits. (AR000655-67).

The Court's review, therefore, must be confined to the reasonableness of Liberty's decision to terminate LTD benefits based on the specific grounds stated in the termination letter of April 25, 2005, and the final denial letter of June 22, 2005, to determine whether those specific grounds are supported by the substantial evidence of record and are reasonable in light of the definition of disability stated in the LTD plan. See *Orndorff, supra,* **404 F.3d 515**.

The Sodexho-Marriott LTD plan contains the following provision which is material to the issues on this complaint for judicial review. "Disability" under the group LTD policy for employees such as Plaintiff, who have completed the 24-month "own occupation" term of disability, means the inability:

> to perform, *with reasonable continuity*, all of the material and substantial duties of (the claimant's ) own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

(AR00006), emphasis added). The term "reasonable continuity" is not defined anywhere in the group LTD policy.

Where such an important term is not defined in an ERISA plan, the reviewing court must apply "common-sense canons of contract interpretation" to accord the language its plain, ordinary and natural meaning, *Filiatrault v. Comverse Technology, Inc.,* **275 F.3d 131 (1st Cir., 2001)**; Only if the term is ambiguous, may the Court refer to external evidence as to the parties'

intent.  ***Hughes v. Boston Mutual Life Ins. Co.,***, **26 F.3d 264, 268 (1st Cir., 1994)**.

The term "continuity" is easily defined by its "plain, ordinary and natural meaning."  As commonly understood, the term "continuity" refers to an *uninterrupted* flow or course of action.[2] The contract refers to "reasonable" continuity, and there is no cause for the Court to seek evidence as to the parties' intent as to the meaning of this term, because reasonableness is the touchstone to which the Court must refer in determining whether or not a disability determination is arbitrary and capricious.  See ***Cook***, *supra,* **320 F.3d at 19.**  It would be tautological for the Court to accept a solipsistic[3] definition from Liberty as to what it means by the term "reasonable" as used in the contract when deciding whether Liberty's conduct, as controlled by that term, was reasonable based on the record evidence as a whole.   If nothing else, the case law pertaining to "arbitrary and capricious" review reserves findings of reasonableness to the Court as the standard by which a plan administrator's decision is judged on judicial review. See ***Liston***, *supra,* **330 F.3d at 24.**  If a plan administrator were  permitted to define what is "reasonable" as to its own findings, without reference to any specific plan language on point, that would amount to the Court's "rubber stamping" the administrator's decision in every case, which would be no review at all.   See ***Donato v. Metropolitan Life Ins. Co.,*** **19F.3d 375, 380 (1st Cir., 1994);**

---

[2] This definition is supported by reference to the **Oxford English Dictionary**, defining "continuity," pertaining to action, as "The state or quality of being *uninterrupted* in sequence or succession, . . . *unbrokenness."*  **Oxford English Dictionary**, 3d Edition (Oxford University Press, 2004), emphasis added.  It is also supported by reference to **Webster's New World Dictionary of theAmerican Language**, which defines "continuity" as:

    1.     The state or quality of being continuous: connectedness; coherence.
    2.     A continuous flow, series or succession, unbroken, coherent whole.
    3.     Continuous duration.

***Webster's New World Dicitonary of the American Language***, 2nd College Edition, (Simon & Schuster, N.Y.; 1982).

[3] Deference to an ERISA administrator as to the meaning of "reasonable," would result in an absurdity equal to Humpty Dumpty's proclamation in Lewis Carroll's *Through the Looking Glass:*  "When I use a word, . . . it means just what I choose it to mean –neither more nor less.

_**Jones v. Metropolitan Life Ins. Co.,**_ **385 F.3d 654, 661 (6**[th] **Cir., 2004)**.

　　　With no language in the policy defining what "_reasonable_ continuity" means, the Court must look to what that term is commonly understood to mean in the real world.  For most Americans, the work day is eight hours interrupted by a single, ten-minute "coffee break" in the morning, a lunch break which may be as little as a half-hour, and another short break in the afternoon.  Federal law does not require an employer to provide either coffee breaks or a lunch break, and in Massachusetts, under M.G.L., c.149, Sect. 100, only a 30-minute lunch break is required.

