UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOSEPH ARCHAMBAULT, ) | | |
| Plaintiff ) | | |
| ) | | |
| VS. ) | | CIVIL ACTION |
| ) | | NO. 05-11762-NG |
| LIBERTY LIFE ASSURANCE ) | | |
| COMPANY OF BOSTON, ) | | |
| Defendant ) | | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

The Plaintiff submits this Opposition to the Defendant's Motion for Summary Judgment, stating the reasons why, with reference to the Administrative Record and supporting authorities, Defendant is not entitled to summary judgment upholding the termination of Plaintiff's long term disability benefits under his employer's ERISA plan.  References to the Administrative Record (AR00001 et seq.) are indicated in parentheses.

**ARGUMENT**

**A.    Defendant's Termination Of Plaintiff's LTD Benefits Was Unreasonable.
Arbitrary And Capricious, As Unsupported By Substantial Record Evidence.**

Apart from any conflict of interest based on Liberty's dual role as insurer and plan administrator, the decision to terminate Plaintiff's Long Term Disability (LTD) claim was unreasonable, arbitrary and capricious *per se* because it was not based on any substantial medical or vocational evidence that Plaintiff is able to *sustain* any gainful work activity with "reasonable continuity" within the Sodexho Marriott LTD plan's definition of total disability (AR00006), and it fails to take due account of the substantial record evidence that Plaintiff cannot sustain any level of work activity with reasonable continuity.

Under the "arbitrary and capricious" standard of review, the basic question is whether Liberty's denial of benefit was "reasonable," based on the substantial evidence of record as a whole, *Cook v Liberty Life Assurance Co. of Boston*, 320 F.3d 11, 19 (1s Cir., 2003), where the Court's review is limited to the "administrative record," i.e. Liberty's claim file and plan documents.  On judicial review, Liberty is limited to the grounds for denial which it articulated to the Plaintiff.  *Orndorff  v. Paul Revere Life Ins. Co*, 404 F.3d  510, 515 (1st Cir., 2005); *Glista v. Unum Life Ins. Co.*, 378 F.3d 113, 128-129 (1st Cir., 2004).  Those grounds are as stated on Liberty's termination letter of April 25, 2005 (AR00075-00077), and the subsequent letter of June 22, 2005, finally denying Plaintiff's administrative appeal.  (AR00065-67).

The termination letter of April 25, 2005, referred only to a "Restrictions Form" from Plaintiff's treating physiatrist, Dr. Liguori, dated December 4, 2004 (AR00247), and purported "confirmations" from Drs. Bilazarian and Cariz. (AR00211-212 and AR00213-214), which did not state or imply that Plaintiff can sustain any level of work activity, either full or part time. The denial of  Plaintiff's administrative appeal referred only to a report from his treating neurologist, Dr. Kase (AR00083-84), who stated that Plaintiff is totally disabled by reason of painful muscle spasms which prevent him from performing any work activity with reasonable continuity, and a report from Liberty's medical consultant, Dr. Madireddi, which contradicted Dr. Kase's opinion in conclusory fashion with no reasoned analysis or reference to any specific clinical findings in the record to support her opinion.

 The Court's review, therefore, must be confined to the reasonableness of Liberty's decision to terminate the LTD claim based on the specific grounds stated in the termination letter of April 25, 2005, and the final denial letter of June 22, 2005, to determine whether those specific grounds are supported by the substantial evidence of record and are reasonable in light

2

of the definition of disability stated in the Sodexho Marriott LTD plan.  See **<u>Orndorff</u>**, *supra*, **404 F.3d 515**.  Plaintiff submits that those grounds for termination are not supported by the substantial evidence of record as clearly appears from a review of the subject LTD policy and the record facts.

1.  **<u>The Plan Definition of "Disability," i.e. "Reasonable Continuity," Requires That Liberty's Denial Be Based On Substantial Evidence As To Plaintiff's Ability To Sustain Sedentary Work Activity Despite His Pain And Fatigue.</u>**

The Sodexho-Marriott LTD plan contains a definition of disability which is material to the issues on this complaint for judicial review:  "Disability" under the group LTD policy for employees such as Plaintiff who have completed the 24-month "own occupation" term of disability, means the inability "to perform, *with reasonable continuity*, all of the material and substantial duties of (the claimant's) own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity."  (AR00006, emphasis added).  Liberty's termination of Plaintiff's LTD benefits was not reasonable because the "evidence" cited in the termination letter and denial of appeal was non-probative as to the essential finding that Plaintiff has the capacity to *sustain* any level of work activity with reasonable continuity, and was contrary to the aggregate record evidence that he cannot do so.