　　　Though not legally required, many employers customarily provide a brief morning break, a lunch break and a brief afternoon break.   In the real workaday world:

> In order to perform a job satisfactorily, to carry out its duties, a worker must be able to perform the tasks it requires from the beginning to the end of the work day.  Otherwise, he cannot perform its tasks or carry out its duties.  This is another way of saying that the duty of a job is to perform its tasks as many times, and as long throughout the work day as the job requires.

_**Tippitt v. Reliance Standard Life Ins. Co.,**_ **_____ F.3d _____     (11**[th] **Cir., 2006),**  Docket No. 05-14005, Memorandum of Opinion, marked "publish," at page 18.[4]  That is the commonly understood meaning of "reasonable continuity" in the workplace, and this is true whether the employee's work day may be full time or only part time.  When on the job, for however many hours a shift may be, a worker must be able to perform all required tasks as many times and as long as the job requires, and not as determined by his limitations.  If an administrator would find there are specific jobs suitable for a claimant, which permit greater tolerance for employee down-time, that must be based on substantial evidence in the record that is case-specific for such

---

[4] _**Tippitt**_ involved a substantive issue different from those in the present case, concerning an interaction between definitions of partial disability and total disability, based on a "non-equivalence" provision of the subject ERISA plan that does not obtain here.  What is common to both _**Tippitt**_ and the present case is the Court's interpretation of ERISA plan terminology regarding employment conditions according to the commonly understood meaning of such terminology.

jobs.  See ***Evans v. Unumprovident Corp.***, **434 F.3d 866, 879-880 (6th Cir., 2006).**

Liberty's termination of Plaintiffs' LTD benefit is not supported by any substantial record evidence as to medical and vocational issues, and it is contrary to the substantial evidence which indicates that he is totally disabled from performing any activity with reasonable continuity in a work environment.  Plaintiff's disability is based on the neurological sequelae of a stroke which has left him severely impaired, with total loss of function in his left arm and hand and significant loss of function in his left leg.  See Dr. Kase Letter (AR00083).  In addition to such severe neurological motor deficits and paralysis, Plaintiff is affected by frequent "spasms" that are very painful, as attributed to the spasticity of his left limbs resulting from the stroke.  *Id.* Despite heavy medication, Plaintiff has had only partial relief of his symptoms and, based on both motor deficits and painful spasms, Dr. Kase has determined that Plaintiff is unable to perform, with reasonable continuity, the substantial duties of any occupation, i.e. "he is completely and permanently disabled for any occupation" by reason of the neurological sequelae of his stroke.  *Id.*

This report from Plaintiff's treating neurologist, who has managed "the various complications" resulting from his stroke since November 2000, is substantial evidence by itself that Plaintiff is totally disabled by pain and motor disturbance for any occupation.   The test for substantial evidence is whether it is  "reasonably sufficient to support a conclusion." ***Vlass v. Raytheon Employees Disability Trust***, **244 F.3d 27, 30 (1st Cir., 2001),** where:

> Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

***Currier v. Secretary of H.E.W.***, **612 F.2d 594, 597 (1st Cir., 1980)**.  Dr. Kase's report is sufficient, standing alone, to meet this substantial evidence standard.

Although pain is a subjective factor, often not susceptible to objective proof, cf.

***Boardman v. Prudential Life Ins. Co. of America*, 337 F.3d 9, 16 (1ˢᵗ Cir. 2003),** pain may

nonetheless be the basis for a finding of total disability from any occupation under an ERISA

plan. ***Buffonge v.The Prudential Insurance Company of America*, 426 F.3d 20, 26 (1ˢᵗ Cir.,**

**2005).**  In the present case, where Plaintiff's disabling pain is medically attributed to his frequ-

ent muscle spasms, which is objective evidence of intense pain caused by the involuntary

contracture of the affected muscles,  ***Rivera-Torres v. Secretary of  HEW*, 837 F.2d 4,6 (1ˢᵗ Cir.,**

**1988); *Jones v. Secretary of HEW*, 945 F.2d 1365, 1369-70 (6ᵗʰ Cir., 1991); *Mullen v. Bowen*,**

**800 F.2d 535, 547-548 (6ᵗʰ Cir., 1986)**, as anyone who has experienced a leg "cramp" will

readily understand.