The term "reasonable continuity" is not defined anywhere in the group LTD policy (AR00001 through 00032), but it is unnecessary to refer to external evidence of intent to determine the meaning of "reasonable continuity."  The term is easily defined by reference to its "plain, ordinary and natural meaning."  **<u>Filiatrault v. Comverse Technology, Inc.</u>, 275 F.3d 131, 135 (1st Cir., 2001).**  As commonly understood, the term "continuity" refers to an uninterrupted flow or course of action, and there is no reason to seek extrinsic evidence as to the parties' intent in order to give meaning to the term "*reasonable* continuity," because reasonableness is the touch-

3

stone to which the Court must refer to determine whether or not a disability denial is arbitrary and capricious,[1] i.e. whether it is supported by the substantial evidence of record.  See ***Cook, supra,* 320 F.3d at 19.**

In the absence of specific language in the policy defining what "*reasonable* continuity" means with respect to performing work activity, reference must be made to what that term is commonly understood to mean in the real workaday world.  For most Americans the work day is eight hours long, interrupted by a single, ten-minute "coffee break" in the morning, a lunch break which may be as little as a half-hour, and another ten-minute coffee  break in the afternoon.[2]

Although It is not legally required, many employers do provide for a brief morning break, a lunch break and a brief afternoon break.  In the ERISA context, it has been recognized that:

> In order to perform a job satisfactorily, to carry out its duties, a worker must
> be able to perform the tasks it requires from the beginning to the end of the work
> day.  Otherwise, he cannot perform its tasks or carry out its duties.  This is another
> way of saying that the duty of a job is to perform its tasks as many times, and as long
> throughout the work day as the job requires.

***Tippitt v. Reliance Standard Life Ins. Co*., \_\_\_\_\_ F.3d \_\_\_\_\_   (11th Cir., 2006),  2006 WL 2105986, Case No. 05-14005, Memorandum of Opinion, at page 18**.  That is the commonly understood meaning of "reasonable continuity" in the workplace, and this is true irrespective of whether the employee's work day may be full time or only part time.

---

[1] If nothing else, the case law pertaining to "arbitrary and capricious" review reserves findings of reasonableness to the Court as the standard by which a plan administrator's decision is judged on judicial review.  See ***Liston v. Unum Corp. Officer Severance Plan* , 330 F.3d  19, 24 (1st  Cir., 2003).** If a plan administrator were permitted to define what is "reasonable" in context of its findings, without reference to any specific plan language pertinent to the question, that would amount to the Court's "rubber stamping" the administrator's decision in every case, which would be no review at all.   See ***Donato v. Metropolitan Life Ins. Co*., 19F.3d 375, 380 (1st Cir., 1994);  *Jones v. Metropolitan Life Ins. Co*., 385 F.3d 654, 661 (6th Cir., 2004)**.

[2] Federal law does not require an employer to provide either coffee breaks or a lunch break, and in Massachusetts, under Mass. General Laws, c.149, Sect. 100, the only requirement is for a 30-minute lunch break while no coffee breaks are required.

When he is on the job, for however many hours his shift may be, a worker must be able to perform all required tasks as many times and as long as the job demands, and not as determined by his limitations. If an ERISA plan administrator would find there are specific jobs suitable for a claimant, which allow for greater employee down-time, that must be based on substantial vocational evidence that is case-specific for such jobs. See *Evans v. Unumprovident Corp.*, 434 F.3d 866, 879-880 (6th Cir., 2006); *Quinn v. Blue Cross & Blue Shield Ass'n.*, 161 F.3d 472,476 (7th Cir., 1998).

**2.    Defendant's Termination Of Plaintiff's Claim Was Arbitrary And Capricious Because It Is Based On Non-Probative Medical Evidence**

Plaintiff claims disability based on the neurological sequelae of a stroke which has left him severely impaired. Carlos Kase, M.D., Letter, June 7, 2005 (AR00083). In addition to severe neurological motor deficits and paralysis, Plaintiff is disabled by frequent "spasms" which are very painful and are attributed to the spasticity of his neurologically impaired left limbs. *Id.* Despite treatment with various medications, Plaintiff has had only partial relief of his symptoms. Based on both motor deficits and painful spasms, Dr. Kase has determined that Plaintiff cannot perform, with reasonable continuity, the substantial duties of any occupation. Plaintiff "is completely and permanently disabled for any occupation" by such neurological impairments. *Id.*

The test for substantial evidence is whether it is "reasonably sufficient to support a conclusion." *Vlass v. Raytheon Employees Disability Trust*, 244 F.3d 27, 30 (1st Cir., 2001).

> Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Currier v. Secretary of H.E.W.*, 612 F.2d 594, 597 (1st Cir., 1980); citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). Dr. Kase's report is sufficient, standing alone, to meet Plaintiff's burden to prove his disability under the substantial

5

evidence standard.  Although pain is a subjective factor, often not susceptible to objective proof, cf. **_Boardman v. Prudential Life Ins. Co. of America_**, **337  F.3d 9, 16 (1st Cir., 2003),** pain may nonetheless be the basis for a finding of total disability from any occupation under an ERISA plan.  **_Buffonge v. The Prudential Life Ins. Co. of America_, 426 F.3d 20, 26 (1st Cir., 2005).**  In the present case, where Plaintiff's disabling pain is medically attributed to his frequent muscle spasms, that is objective evidence of intense pain caused by the involuntary contracture of the affected muscles,  **_Rivera-Torres v. Secretary of HEW_, 837 F.2d 4, 6 (1st Cir., 1988).**

While such substantial evidence of disability may, under the arbitrary and capricious standard, be overcome by evidence to the contrary, see **_Gannon v. Metropolitan Life Ins. Co., 360 F.3d 211, 213 (1st Cir., 2004),** such contrary evidence must itself be substantial.  Non-probative "evidence" will not suffice under the  arbitrary and capricious standard to support an administrator's denial of benefits, **_Cook, supra,_ 320 F.3d at 22**.  The primary medical basis for Liberty's termination of Mr. Archambault's LTD claim, as stated in its notice of termination (AR00075-76), was Dr. Liguori's "restrictions" of December 4, 2004, and the "confirmations" from Dr. Bilazarian and Dr. Cariz.   This "evidence" as cited in the termination notice does not rise to the level of substantial evidence because it is non-probative on an essential, material issue under the Sodexho-Marriott LTD plan –Mr. Archambault's capacity to *sustain* any work activity with "reasonable continuity."  See **_Crist v. Liberty Life Assurance Co. of Boston_**, **Slip Copy at 27, 2006 WL 1209350 (S.D. Ohio),** pain and fatigue from fibromyalgia precluded claimant from sustaining work activity with "reasonable continuity."

The cited report from Dr. Liguouri, a form evaluation completed on December 4, 2004, refers only to "restrictions," i.e. what Plaintiff *cannot* do.  The form does not ask, and the doctor does not say that Plaintiff *can* perform any work activity with any degree of continuity in a work

6

setting.  Restrictions Form (AR00247).  The form makes no indication as to any degree of sustained activity, and it makes no reference to "work" as opposed to simple "sedentary activity" such as reading a book at home.[3]  Dr. Liguori's "restriction" to limited "sedentary activity" is entirely consistent with Plaintiff's actual daily routine, and it says absolutely nothing about his having the capacity to *sustain* any level of activity in a *work* setting.  Those critical factors under the "reasonable continuity" criterion are not addressed in Dr. Liguori's "restrictions," and therefore those restrictions cannot be read as indicating that Plaintiff can, despite his pain and fatigue, perform with reasonable continuity in a work setting.  See **Clausen v. Standard Ins. Co., 961 F. Supp. 1446, 1457 (D. Colo., 1997).**  A treating doctor's listing of functions which a claimant *cannot* perform does not create an inference that an activity not on the list is one which the claimant *can* perform.  **Buffonge, supra, 436 F.3d at 29.**[4]

Dr. Liguori's stated findings on this form, in context of the record as a whole, are contrary to a finding that Plaintiff might perform any work, with any degree of continuity within his physiological restrictions, as it expressly refers to Plaintiff's "Spasticity/contractures" and "fatigue."  (AR00247).  The spasticity and contractures are the same factors to which Dr. Kase attributes disabling pain, and these, with chronic fatigue, are the same factors to which Dr. Liguori referred in his Note of May 9, 2003, stating:

---

[3] Plaintiff in fact does limited sedentary "activity" at home, e.g. preparing his meals or reading a book (AR00239), and he cannot do even such limited activities of daily living without suffering from episodic bouts of pain, due to spasticity, and fatigue which requires that he nap between one-and-a-half to three hours a day.

[4] The "confirmations" of Dr. Liguori's "restrictions" from Dr. Cariz and Dr. Bilazarian, similarly, are not substantial evidence that Mr. Archambault might perform any work activity with any degree of continuity because they also do not indicate that Mr. Archambault can peform work activity within the stated restrictions on a sustained basis.  The form letter sent to them merely referred to Dr. Liguori's "restrictions," and did not ask for any comment on how long Mr. Archambault might be able to perform within those severely limited restrictions. Letter, 3/18/05 (AR00211-212) and Letter, 2/23/05 (AR00213-214).  Dr. Bilazarian and Dr. Cariz were not asked to comment on this material issue, and they did not do so in their responses to Liberty.

> He remains having limitations with standing, balance and endurance. *Fatigue is an issue. Spasticity in the left upper and lower extremities also remains an issue*. . . . He has had a few *falls* since his last visit, *usually related* to slippery surfaces, *fatigue* and uneven surfaces.
>
> I discussed at length with Mr. Archambault regarding spasticity management and the *need to titrate medications as too little with (sic) cause increase in spasticity* and too much will contribute to *weakness and fatigue*. . . . We discussed his fatigue as an issue as well, and because of his fatigue, he eliminated Zanaflex in the a.m. and afternoon which did improve somewhat. *He continues to have difficulty with fatigue, attention and concentration, however. He reports having difficulty completing reading a book as he does tire easily.*

OP Follow Up Note, 5/9/03 (AR00297-98, emphases added). Nothing in Dr. Liguori's Restrictions Form of 12/4/04 recants or qualifies these limitations in any way, or contradicts Dr. Kase as to the disabling effects of Plaintiff's painful spasms.