Dr. Kase's  report as to Plaintiff's continued total disability, is fully supported by the

other substantial medical evidence in the record that was available to Liberty when it terminated

the LTD claim, documenting Plaintiff's continuing debilitating neurological impairments,

including painful spasms, significant motor deficits and chronic fatigue. See Plaintiff's Rule 51.6

Statement, Section C, filed herewith.

Dr. Liguori's March 30, 2005, letter corrected the prior "restrictions" form on which

Liberty based its vocational analysis, to state that:  "*Due to his imbalance* it was recommended

that Mr. Archambault not lift or carry objects greater than *five* pounds," emphases added

(AR00204). When last seen in September 2004, Plaintiff had been having difficulty with "in-

creased falls and a decreased left sided awareness."  Based on examination, Plaintiff continued to

demonstrate significant left sided weakness and significant functional deficits.  Dr. Liguori still

found chronic "difficulties with fatigue and alertness which are intermittent"  (AR00204), i.e.

episodic and not completely controlled. See ***Buffonge , supra,,*** **426 F.3d at 24.**  Dr. Liguori's

findings did not suggest any significant improvement from those of June 7, 2002. (AR00383).

     The record shows that Liberty was aware that Plaintiff's severe restrictions due to pain

and fatigue precluded him from any substantial work activity.  The vocational analyst, Kathleen

Baris, in August, 2002, noted that that an impediment to employment would be "the claimant's

stamina and ability to sustain at least a thirty-hour workweek" Report (AR00352), and that

Plaintiff suffers side effects related to his medication for spasms, primarily with fatigue, which

requires that he lie down and rest.  Report (AR00349).  Plaintiff's concerns about his ability to

perform a job successfully, due to "fatigue as well as the variability of his symptoms" were

deemed to be well-founded.  (AR00335).  Liberty's claims personnel noted that "fatique (sic) is a

*huge* issue for stroke patients."  File Note,  12/06/02 (AR00041, emphasis added).  Liberty's

analyst,Tina Damsell, noted specifically that "Medical provided supports (Employee's) inability

to perform work at a sedentary level for 8 hours per day" and, further, "(Employee) could not

meet gainful by working part time."  File Note, 12/09/02 (AR00041).

     The above medical and vocational documents of record are substantial evidence suffic-

ient to meet Plaintiff's burden to show that he remains totally disabled from performing any

work activity with any reasonable continuity.   Such substantial evidence of disability may, under

the arbitrary and capricious standard, be overcome by evidence to the contrary, see ***<u>Gannon v.

Metropolitan Life Ins. Co.,</u>*** **360 F.3d 211, 213 (1**[st]** Cir., 2004),** but such contrary evidence must

itself be *substantial.* Non-probative "evidence" will not suffice under the arbitrary and capricious

standard to support an administrator's denial of benefits, ***<u>Cook, supra,</u>*** **320 F.3d at 18. 22**.  Lib-

erty's termination of the LTD claim is not supported by substantial evidence because it is based

entirely on material gaps and *non-sequiturs* in the "evidence" on which Liberty relied.

The primary medical basis for Liberty's termination of the LTD claim, as stated on the notice of termination, was Dr. Liguori's initial "Restrictions" form, as purportedly "confirmed" by Drs. Bilazarian and Caris. This "evidence" does not rise to the level of substantial evidence because it is non-probative on an essential, material issue under the subject LTD plan –Plaintiff's capacity to *sustain* any work activity with "reasonable continuity."

Dr. Liguori makes no indication as to any degree of sustained activity, and he makes no reference to "work" as opposed to simple "sedentary activity" such as reading a book at home, where Plaintiff in fact does such limited, non-productive sedentary "activity,"e.g. preparing his meals or reading a book (AR00239), and he cannot do even such limited activities of daily living without suffering from episodic bouts of pain, due to spasticity, and fatigue which requires that he nap between one-and-a-half to three hours a day. Dr. Liguori's "restriction" to limited "sedentary activity" is entirely consistent with Plaintiff's actual daily routine, and it says absolutely nothing about his having the capacity to *sustain* any level of activity in a *work* setting. Those critical factors under the "reasonable continuity" criterion are not addressed in Dr. Liguori's "restrictions," and therefore a gaping void exists between Dr.Liguori's "restrictions" and Liberty's conclusion that Plaintiff might perform the duties of certain enumerated occupations "with reasonable continuity." A treating doctor's listing of functions which a claimant *cannot* perform does not create an inference that an activity not on the list is one which the claimant *can* perform. ***Buffonge, supra,*** **436 F.3d at 29.**