There is a further flaw in Liberty's reliance on Dr. Liguori's Restrictions Form and the confirmations by Dr. Bilazarian and Dr. Cariz. The restrictions noted by Dr. Liguori on December 4, 2004, indicated no lifting or carrying greater than 10 pounds, with no explanation why (AR00247). Subsequently, on March 30, 2005, Dr. Liguori submitted a narrative which indicated that Plaintiff was limited to lifting *five* pounds at most, and this was due to his neuro-logically impaired balance (AR00204).

This is another material gap in the substantial evidence because the requirements for "sedentary" work activity include the ability to lift and carry up to 10 pounds, not five pounds at most. This fact was expressly recognized by Liberty's own review physician, Dr. Madireddi, who referred to the U.S. Department of Labor, Dictionary of Occupational Titles (DOT) definition of "sedentary" work activity:

> exerting up to *ten pounds* of force occasionally and/or a negligible amount of force frequently or constantly to lift, carry, push, pull or otherwise move objects. . . . Jobs are sedentary if walking and standing are required only occasionally and other sedentary criteria are met.

8

Independent Peer Review (AR00130), emphasis added.  Plaintiff agrees this is a correct statement of the definition of "sedentary" work activity, with the proviso that "occasionally" means lifting and carrying up to one third of time during the workday[5] and therefore, even if Dr. Liguori's "restrictions" relied on by Liberty could be read as referring to sedentary *work* activity, they cannot be reasonably read as indicating that Plaintiff has the capacity for sedentary work within the DOT definition to which Dr. Madireddi referred,  which is the standard for vocational analysis on most ERISA disability claims.

     The arbitrary and capricious standard gives discretion to an ERISA plan administrator to find the facts pertinent to a claim based on the substantial record evidence.  This is a standard of reasonableness which requires that the administrator's findings be based on some actual evidence in the record, where "evidence contrary to an administrator's decision does not make that decision unreasonable, *provided substantial evidence supports the decision*."  **<u>Wright v. R.R. Donnelly & Sons Company Group</u>, 402 F.3d 67, 74 (1st Cir., 2005),** emphasis added.

     Medical reports are not substantial evidence as to a material issue on a disability claim if they do not expressly address that issue.  See **<u>Doyle v. Paul Revere Life Ins. Co.</u>, 144 F.3d 181, 186  (1st Cir., 1998),** holding that the claimant's medical records as to his symptoms were not substantial evidence of disability where they expressed no opinion as to whether the symptoms were sufficiently severe to prevent him from returning to work.  In the present case, similarly, Liberty cannot rely on Dr. Liguori's  Restrictions  Form, or the derivative "confirmations" by by Drs. Bilazarian and Cariz, to establish that Plaintiff has the capacity for any *sustained* sedentary activity in a *work setting,* because those records state no opinion as to those critical issues  --neither directly nor by implication as in response to any specific inquiry on point.

---

[5] See **<u>Lopes v. Metropolitan Life Ins. Co.</u>332 F.3d 1, 3 fn.2 (1st Cir., 2003),** referring to the DOT definition of sedentary work:  "Exerting up to 10 pounds of force occasionally (Ocassionally: activity or condition exists up to *1/3 of the time*). . . ."  Emphasis is added.

The letter denying Plaintiff's administrative appeal stated that the medical records were reviewed by Dr. Madireddi, who concluded that the medical evidence "continues to support that (Plaintiff) can still lift and carry 20 pounds with the right extremity on an occasional basis and 10 pounds frequently" (AR00065-66).  Liberty's reliance on Dr. Madireddi's two reports is not reasonable for several reasons.

Dr. Madireddi conducted a record review only, taking all of two hours and ten minutes to review the voluminous medical records on file, and another 43 minutes writing her initial 32-page report, Independent Peer Review (AR00131), and has never examined Mr. Archambault personally.  See **_Buffonge_**, _supra,_ **426 F.3d at 26,** rejecting the opinion of a non-examining review physician who spent only three hours reviewing records and preparing a report.

The opinion of a review physician who has not personally examined the claimant may rise to the level of substantial evidence. See **_Gannon_** _supra,_ **360 F.3d at 214**, where the review physician's conclusions, as against the contrary opinion of the claimant's treating physicians, were supported by the clinical findings of a therapist who had conducted a Functional Capacities Evaluation (CFE).   But where there is no such conflict, where the only substantial and _probative_ medical evidence favors the claimant, as in the present case, the review physician's contrary opinion is subject to doubt. See **_Orndorff_**, _supra,_ **404 F.3d at 526; and _Myers v. Hercules, Inc._, 253 F.3d 761, 768 (4th Cir., 2001).**  In the present case, Dr. Madireddi's lengthy Independent Peer Review purports to summarize Liberty's complete medical file, but nowhere in that summary does she refer to any clinical findings which support a conclusion that Plaintiff can perform any work activity on a _sustained_ basis despite his well documented  spasticity, pain and fatigue.  See (AR00110 – 122).  That is because no such probative clinical evidence exists.