Dr. Liguori's stated findings on this form, in context of the record as a whole, are contrary to a finding that Plaintiff might perform any work with any degree of continuity within his physiological restrictions, as it clearly refers back to Plaintiff's "Spasticity/contractures" and "fatigue" (AR00247), which are the same factors to which Dr. Liguori referred in his Note of

May 9, 2003, which stated:

> He remains having limitations with standing, balance and endurance. *Fatigue is an issue.* Spasticity in the left upper and lower extremities also remains an issue. . . . He has had a few *falls* since his last visit, *usually related* to slippery surfaces, *fatigue* and uneven surfaces.
>
> I discussed at length with Mr. Archambault regarding spasticity management and the need to titrate medications as too little with (sic) cause increase in spasticity and too much will contribute to *weakness and fatigue*. . . . We discussed his fatigue as an issue as well, and because of his fatigue, he eliminated Zanaflex in the a.m. and afternoon which did improve somewhat. *He continues to have difficulty with fatigue, attention and concentration, however. He reports having difficulty completing reading a book as he does tire easily.*

OP Follow Up Note, 5/9/03 (AR00297-98, emphases added). Nothing in Dr. Liguori's "Restrictions" Form of 12/4/04 recants or qualifies these limitations in any way.

These are the same factors, unaltered by Dr. Liguori's "restrictions" form, on which Liberty's vocational consultant had previously found that Plaintiff's concerns about the effect of his fatigue and variable symptoms on his inability to work were "realistic" (AR00334-335); the same factors previously recognized by Liberty's claims personnel, stating that "fatique (sic) is a *huge* issue for stroke patients," (AR00041, emphasis added), and the same factors on which Liberty's analyst previously acknowledged that "Medical provided supports (Employee's) inability to perform work at a sedentary level for 8 hours per day" and, further, "(Employee) could not meet gainful by working part time." File Note, 12/09/02 (AR00041).

Nothing in Dr.Liguori's "Restrictions" form, or the "confirmations" from Drs. Bilazarian[5] and Cariz, can reasonably be read as altering those prior findings. Dr. Bilazarian and Dr. Cariz were not asked to comment on this material issue, and they did not do so in their

---

[5] Dr. Bilazarian is a cardiologist and his treatment has been limited to monitoring Plaintiff's cardiovascular health after a pacemaker implant, not the neurological problems which are the basis of this LTD claim. Prior counsel's objection on this basis, Letter 5/12/05 (AR00168), is well founded. See *Zavora v. Paul Revere Life Ins. Co.*, **145 F.3d 1118, 1123 (9th Cir. 1998)**; *Kunin v. Benefit Trust Life Ins.Co.*, **910 F.2d 534, 538 (9th Cir., 1990)**; *Monroe v. Pacific Telesis Group Comp. Disability Benefits Plan*, **971 F. Supp. 1310,1314-15 (N.D. Cal., 1997)**.

responses to Liberty.   Neither  Dr. Bilazarian nor Dr. Cariz provide the necessary bridge from

Plaintiff's severe limitations and a finding that he can perform *work* activity within those limit-

ations on any *sustained*  basis without succumbing to his painful spasms and/or chronic fatigue.

There is a further flaw in Liberty's reliance on Dr. Liguori's "Restrictions" form and

the confirmations by Dr. Bilazarian and Dr. Cariz.   On March 30, 2005, Dr. Liguori submitted

a narrative correcting his prior assessment that Plaintiff might lift 10 pounds, to state that he was

in fact limited to lifting  *five* pounds at most, and this was due to Mr. Archambault's neurological

problem with balance.  (AR00204).[6]

This creates another material gap in the substantial evidence because the requirements for

"sedentary" work activity include the ability to lift and carry up to 10 pounds, not five pounds at

most, as expressly recognized by Liberty's own review physician, Dr. Madireddi, referring to the

Dictionary of Occupational Titles definition of "sedentary" work activity:

> exerting up to *ten pounds* of force occasionally and/or a negligible amount of
> force frequently or constantly to lift, carry, push, pull or otherwise move
> objects. . . .  Jobs are sedentary if walking and standing are required only occasionally
> and other sedentary criteria are met.