In every case, a non-examining review physician's report must be judged by the standard of reasonableness in context of the record as a whole, see **_Bufonge, supra,_** **426 F.3d at 243**, and a review physician's report is therefore not automatically entitled to substantial evidentiary weight. The reports of a claimant's treating physicians, although not entitled to greater weight than a non-treating physician's opinion, may not be arbitrarily or summarily disregarded by an administrator. **_Black & Decker Disability Plan v. Nord.,_** **538 U.S. 822, 834, 123 S.Ct. 1965, 1967, 155 L.Ed2d 1034 (2003)**. Plaintiff does not claim that the opinions of his treating physicians are entitled *per se* to any greater weight than the findings of Liberty's review physician, but they are entitled to controlling weight in this case because they are based on *clinical observation* and *findings* made during several years of treating the sequelae of Plaintiff's stroke, see **_Buffonge, supra,_** **426 F.3d at 27, fn6,** including objective findings of painful muscle contractions and fatigue, while the review physician's contrary *opinion* is not supported by any clinical findings in the medical record.

Dr. Madireddi's opinion that Plaintiff is not disabled is based on clear errors and mischaracterizations of the medical records she purported to review. In her Independent Peer Review, Dr. Madireddi summarized Dr. Liguori's note of December 2004, as follows:

> no standing for long periods of time, no walking long distances, no lifting or carrying over 10 pounds, unable to use the left arm and hand and no climbing, bending, stooping kneeling, pushing or pulling. The claimant is right-hand dominant and *it was felt that this was a full-time sedentary work capacity* with no use of the left arm.

(AR00109), emphasis added. This is a blatant misstatement. Nowhere does Dr. Liguori indicate that he feels Plaintiff is capable of "full-time sedentary work capacity." This mischaracterization of the medical record[6] is by itself sufficient for the Court to reject Dr. Madireddi's conclusions.

---

[6] If Dr. Madireddi meant that Liberty's claims personnel "felt" that Dr. Liguori's restrictions indicated a full time work capacity, that would render her conclusion equally invalid as relying on the erroneous belief of non-medical personnel as the basis for her medical opinion.

11

See *Buffonge, supra,* **426 F.3d at 29,**

Dr. Madireddi opined that Plaintiff could lift and carry a maximum of 20 pounds occasionally and ten pounds frequently using his right arm only (AR00127 and AR00063). Here, "occasionally" means up to one-third of the time as defined by the DOT, and this arbitrarily ignores the reason why Dr. Liguori restricts Plaintiff for lifting and carrying even five pounds, let alone ten or twenty. That is because, due to the severe left-sided hemiplegia, lifting even minimal weight with his right hand, where his left hand is completely non-functional and cannot lift or grasp anything, will cause him to lose his balance[7] as indicated by Dr. Liguori's Note of March 30, 2005. (AR00204). Such "parsing" of the medical evidence also negates the probative value of Dr. Madireddi's opinion. See **Buffonge, supra.**

Without any reasoned analysis, Dr. Madireddi concludes that "medical evidence continues to support that he can still lift and carry 20 pounds with the right extremity on an occasional basis and 10 pounds frequently" Addendum (AR00063). This is an outright misstatement, where Dr. Madireddi does not refer to any clinical finding in the record which indicates that Plaintiff can lift twenty pounds, and there is no *probative* medical report in the record which indicates he can lift and carry even ten pounds. Contrast *Thomas v. Liberty Life Assurance Co. of Boston,* **226 F. Supp. 735, 738 (D. Md., 2002).**

Dr. Madireddi purports to make allowance for Plaintiff's fatigue by qualifying his capac-

---

[7] Mr. Archambault's balance problem. which causes him to fall occasionally due to fatigue as well as lifting and carrying, is long-standing as indicated by Dr. Liguori's report of May 9, 2003. This is not an orthopedic question of musculo-skeletal strength, where Mr. Archambault may well have the *strength* to lift 20 pounds with his right arm. It is, rather, a neurological question of losing his *balance* when Mr. Archambault attempts to manipulate any appreciable weight with his right arm, and Dr. Madireddi's opinion as to the capacity to lift 20 pounds with the right arm is therefore clearly erroneous and contradicted by the only substantial medical evidence on point in the record. The fact that Mr. Archambault may retain sufficient strength in his right arm to lift 20 pounds, or even more, is irrelevant to the claim as presented to Liberty.

ity for sustained sedentary activity with a requirement that he must rest and take a break for an unspecified period after every sixty minutes of activity. (AR0028). This finding is not reasonable from a medical perspective because it does not take account of the variable, "intermittent" nature of Plaintiff's fatigue,[8] Dr. Liguori, Letter, March 30, 2005 (AR00204), meaning that it occurs with frequency but with no predictability. See **_Buffonge, supra,_ 426 F.3d at 24.** Further, the medication which Mr. Archambault requires to control his pain and spasms increases his fatigue. Dr. Liguori, Follow Up Note, 5/30/03 (AR00298).