(AR00130), emphasis added.  This is a correct statement of the definition of "sedentary" work

activity, with the proviso that "occasionally" means lifting and carrying up to one third of time

during the workday,[7] and therefore even if Dr. Liguori's "restrictions" as corrected could be read

---

[6] There is no indication here that Dr. Liguori was improperly influenced to change his finding, where this occurred
before Liberty notified Mr. Archambault that the claim would be terminated, and this report was submitted to
Liberty as a correction and supplement for the prior "Restrictions" form, in response to Liberty's form letter which
*invited* further comment with reference to his prior "restrictions" and the "information" received from Dr. Bilazar-
ian. Letter, 2/23/05 (AR00205).  See **_Cook, supra,_**at 20.  Dr. Liguori's correction was received by Liberty prior to
its termination of the claim, as indicated on the termination notice of April 25, 2005, acknowledging receipt,
Termination Notice (AR00076), but no follow-up was sent to Dr. Bilazarian or Dr. Cariz for further "confirmation."

[7] See **_Lopes v. Metropolitan Life Ins. Co.,_** 332 F.3d 1, 3 fn.2 (1st Cir., 2003), referring to the DOT definition
of "sedentary" work:  "Sedentary Work – Exerting up to 10 pounds of force occasionally (Occasionally:  activity
or condition exists up to 1/3 of the time) . . . ."  Emphasis is added.

as referring to *work* activity, they cannot be reasonably read as indicating that Plaintiff has the capacity for sedentary work, as defined by the DOT, combined with the other restrictions found by Dr. Liguori.

The arbitrary and capricious standard gives discretion to an ERISA plan administrator to find facts pertinent to a claim based on the substantial record evidence, which requires that the administrator's findings be based on some actual evidence in the record. "Evidence contrary to an administrator's decision does not make that decision unreasonable, *provided substantial evidence supports the decision*." **Wright v. R.R. Donnelly & Sons Company Group**, **402 F.3d 67, 74 (1st Cir., 2005),** emphasis added.

Medical reports are not substantial evidence as to a material issue on a disability claim if they do not expressly address that issue. **Doyle, supra, 144 F.3d at 186**, holding that a claimant's medical records as to his symptoms were not substantial evidence of disability where they did not state that the symptoms were sufficiently severe to prevent him from returning to work. In the present case, similarly, Liberty cannot rely on Dr. Liguori's "Restrictions" form to establish that Plaintiff has the capacity for any *sustained* sedentary activity in a *work setting*, because those records say nothing as to those critical issues --neither directly nor by implication as in response to a specific inquiry on point. The standard for substantial evidence is the same for both parties on an ERISA claim, and deferential judicial review under the arbitrary and capricious standard does not allow an administrator to simply assume the facts necessary to support a denial of benefits, against the clear weight of the record evidence as a whole. See **Buffonge, supra, 436 F.3d at 30**. That is just what Liberty did in its arbitrary attempt to bridge the gap between Dr. Liguori's "Restrictions" and the plan's criterion for "reasonable continuity."

Liberty's letter denying Plaintiff's appeal referred to further medical documentation

15

from Dr. Kase, which fully supported the disability claim, and Dr. Madireddi's Addendum to her "independent peer review." Letter, June 22, 2005 (AR00065-67). Liberty's reliance on either of Dr. Madireddi's two reports is not reasonable for several reasons.

Dr. Madireddi conducted a record review only, taking all of two hours and ten minutes to review the voluminous medical records on file, and another 43 minutes writing her initial 32-page report, Independent Peer Review (AR00131), and has never examined Plaintiff personally. See ***Buffonge****, supra,* **426 F.3d at 26,** rejecting the opinion of a non-examining review physician who spent only three hours reviewing records and preparing a report.