Liberty's reliance on Dr. Madireddi's Independent Peer Review puts this case closely on point with **_Buffonge, supra_**, where Dr. Madireddi's review is based on "parsing" and in large measure disregarding without any reasoned analysis the clinical findings of the physicians who had examined Plaintiff. Dr. Madireddi's review, therefore, is not entitled to any substantial evidentiary weight in support of Liberty's termination of Plaintiff's LTD claim. See **426 F.3d at 26.**

3. **Liberty's Termination Of Plaintiff's LTD Claim Was Arbitrary And Capricious Because It Relies On Non-Probative Vocational Evidence.**

Relying on Dr. Liguori's initial Restrictions Form, which included lifting no more than ten pounds, Liberty's "Vocational Case Manager," Laura Doherty, identified "sedentary" jobs which Plaintiff might perform within those restrictions. She interpreted Dr. Liguori's restrictions as implying that Plaintiff had "up to a full-time sedentary work capacity with no use of the left arm." Transferable Skills Analysis & Labor Market Information, 3/29/05 (AR00183). As discussed above, this was clearly erroneous, where neither Dr. Liguori's Restrictions Form nor any other probative medical evidence in the record supports a finding that Plaintiff has the

---

[8] Dr. Madireddi also fails to take account in this restriction of the fact that the rest breaks Plaintiff requires during a normal day of minimal activity at home involve sleeping from one-and-a-half to three hours. Activities Questionnaire, 12/30/04 (AR00239) and File Note, 9/3/04 (AR00038). When Plaintiff is fatigued, he requires sleep, which is an eminently reasonable response to fatigue, and there is no substantial medical evidence to the contrary.

13

capacity for any *sustained* work activity, even part time.

After Dr. Liguori corrected and clarified his "restrictions," stating that Plaintiff cannot lift or carry objects greater than five pounds due to neurologically impaired balance (AR00204), Ms. Doherty did not alter her analysis as to the "sedentary" jobs she purported to find for Plaintiff, even though Dr. Liguori's corrected restriction no longer conformed to the ten-pound lifting and carrying criterion of the DOT definition for sedentary jobs. Instead, on April 4, 2005, she referred her transferable skills analysis to an outside contractor, Windham Group, to conduct a market survey for those same jobs. Her referral enclosed the Transferable Skills Analysis she had prepared, Letter, 4/4/05 (AR00198), which as far as appears in the record specifically referred to Dr. Liguori's ten-pound restriction for lifting and carrying.[9] Even if the reduction from ten pounds to five pounds were valid for the jobs identified in the Labor Market Survey, which isn't entirely clear on the record, there is no evidence that Plaintiff could perform any of those jobs with Dr. Madireddi's restriction for taking a rest break every hour. This question was not put to Ms. Delf, and she did not put it to any of the employers she reportedly contacted. This is another material break in the "evidence"Liberty relied on to terminate Plaintiff's LTD claim.

The criterion of "reasonable continuity" in the performance of any job usually requires sustained work activity throughout the work shift, full or part time, with only one break each

---

[9] On April 14, 2005, Susan Delf of Windham Group sent a "Labor Market Survey" to Ms. Doherty, which referred to "no lifting or carrying over *5 pounds*," among other restrictions. Letter, April 14, 2005 (AR00186), emphasis added. It is not apparent on the record whether the change from a ten pound restriction on the referral to a five pound restriction on the Survey was based on some communication between Ms. Doherty and Ms. Delf, or whether it resulted from an after-the-fact alteration of the Survey. In either case, it casts doubt on the accuracy and veracity of the vocational analysis and survey where jobs defined as "sedentary," with lifting up to ten pounds, were somehow transformed into less than sedentary jobs with lifting no more than five pounds, with no further vocational analysis or reference to the DOT. This is an instance where Liberty's conflict of interest as both insurer and plan administrator suggests an improper motive to terminate the claim, which may be considered on judicial review as to the reasonableness of Liberty's decision. <u>Calvert v.Firstar Finance, Inc.,</u>**409 F.3d 286, 292 (6th Cir.,2005).**

shift if any.  Real jobs demand that work be done when the employer requires that it be done, and not at the convenience of the employee.  *Tippitt, supra,* **Memorandum at 18**.  It may be that some jobs exist, e.g. heavy labor where a worker must reasonably rest his muscles periodically, that would reasonably allow the worker to take a short rest break every hour[10]  (which in Plaintiff's  case would require a sofa or cot on which he could nap for up to three hours in an eight hour workday) but that does not appear appear anywhere in the vocational evidence on which Liberty relied to terminate Plaintiff's LTD claim.[11]