Dr. Madireddi's opinion that Plaintiff has the capacity to perform *sustained* sedentary work activity is not supported by any physician or therapist who has examined Plaintiff, and it is contrary to the stated opinions of the two physicians who are primarily involved in treating the permanent and severely debilitating neurological symptoms of his stroke. The opinion of a review physician who has not examined a claimant may in some cases rise to the level of substantial evidence, as in ***Gannon****, supra,* **360 F.3d at 214**, where the review physician's conclusions were based on the clinical findings of a therapist who had examined the claimant, contrary to the findings of the claimant's treating physicians. Where there is no such conflict, however, where the only substantial and *probative* medical evidence runs in the claimant's favor as in the present case, a review physician's contrary opinion is open to doubt on judicial review. See ***Orndorff****, supra,* **404 F.3d at 526.**

A non-examining review physician's report must be judged by the standard of reasonableness in context of the record as a whole, see ***Bufonge****, supra,* **426 F.3d at 243**, and it is not automatically entitled to substantial evidentiary weight. The reports of a claimant's treating physicians, although not entitled to any greater weight than a non-treating physcian's opinion,

may not be arbitrarily or summarily disregarded by a plan administrator, ***Black & Decker***

***Disability Plan v. Nord.,*** **538 U.S. 822, 834, 123  S.Ct. 1965, 1967, 155 L.Ed2d 1034 (2003)**,

and it  therefore follows that an administrator cannot reasonably rely on the report of a review

physician who arbitrarily dismisses the findings of a claimant's treating physicians, misstating

the medical evidence of record, with no reasoned analysis based on the medical record as a

whole, as in the present case.  Plaintiff does not argue that the opinions of his treating physicians

are entitled *per se* to any greater weight than the findings of Liberty's review physician, contrary

to the ***Black & Decker*** rule, but on the facts of the present case, the review physician's report is

not entitled to any substantial evidentiary weight because it is not supported by any substantial

medical evidence in the record.

Dr. Madireddi's opinion that Plaintiff is not disabled is based on clear error and mis-

reading of the medical records she purported to review, as where she summarized Dr. Liguori's

note of December 2004:

> no standing for long periods of time, no walking long distances, no lifting or
> carrying over 10 pounds, unable to use the left arm and hand and no climbing,
> bending, stooping kneeling, pushing or pulling.  The claimant is right-hand
> dominant and *it was felt that this was a full-time sedentary work capacity* with
> no use of the left arm.

(AR00109), emphasis added.  This is a material misstatement of Dr. Liguori's restrictions, which

nowhere indicate that Dr. Liguori believes Plaintiff is capable of "full-time sedentary work

capacity."  This by itself is a sufficient basis to disregard Dr. Madireddi's opinion as to

Plaintiff's capacity for sedentary work activity.  See ***Buffonge, supra,*** **426 F.3d at 9.**

Dr.  Madireddi claimed that the available medical documentation "does not provide

detailed restrictions placed upon Mr. Archambault by his attending physicians" (AR00129), but

Dr. Liguori listed several specific functional restrictions for standing, walking, lifting, bending,

stooping, kneeling and other functional abilities. (AR00247). If Dr. Madireddi's reference to unspecific restrictions refers to the lack of any stated time limits, that only begs the question where Dr. Liguori was not asked to state time limits. A medical evaluation that states only restrictions cannot be read as implying that the claimant is capable of performing activities that are neither asked about nor addressed in the evaluation, ***Buffonge, supra,*** **436 at 29**, and given Liberty's awareness that a major component of Plaintiff's disability is chronic fatigue, see File Note, (AR00041), it is fair to ask why information as to such a material issue would not have been sought by Liberty when directing an inquiry to Plantiff's treating physician.[8]

Dr. Madireddi opined that Plaintiff could lift and carry a maximum of 20 pounds occasionally using his right arm only, (AR00127) and (AR00063), which completely ignores the reason why Dr. Liguori restricts lifting lifting and carrying to five pounds. That is because, due to severe left-sided hemiplegia, lifting even minimal weight with his right hand will cause Plaintiff to lose his.balance (AR00204).[9] This is objectively related to Plaintiff's "decreased left side awareness" due to his severe neurological impairment. *Id.* The issue is not whether Plaintiff has sufficient musculoskeletal *strength* in the right arm to lift 20 pounds, but how lifting even a negligible amount with his right arm will cause him to lose his *balance* and fall.