The transferable skills analysis and the market survey are therefore entitled to no evidentiary weight in support of  Liberty's termination of Plaintiff's LTD claim because they are not based on probative medical evidence that he can *sustain* any work activity with reasonable continuity, and because there is a significant, material gap in the evidence between Plaintiff's restrictions as stated  by Liberty's own review physician and the requirement  for  reasonable continuity in any job that actually exists in the labor market.  See *Evans, supra,* **434 F.3d at 879-880;** *Quinn, supra,* **161 F.3d at 476.**

**4.      Liberty's Termination Of Plaintiff's LTD Claim Was Arbitrary And Capricious Because It Failed To Consider The Evidentiary Weight Of  The SSDI Award**

It is well settled that an ERISA disability claimant's award of SSDI benefits is not conclusive on an ERISA plan administrator, except where the "statutory criteria are identical to the criteria set forth in the insurance plan," *Pari-Fasano, supra,* **230 F.3d at 420.**  In the present

---

[10] See, e.g., *Sweno v. Liberty Life Assurance Co. of Boston*, not reported in F. Supp. 2d, 2003 WL 1572006 (D. Minn.), *dictum* at page 4.

[11] In the present case, neither Ms. Doherty nor Ms. Delf nor any of her several employer contacts have indicated that such an accommodation could be made for Mr. Archambault in an actual work environment, which is very unlikely.  Consider the job of "Front Desk Badge Security Clerk," for example  (AR00184), which necessarily requires that the employee be vigilant *continuously* during his shift, and even a ten minute rest break away from his station may jeopardize the employer's security.   The same is true for "Information Clerk,' where an employer's patrons will have little patience waiting  ten minutes or so for the information clerk to get back from his hourly nap.

case, the relevant criteria for determining disability under the Sodexho-Marriott LTD plan are substantially identical to the SSDI statutory definition of disability.

The Sodexho-Marriott LTD plan, insofar as it is relevant to the termination of Mr. Archambault's benefits, refers to "any occupation" disability as requiring that the claimant be:

> unable to perform, with reasonable and continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, *education, experience, age and physical and mental capacity.*

Group Disability Income Policy (AR00006), emphasis added.  This is not *verbatim* with the SSDI statutory definition of disability, but it is not materially different from that definition, where "disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a period of not less than 12 months.

42 U.S.C. Sect. 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his *age, education and work experience*, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. Sect. 423(d)(2)(A), emphasis added.  It is difficult to discern any real difference here as may be relevant to Plaintiff's LTD claim.  See **_Crist_, *supra,* 2006 WL 1209350 at 28,** construing the same policy language.  The policy refers to "reasonable continuity" in performing "all the material and substantial duties" of the claimant's own or any other occupation, but that criterion, if anything, is more lenient than the statutory requirement that the claimant be unable to perform "*any*. . . substantial gainful work" that exists in the national economy.

Also, there is no material difference in the way disability claims are evaluated.  SSDI

claims are often decided by reference to published "Medical Vocational Guidelines," colloquially known as the "Grid."  20 C.F.R. Pt. 404, Subpt. P, App. 2.  But the Grid is not a collection of arbitrary "rules."[12]  It is, instead, an embodiment of administratively noticed fact concerning the transferability of skills to occupations within the several exertional categories defined by the DOT, see **_Heckler v. Cambpell,_** **461 U.S. 458 (1983)**.  This is the same inquiry made by Liberty's vocational analyst in the present case.  The Grid takes account of the same factors considered by Liberty on the present claim, i.e. the claimant's age, education, work experience and residual work capacity, and only offers guidance, not a strict "rule,"[13] for determining disability cases like the present one which involve combined impairments.  *Id.*

Given such close similarity between the statutory and policy definitions of disability, and between the medical-vocational issues considered in both contexts, this case would appear to be one of the "rare" ones where the Social Security determination of disability should be accorded substantial, if not "controlling" weight.  Cf. **_Pari-Fasano, supra._**  In any case, even where such substantial similarity between the plan and the statute is not shown, a favorable SSDI determination is relevant to a related ERISA claim and is entitled to *some* evidentiary weight.  **_Pari-_**

---

[12] The Medical Vocational Guidelines have been recognized by the First Circuit as more reliable than reliance on vocational analysts, where they provide not only a more efficient way to resolve the "other jobs" issue, but also (insofar as the knowledge of individual vocational experts is not complete) a more accurate one. **_Sherwin v. Secretary of Health & Human Services,_** **685 F.2d 1, 4 (1st Cir., 1982)**.