After dismissing Dr. Kase's findings that in addition to Plaintiff's motor deficits, he is afflicted with frequent painful spasms of the left limbs that render him unable to perform with

---

[8] Liberty's failure to seek specific information from Dr. Liguori as to Mr. Archambault's stamina, as affected by his chronic fatigue, suggests that Liberty did not want to have such additional information in the file because it was trying to terminate the claim and it already knew that Mr. Archambault's stamina for sustained work activity was severely compromised. See File Note, 12/09/02 (AR00041). The administrator of an ERISA LTD plan, as a "trustee," has a duty to take the initiative to obtain such reasonably available information pertinent to a disability claim, ***Toland v. McCarthy,*** **499 F. Supp. 1183, 1190 (D. Mass., 1980),** and LTD insurers routinely use pre-printed forms seeking time-specific evaluations from physicians as to the claimant's endurance for work activities. The lack of such inquiry in the present case is suspect, as evidencing Liberty's improper motive for terminating the claim, See ***Calvert****, supra,* **409 F.3d at 292.**

reasonable continuity any work activity, Dr. Madireddi states in conclusory fashion, without any reasoned analysis, that "medical evidence continues to support that he can still lift and carry 20 pounds with the right extremity on an occasional basis and 10 pounds frequently" (AR00063). This is another material misstatement. Dr. Madireddi does not refer to any medical record indicating that Plaintiff has the capacity to lift twenty pounds, or to do any work activity on a sustained basis, and no such medical evidence exists in Liberty's extensive claim file for this case.

Dr. Madireddi's summary dismissal of Dr. Kase's finding of disability based on frequent spasms and pain, without any analysis or reference to specific medical evidence of record, is unreasonable where Dr. Kase's opinion as to the disabling effect of Mr. Archambault's spasticity and pain is based on several years of treatment and direct observation, ***Buffonge, supra,*** **426 F.3d at 26**, where the spasticity of Mr. Archambault's musculature is an objectively determined cause of debilitating pain, see ***Rivera-Torres, supra,*** **837 F.2d at 6,** and where Dr. Kase expressly states that the pain and spasticity are so severe as to prevent Mr. Archambault from engaging in any sustained work activity. Contrast ***Doyle, supra,*** **144 F.3d at 186.**

Dr. Madireddi dismisses Plaintiff's self-report of pain and fatigue in similar summary fashion, stating that "Overall, the medical evidence would support that Mr. Archambault's self-reported limitations are somewhat overstated and are not entirely consistent with the available medical evidence." (AR00131). There is no analysis or specific reference to any medical record to support this conclusion, and it is another material misstatement of the evidence where the physicians involved in treating plaintiff's neurological symptoms, Dr. Liguori and Dr. Kase, clearly do support his self-reported symptoms and deficits.

Dr. Madireddi's "Independent Peer Review" is closely on point with ***Buffonge, supra,***

19

where it is based entirely on material misstatements and "parsing" or the medical record, and on disregard, without any reasoned analysis, of the findings of the physicians who have treated Plaintiff's severe neurological impairments.  See **426 F.3d at 26.**  Dr. Madireddi's review, therefore, is not entitled to any substantial evidentiary weight in support of Liberty's termination of Plaintiff's LTD claim.

C.   **Plaintiff Is Entitled To Summary Judgment On The Substantial Evidence Of Record, To Be Reinstated For Disability Benefits Under The Sodexho-Marriott LTD Plan With Full Payment Of All Past Due Benefits.**

The appropriate remedy in this case, as requested on Plaintiff's Motion for Summary Judgment,is an order that Liberty reinstate Plaintiff's LTD claim, with payment of all benefits past due, where Liberty's termination of benefits was not only based on a conflict of interest affecting its decision making, cf. ***Buffonge, supra***, **426 F.3d at 31**, but was also clearly unreasonable based on the substantial evidence of record. ***Cook, supra,*** **320 F.3d at 24.**   Here, where Plaintiff's continuing disability on the LTD clami is fully supported by the substantial medical and vocational evidence of record, and where Liberty's termination of benefits was not based on evidence which withstands the test of reasonableness, Liberty should not get "a second bite at the apple when its first decision was simply contrary to the facts."  *Id.*

Dated:   August 23, 2006                      For the Plaintiff,


                                              /s/   Richard K. Latimer

                                              Richard K. Latimer, BBO #287840
                                              222 Main Street, Box 710
                                              Falmouth, MA  02541
                                              (508) 548-7006
                                              rklaw@cape.com