[13] Some SSDI claims are determined under the "Listing of Impairments," 20 C.F.R., Pt. 404, Subpart P, App. 1, where only medical findings are considered.  This is a listing of specific impairments which, if supported by the record medical evidence, are considered so severe that the claimant has no residual functional capacity to perform *any* gainful work activity.  If a claimant's condition meets the criteria of a listed impairment, he is considered vocationally helpless, and no skill transferability need be considered.  A finding under the Listing of Impairments is not binding on an ERISA plan administrator, **_Pari-Fasano_**, *supra*, but if a claimant's SSDI award were based on a listed impairment it would have to be of such severity that an ERISA plan administrator's contrary finding would be questionable under the standard of reasonableness that applies on review under the arbitrary and capricious standard.

*Fasano*, **230 F.3d at 420**.  See *Gannon, supra,* **360 F.3d at 215**, upholding the defendant's reliance on an SSDI denial as substantial evidence that the claimant did not meet the plan definition of "disabled."

In the present case, Liberty completely disregarded Plaintiff's highly relevant SSDI award in the findings stated in the termination notice (AR00075-76).  This relevant fact appears nowhere in Liberty's medical or vocational analyses from and after September 2004 when it began to manufacture the "evidence" it relied on to terminate Plaintiff's LTD claim.  The only reference Liberty made to the SSDI award was its brief, dismissive comment in the denial of Plaintiff's appeal saying only that "these provisions are not contingent on decisions made by the Social Security Adminstration. . . ," (AR00067), with absolutely no reasoned explanation why its findings as to Plaintiff's ERISA claim should be any different from that made by SSA using substantially the same criteria and based on identical medical and vocational facts.   This was arbitrary, capricious and unreasonable, especially where Liberty required Plaintiff to apply for SSDI and then enjoyed a set-off of more than 50 percent against the benefits it was otherwise obligated to pay on Plaintiff's claim.  LTD Claim Worksheet (AR00304).  See *Crist, supra,* **2006 WL 1209350, Slip Copy at 28.**

**B.     Liberty Is Not Entitled To Summary Judgment Dismissing Plaintiff's Count II For Breach Of Contract Which Is Based Solely On Federal Contract Law.**

Liberty's Memorandum of Law erroneously assumes that Plaintiff's Count II as to breach of contract refers to a state-law claim that would be subject to dismissal because it is pre-empted by federal-court jurisdiction over ERISA claims.  As discussed above, Liberty's termination of Plaintiff's LTD claim failed to comply with the contractual definition of disability, referring to the ability to work with "reasonable continuity."  This is a matter of federal contract law, as to

the construction of a term which is nowhere defined in the subject ERISA insurance contract. See *Filiatrault, supra,* **275 F.3d at 135,** holding that the provisions of an ERISA regulated employee benefit plan "must be interpreted under principles of federal common law." See also *Hughes v. Boston Mutual Life Ins. Co.*, **26 F.3d 264, 268 (1st Cir., 1994),** holding that "a federal common law of rights and obligations" governs the interpretation of ERISA-regulated group insurance plans. Plaintiff has nowhere indicated that he is asserting a state-law contract claim, and Liberty's extensive citation of cases pertaining to federal pre-emption is therefore irrelevant to the issues expressly presented for review under 29 U.S.C. Sect. 1132(a)(1)(B).

Plaintiff's Count II is not in this respect "entirely duplicative" of Count I as Liberty contends, where Count I refers generally to "wrongful claim denial," encompassing several matters not specifically addressed by federal common law contractual interpretation, such as Liberty's conflict of interest, argued in Plaintiff's Memorandum in Support of Summary Judgment, or Liberty's arbitrary failure to accord substantial evidentiary weight to Plaintiff's favorable SSDI award, as argued above. This is not an immaterial distinction.

The subject Plan, or contract, requires that Plaintiff submit proof of his disability in order to receive benefits. (AR00112). It is submitted that Plaintiff has done so as to his ongoing total disability, as discussed above and in his Memorandum in Support of Summary Judgment which seeks not only reversal of Liberty's wrongful termination of the claim, but also seeks affirmative relief by reinstatement of benefits with interest and costs, as expressly requested in Plaintiff's first prayer for relief. Plaintiff submits that this is an appropriate case for such relief, as opposed to a remand for further administrative review. See *Cook*, *supra,* **320 F.3d at 24; and** *Glista, supra,* **378 F.3d at 132.** And to this end it is appropriate, if not entirely necessary under the liberal rules of notice pleading, that Plaintiff's Complaint state, not only that Liberty's terminat-

tion of his LTD benefits was wrongful, possibly subjecting the claim to further administrative review, but that it was in breach of contract –thus entitling Plaintiff to contractual "damages" in the form of benefits past-due, plus interest and costs, upon his affirmative showing of continuing disability as appears on the administrative record. See **_Cook_**, *supra*, **320 F.3d at 24-25.**

Dated: September 1, 2006

                For the Plaintiff

                /s/ Richard K. Latimer

                Richard K. Latimer, BBO #287840
                222 Main Street, P.O. Box 710
                Falmouth, MA  02541
                (508) 548-7006
                rklaw@cape.com

Case 1:05-cv-11762-NG   Document 26   Filed 09/01/2006   Page 20 of 20