UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOSEPH ARCHAMBAULT,
    Plaintiff

v.

LIBERTY LIFE ASSURANCE COMPANY OF BOSTON
    Defendant

Civil Action No. 05-11762-NG

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendant, Liberty Life Assurance Company of Boston ("Liberty Life"), opposes Plaintiff's motion for summary judgment. Liberty Life has also moved for summary judgment on Plaintiff's Complaint because Liberty Life did not arbitrarily and capriciously deny Plaintiff's claim for long-term disability ("LTD") benefits. As set forth more fully in Liberty Life's summary judgment submission and below, Plaintiff's motion for summary judgment should be denied and Liberty Life's motion should be granted because the record contains substantial evidence to support Liberty Life's decision to deny Plaintiff further LTD benefits based on a conclusion that he was no longer disabled from performing the duties of any occupation.

In his memoranda submitted to the Court in connection with the Parties' summary judgment motions, Plaintiff blatantly ignores the opinions of his own treating physicians and intentionally mischaracterizes the administrative record and applicable law. The administrative record demonstrates that the denial decision was prompted by information provided by <u>three of Plaintiff's own treating physicians</u> who confirmed that Plaintiff was capable of performing sedentary function without the use of his left arm. Despite the clear opinions of his own doctors, which were provided prior to the initial denial, Plaintiff argues that those opinions should have been disregarded by Liberty Life. During his appeal of the denial decision, Plaintiff failed to

reconcile or otherwise correct any misinterpretation of the information provided by those three doctors. Nor did he provide Liberty Life with any follow up reports from those three doctors or additional medical information from them altering their opinions or correcting any misinterpretation of their records by Liberty Life, even though Plaintiff knew at that point the manner in which Liberty Life was interpreting and applying their statements about Plaintiff's ability to perform sedentary function.

In the end, the opinions of Plaintiff's treating physicians, the conclusions from a transferable skills analysis and a labor market survey, and the conclusions of an independent reviewing physician, who reviewed the medical records and opinions of Plaintiff's treating physicians each provided sufficient evidence to support Liberty Life's decision. To the extent that these documents contradict or conflict with other records in the record does not, by itself, make the administrator's decision arbitrary. See Vlass v. Raytheon Employee's Disability Trust, 244 F.3d 27, 30 (1st Cir. 2001); Sullivan v. Raytheon Co., 262 F.3d 41, 52, n.8 (1st Cir. 2001). Moreover, the fact that

For the reasons set forth in Liberty Life's initial statement of undisputed material facts and memorandum of law in support of its motion for summary judgment, as well as for the reasons set forth below, Liberty Life's Motion for Summary Judgment should be granted and Plaintiff's motion for summary judgment should be denied. Liberty Life is entitled to the "arbitrary and capricious" standard of review in this case, and the administrative record establishes that Liberty Life's decision to deny LTD benefits to Plaintiff was reasonable.

2

## ARGUMENT

I. **Liberty Life's Decision To Deny Long-Term Disability Benefits To Plaintiff Was Reasonable**

In his summary judgment submissions, Plaintiff fails to establish that the decision by Liberty Life to deny his LTD benefits was somehow unreasonable, or not based on "evidence reasonably sufficient to support [its] conclusion." Pari-Fasano v. ITT Hartford Life and Accid. Ins. Co., 230 F.3d 415, 419 (1st Cir. 2000). He cannot do so because Liberty Life's decision was based on medical information provided by Plaintiff's own physicians and by an independent reviewing physician, as well as additional information in the administrative record including, but not limited to, a transferable skills analysis and a labor market survey.

A. **The Claims File Supports Defendant's Decision**

Plaintiff's claim that the Administrative Record does not support Liberty Life's decision is wrong. Rather, the Administrative Record contains substantial evidence to support Liberty Life's decision to deny Plaintiff's claim for LTD benefits. Indeed, the record evidence establishes that the information about Plaintiff's physical limitations upon which the denial decision was based was provided in part by Plaintiff's own treating physicians, and the conclusion about Plaintiff's ability to perform sedentary function was shared by an independent reviewing physician.

1. **Plaintiff's Own Physicians (Liguori, Bilazarian and Cariz) Confirm That Plaintiff Can Perform Sedentary Function With Reasonable Continuity.**

a. **Plaintiff can perform sedentary functions**

The reasonableness of Liberty Life's denial decision is evident from the fact that it is based substantially on information provided by Plaintiff's own treating physicians about his ability to perform sedentary functions without the use of his left arm. First, Plaintiff's claim that

3

Liberty Life relied exclusively on the restrictions identified by Plaintiff's own physician, Dr. Liguori, is simply wrong. As is evident from the claims file, Liberty Life relied on the medical opinions of Plaintiff's treating physicians, Drs. Liguori, Cariz and Bilazarian, the opinions of Dr. Madireddi, and other surveys and analyses conducted at or around the time that these opinions were rendered.

As set forth in Liberty Life's February 23, 2005 letters to Drs. Liguori, and Bilazarian (AR 00205-206, 213-214) and its March 18, 2005 letter to Dr. Cariz (AR 00211), Liberty Life asked if each agreed that Plaintiff could perform sedentary function without the use of his left arm based not only on the restrictions identified by Dr. Liguori in December, 2004, but also on information from Dr. Bilazarian "from an office visit on December 9, 2004, which indicated that [Plaintiff] did not have any cognitive deficits and that all other comorbid conditions were stable." (Id.) Indeed, Drs. Cariz and Bilazarian both expressed the opinion that he could do so. Plaintiff now seeks to avoid the consequences of those records by shifting the focus of the relevant inquiry to alleged pain associated with periodic spasms. However, nothing in Dr. Liguori's December, 2004 physical restriction form or his March 30, 2005 supplement supports Plaintiff's claim that he was suffering from debilitating pain. Similarly, nothing in Dr. Liguori's initial physical restrictions form in December, 2004, or his supplemental response in March, 2005 states that Plaintiff could not perform sedentary function with reasonable continuity. (AR 00247, 00204) As set forth in Liberty Life's memorandum in support of its motion for summary judgment, Dr. Liguori's statement in March, 2005, that based upon his last examination in September, 2004, "it <u>was</u> recommended that [Plaintiff] not lift or carry objects greater than five pounds" was inconsistent with his December, 2004 note where he identified the lifting restriction at 10 pounds based upon the September, 2004 evaluation. (emphasis added) Moreover, it is

4

undisputed that Dr. Liguori's "modified" lifting restriction was specifically considered by Dr. Madireddi in the addendum to his peer review and by Liberty Life as part of its review of the claims file in connection with the final denial decision.

Furthermore, the December, 2004 restrictions form completed by Dr. Bilazarian does not identify any physical restrictions for Plaintiff. (AR 00248) Moreover, while Dr. Liguori's March, 2005 letter references problems with gait and imbalance identified by Plaintiff during Plaintiff's then most recent visit with Dr. Liguori on September 14, 2004 (AR 00204), the record is equally clear that according to Plaintiff's primary care physician, Dr. Cariz, the gait and imbalance issues <u>had been resolved</u> by October, 2004.[1] In his memoranda, Plaintiff simply chooses to ignore the most contemporaneous medical records in the file, and instead flagrantly parses the file and relies on various records from 2002 - some 30 months prior to the denial decision.[2]

        b.      **<u>Drs. Cariz, Bilazarian and Liguori Have Never Attempted To Change Their Assessment Or Disagree With Liberty Life's Interpretation of Their Records When It Denied Plaintiff's Claim For Benefits In April, 2005 By Concluding That Plaintiff' Could Perform The Duties of Any Occupation With Reasonable Continuity.</u>**

Equally fatal to Plaintiff's claim is the fact that none of Drs. Liguori, Bilazarian or Cariz ever disputed Liberty Life's interpretation of Dr. Liguori's restrictions form and confirmation of Plaintiff's ability to perform sedentary function by Drs. Bilazarian and Cariz. That is true even after Liberty Life sent Plaintiff the April 25, 2005 denial letter in which it explained its

---

[1] Specifically, Dr. Cariz's treatment record from an office visit on October 15, 2004, indicates that Plaintiff was seen by his neurologist (Dr. Kase) in September, 2004 in connection with Plaintiff's complaint about his balance. (AR 00249) Plaintiff was administered a CT scan, which showed "no acute process." (<u>Id.</u>) According to Dr. Cariz's treatment record, Plaintiff "stated that his balance is better now." (<u>Id.</u>) Dr. Cariz's treatment record from that October, 2004 visit makes no mention of any debilitating pain.

[2] It is also significant to note that despite being asked to provide Liberty Life with copies of diagnostic tests, office notes and consultation reports by letter dated November 29, 2004 (AR 00251), Dr. Kase never provided any such information prior to the denial decision or thereafter.

5

conclusion that Plaintiff no longer satisfied the definition of disability. It is undisputed that in the April 25, 2005 letter, Liberty Life specifically advised Plaintiff of his right to appeal the decision and to submit "any additional information which you feel will support your claim." (AR 00181). It is further undisputed that by letter dated May 10, 2005, Liberty Life reminded Plaintiff of the fact that he had not yet submitted any additional information in connection with his appeal of the denial decision. (AR 00169) Indeed, Liberty Life specifically encouraged Plaintiff's counsel to "please follow up with all his treating physicians and have them submit copies of recent office treatment notes, consultations, medications, and any diagnostic test results as soon as possible." (AR 00169) If, as he claims now, Plaintiff believed that Liberty Life or Dr. Madireddi misinterpreted the medical and vocational information in Plaintiff's claims file or the nature and impact of the restrictions identified by Dr. Liguori and Dr. Bilazarian and Dr. Cariz, or of Plaintiff's ability to perform full-time sedentary functions at work, Plaintiff certainly had the opportunity to ask Drs. Liguori, Bilazarian and Cariz to modify, clarify or retract their statements or diagnoses if medically appropriate. Plaintiff and his doctors were either unwilling or unable to do so.

    2.    <u>**The Vocational Information Was Based On Substantial Evidence And Supports The Conclusion That Plaintiff Was Not Disabled From Any Occupation.**</u>

Plaintiff's argument that the medical information in the claims file does not support a conclusion that Plaintiff could perform the duties of any occupation with reasonable continuity is similarly wrong. As an initial matter, it is undisputed that neither Plaintiff nor any of his physicians has ever disputed the propriety of the transferable skills identified as part of the TSA - (1) ability to understand and communicate nutritional information to desired audience; (2) skilled in providing customer service to ensure customer satisfaction; (3) ability to perform inventory

control and procurement; (4) ability to understand and utilize accounting procedures to reconcile business receipts; (5) ability to influence others' opinions, attitude and judgment; (6) ability to follow and give written and verbal instructions; (7) ability to complete a variety of tasks and respond to change; (8) can use logic and reasoning to identify the strengths and weaknesses or alternative solutions, conclusions or approaches to problems; and (9) document and assess information through entering, transcribing, recording, storing and maintaining information in written or electronic form. (SOF ¶26) Significantly, none of those transferable skills identified involves any degree of lifting or tasks that were contrary to the restrictions identified by Dr. Liguori or even Dr. Kase.

In any event, the fact that Dr. Liguori modified his statement about Plaintiff's lifting restriction from 10 pounds to 5 pounds after the TSA was conducted, and the fact that Dr. Madireddi believed that the medical evidence supported a conclusion that Plaintiff could lift 10 pounds with his <u>right</u> extremity[3] are not material and would not have required a contrary assessment. As set forth above, none of the transferable skills identified during the TSA were in any way dependent upon an ability to lift anything. Nor were the four sedentary occupations identified as part of the TSA. Second, it is undisputed that when Liberty Life sent the TSA results for a labor market survey, it incorporated the 5 pound restriction into that analysis. (SOF ¶29) Indeed, at the time the labor market survey was commissioned, Laura Doherty stated. "We are specifically trying to determine if [Plaintiff] could perform the occupations of information clerk (tourism booth, hospital, large complex), Front Desk Security Guard, Night Auditor, and

---

[3] Dr. Madireddi did not express any opinion in his supplemental report about Plaintiff's ability to lift using both arms. Moreover, as set forth above, to the extent that Dr. Liguori's lifting restrictions were premised in whole or in part upon the gait and balance issues reported by Plaintiff during the September 14, 2004 visit, those gait and balance issues were reported as resolved by Dr. Cariz just one month later on October 15, 2004. (AR 00249)

7

Customer Service/Food Sales Representative in the Food industry without the use of his non-dominant arm and lifting of up to 5 lbs. in his dominant arm." (Id.)

The Administrative Record contains ample support for the determination that Plaintiff could perform the duties of at least the four other occupations identified as part of the TSA. The labor market survey itself confirmed that every employer contacted was asked whether the job could be performed with the use of one arm only, and with "no standing for long periods of time, no walking long distances, no lifting or carrying over 5 pounds, no climbing, bending, stooping, kneeling, pushing, or pulling." (AR 00186)[4] The descriptions of the jobs provided by the employers contacted confirm that the physical requirements of the jobs could be performed by someone with Plaintiff's physical limitations. For example, descriptions of an "information clerk" type of position described at pages 00187-188 of the record identify essential job duties as including, among other duties, answering the phone and transferring calls to the proper department, researching customer requests through a computer database, greeting guests in a friendly manner, maintaining a visitor log, ordering and maintaining publications, scheduling appointments, and ensuring completeness of forms. Similarly, the job duties identified by employers contacted in connection with a front desk security guard type of position included, among other sedentary tasks, checking identification, providing direction to visitors, issuing visitor badges, reporting security violations and answering the phone (AR 00189-190)[5]

---

[4] In footnote 9 of his Opposition to Liberty Life's motion for summary judgment, Plaintiff questions the timing and motive of the inclusion of the 5 pound lifting restriction in the labor market survey. Far from supporting an inference of an improper motive, the inclusion verifies Liberty Life's good faith throughout the process. As set forth in the Administrative Record, the TSA report was completed on March 29, 2005 (AR 00183). Dr. Liguori's clarification of the lifting requirements was dated March 30, 2005. (AR 00204) The results of the TSA were sent to the Windham Group for the labor market survey on April 5, 2005. (AR 00197)

[5] The same is true of the other two positions. For example, the duties associated with the hotel night auditor position included, among other sedentary tasks, verifying balances and records of financial transactions, registering and discharging guests at the front desk, answering phones and general data entry on the computer. (AR 00190-192) As for those employers contacted about the customer service/food sales representative positions who agreed the

None of the medical evidence cited by Plaintiff in his memoranda supporting his motion for summary judgment or opposing Liberty Life's motion for summary judgment precludes a conclusion that Plaintiff could perform those entirely sedentary job duties.[6]

3. **The Record Supports A Conclusion That Plaintiff Could Perform Sedentary Work Functions With Reasonable Continuity.**

The gravamen of Plaintiff's position is his after the fact claim that the record evidence does not support a conclusion that Plaintiff could perform full time sedentary work functions with reasonable continuity. Plaintiff's argument fails for several reasons. First, it is a clear attempt to shift the burden of proof to Liberty Life. It is well settled that it is Plaintiff's burden to prove that he continued to meet the definition of disability. See Orndorff v. Paul Revere Life Ins. Co., 404 F.3d 510, 525 (1st Cir. 2005)(holding that claimant has burden of showing disability). Plaintiff has failed to meet this burden because he failed to submit any evidence that controverted the opinions of his treating physicians or the opinion of the reviewing physician, who did not find any temporal limitations on Plaintiff's restrictions. Plaintiff merely submitted a conclusory report by Dr. Kase that Plaintiff was unable to perform the duties of any occupation with reasonable continuity based on Plaintiff's motor deficits and spasms. The opinion of Dr. Kase, however, contradicted the opinions of Dr. Liguori from his treatment notes from September 2004 in which he concluded that Plaintiff's spasticity issues were "stable" in September 2004. Dr. Kase's opinion also contradicted the opinions of Drs. Cariz, Bilazarian and Liguori that Plaintiff was capable of sedentary function despite his motor deficits. Further, Dr. Kase's opinion was considered by Dr. Madireddi, who disagreed with this conclusion. At best,

---

position could be done by a person with Plaintiff's physical limitations, the duties included telephone sales and computer record keeping, (AR 00192-195)

[6] Contrary to Plaintiff's suggestion that he did not meet the definition of sedentary work under the DOT definition, Dr. Madireddi concluded that Plaintiff could lift up to 20 pounds with his right extremity occasionally and could lift 10 pounds with his right side frequently. (AR 81) Therefore, there was evidence in the file supporting the conclusion the Plaintiff could perform sedentary work.

9

therefore, there is merely conflicting evidence on this issue in the administrative record, which is not sufficient to render Liberty Life's decision unreasonable.

Second, while the term, "reasonable continuity" is not defined in the LTD policy, even applying a common sense definition to the term provides more than ample support for Liberty Life's conclusion that Plaintiff no longer had a disability within the meaning of the LTD policy as of April 25, 2005. In Sweno v. Liberty Life Assurance Company of Boston, No. 02-376; 2003 U.S. Dist. LEXIS 4115 (D. MN, 2003), the Court evaluated the same "reasonable continuity" language at issue here. Recognizing that the clause was not defined in the policy, the Court looked to the definition of continuity in both Webster's College Dictionary, 1991, and Roget's II The New Thesaurus for the ordinary meaning of "continuity." The Webster's definition was "'the state or quality of being continuous. 'Continuous' is defined as 'uninterrupted in time; without cessation." 2003 U.S. Dist. LEXIS 4115 at p. 3, quoting Webster's College Dictionary 295 (1991). The Sweno Court further recognized:

> The commonsense or ordinary meaning of "continuity" clearly has a temporal component. The Court interprets "reasonable continuity" therefore as the ability to work for some "reasonable" time in an uninterrupted or nonstop fashion. For example, the ability to work with "reasonable continuity" might be the ability to work an hour nonstop, and then take a break, and then resume working. Reasonable continuity must have a lower limit, however. For example, if a claimant could work only a few minutes, and then be required to take a lengthy break, that claimant would not be able to work with reasonable continuity.

Id. at p. 3. As set forth above, none of Drs. Cariz, Liguori or Bilazarian provided any information to Liberty Life after November, 2004 that indicated Plaintiff had any temporal limitations on his ability to perform sedentary tasks. Plaintiff had the opportunity to ask all three to correct Liberty Life's interpretation (or that of Dr. Madireddi) of their records if they felt it was inappropriate. None did so at any time prior to (or after) the final denial decision was

communicated on June 22, 2005. In the absence of any such clarification or correction or contradiction by Drs. Bilazarian, Cariz and Liguori, Plaintiff cannot credibly claim that Liberty Life's decision was unreasonable, arbitrary or capricious.[7]

Furthermore, in the physical limitations form completed by Plaintiff himself in December, 2004, Plaintiff indicated that he sits for 6 hours, stands for 2 hours and walks for 20-30 minutes a day. (AR 00238) It also indicates that Plaintiff was able to maintain contact with people by using the telephone, internet and regular mail. (Id.) Moreover, despite the new focus by Plaintiff on his alleged intermittent pain, he did not identify pain as a reason why he believed he could not engage in any gainful employment. (AR 00240) Therefore, Plaintiff's own statements confirm that he could perform the type of sedentary functions identified during the TSA and labor market survey.

Despite Plaintiff's arguments to the contrary, there simply is nothing in the June 7, 2005 letter from Dr. Kase that should compel a different result under the arbitrary and capricious standard. First and foremost, Dr. Kase's letter does not address the opinions of Drs. Liguori, Cariz and Bilazarian on which Liberty Life relied in part. (AR 00083-84) Second, while the letter does reference alleged frequent "spasms of the left limbs, which are painful." Dr. Kase did not provide any objective information about the frequency of the spasms, the duration of the spasms, the level of pain associated with such spasms, or whether the spasms in any way affected Plaintiff's right-hand dominant side. Nor does the letter from Dr. Kase address or contradict the vocational information in the file. Indeed, it is not clear from Dr. Kase's letter whether he actually saw Plaintiff between the date of his letter and the previous examination in September,

---

[7] Further, the fact that a Federal District Court previously interpreted the exact same "reasonable continuity" clause at issue here in the manner it did in Sweno precludes a finding that Liberty Life acted in an arbitrary or capricious manner interpreting the clause in the manner it did in this case.

11

2004. Dr. Kase was asked to provide updated medical records in February, 2005, prior to the denial, but failed to do so.

    4.    **The Reports Of Dr. Madireddi Unequivocally Confirm That He Considered the Entire Claims File and That There Was A Substantial Basis For His Conclusion**

Plaintiff's "evidence" fails to establish that Dr. Madireddi's independent peer review of the claims file was not based on substantial medical evidence. There is no dispute that Dr, Madireddi considered the records in the claims file. (AR 00135 - 160) That report makes clear that Dr. Madireddi considered the notes and records of Drs. Cariz, Bilazarian and Liguori, as well as the TSA reports[8] and labor market survey information and Dr. Liguori's March 30, 2005 note. There is similarly no dispute that in his supplemental report, Dr. Madireddi considered Dr. Kase's June 7, 2005 letter.[9] (AR 00078-82)

At the end of the day, Plaintiff is left with nothing more than a difference of medical opinion.[10] On one hand is Dr. Kase, who believes that Plaintiff cannot perform any occupation

---

[8] Plaintiff's suggestion that Dr. Madireddi made an unwarranted conclusion that the TSA and restriction identified by Dr. Liguori assumed an ability to perform full time sedentary work in the employment context is also wrong. As set forth in the record, that premise was established by the TSA itself, which stated "for the purpose of this TSA, up to a full-time sedentary work capacity with no use of the left arm was utilized, per DCM instruction." (AR 00183) Again, this information was known to Plaintiff prior to the final denial decision and he did not offer any additional information from Drs. Liguori, Cariz or Bilazarian suggesting that a different assumption should be utilized. Indeed, "at least some very good reason is needed to overcome the strong presumption that the record on review is limited to the record before the administrator. . . .it is almost inherent in the idea of reviewing agency or other administrative action for reasonableness; how could an administrator act unreasonably by ignoring information never presented to it?" Liston v. UNUM Corp. Officer Severance Plan,, 330 F.3d 19, 23 (1st Cir. 2003)

[9] Plaintiff's reliance on Buffonge v. The Prudential Ins. Co. of America, 426 F.3d 20 (1st Cir. 2005) is entirely misplaced. The review in that case is readily distinguishable from the case at bar. First Buffonge suffered from cervical disc disease. 426 F.3d at 23. Second, and most important, the reviewing physician in Buffonge, unlike in this case, improperly concluded that there was a "consensus" among the treating physicians that the claimant could perform a desk job when in fact each of those physicians had stated that the claimant was fully disabled. Id. Here, Dr. Madireddi relied on his own analysis as well as the opinions of three treating physicians, none of whom concluded that Plaintiff was disabled from gainful employment.

[10] Plaintiff challenges Dr. Madireddi's statement that Plaintiff would need to take breaks every 60 minutes. Plaintiff contends that Dr. Madireddi's statement compromises the integrity of the TSA and labor market survey and underscores that Plaintiff could not be expected to perform any occupation with reasonable continuity. First, Plaintiff misconstrues Dr. Madireddi's statement. It does not impose a new limitation on Plaintiff's ability to work.

12

with reasonable continuity. On the other hand is Dr. Madireddi, who believes the medical information (including the opinions of Plaintiff's own treating doctors) supports a conclusion that Plaintiff can perform other occupations with reasonable continuity. Because Dr. Madireddi's conclusions and those of Liberty Life are supported by substantial medical information, the denial decision must be upheld. Indeed, it is well settled that "nothing in ERISA . . . suggests that plan administrators must accord special deference to the opinions of treating physicians." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831, 123 S.Ct. 1965, 155 L. Ed.2d 1034 (2003); Tsoulas v. Liberty Life Assurance Company of Boston, 454 F.3d 69, 77 (1st Cir. 2006).[11]

The potential presence of conflicting or contradictory evidence is not, in and of itself, enough to make the administrator's decision unreasonable and therefore arbitrary. See Vlass v. Raytheon Employee's Disability Trust, 244 F.3d 27, 30 (1st Cir. 2001); Leahy v. Raytheon Company, 315 F.3d 11 (1st Cir. 2002). Moreover, the fact that conflicting evidence exists further supports the Court's use of the deferential standard of review provided under ERISA. Under this standard, "the court is to not substitute its judgment for that of the [decisionmaker]." Terry v. Bayer Corporation, 145 F.3d 28, 40 (1st Cir. 1998). Under First Circuit law, where conflicting medical records could lead to conflicting decisions regarding whether a plaintiff is

---

Rather, Dr. Madireddi merely stated that, "Standing and walking activities should be restricted to a total of four hours out of an eight hour workday. At a frequency of every 60 minutes, he should be afforded the opportunity to rest and take a break." (AR 00128) The availability of the opportunity to take breaks, if necessary, is not something that would have been addressed by the TSA or labor market survey. The availability of such breaks would be governed, for example, by principles embodied in the reasonable accommodation requirements of the Americans With Disabilities Act and/or any equivalent state law.

[11] In his summary judgment papers, Plaintiff incorrectly cites case law regarding the weight afforded the opinions of a non-examining reviewing physician. Contrary to Plaintiff's assertion, it was not unreasonable for Liberty Life to rely on the opinions of non-examining physicians. See Gannon v. Metropolitan Life Insurance Company, 360 F.3d 211 (1st Cir. 2004)(holding that the plan administrator may rely on the assessment of a non-examining medical consultant and stating that the First Circuit has "treated a nonexamining physician's review of a claimant's file as reliable medical evidence on several occasions."); McLaughlin v. The Prudential Life Insurance Company of America, 319 F.Supp.2d 115 (D.Mass. 2004) (same). See also Ivy v. Raytheon Employees Disability Trust, 307 F.Supp.2d 301 (D.Mass. 2004) (finding benefits determination was not arbitrary and capricious when the defendant relied upon opinions of independent non-examining physicians).

13

disabled, a court should defer to the decisionmaker as long the record contains evidence reasonably sufficient to support the decisionmaker's conclusion. See Pari-Fasano v. ITT Hartford Life and Accid. Ins. Co., 230 F.3d 415, 419 (1st Cir. 2000). The First Circuit in Leahy clearly articulated this deference given to plan decisionmakers when it emphasized:

> Disability, like beauty, is sometimes in the eye of the beholder . . . We have held before, and today reaffirm, that the mere existence of contradictory evidence does not render a plan fiduciary's determination arbitrary and capricious. Indeed, when the medical evidence is sharply conflicted, the deference due to the plan administrator's determination may be especially great.

Leahy, 315 F.3d at 18-19 (citations omitted). Accordingly, Liberty Life's motion for summary judgment should be granted and Plaintiff's motion for summary judgment should be denied.

5. **The Findings of the Social Security Administration ("SSA") Are Not Binding In Disability Determination Cases**

In his memoranda, Plaintiff argues that Liberty Life failed to consider the evidentiary weight of the decision awarding Plaintiff Social Security Disability Insurance. Plaintiff's claim fails because the SSA's decision is not binding on Liberty Life under First Circuit law and because Liberty Life considered the fact that Plaintiff received benefits.

The First Circuit Court of Appeals has clearly explained that the decision of the SSA is not binding on a decisionmaker such as Liberty Life. See Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d 415, 420 (1st Cir. 2000); Smith v. Fortis Benefits Ins. Co., 2003 U.S. App. LEXIS 20777 (1st Cir. 2003). Plaintiff's argument that the SSA decision is binding fails based on this precedent. Further, in Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831, 123 S.Ct. 1965, 155 L. Ed.2d 1034 (2003) the United States Supreme Court noted the differences between the Social Security disability program and ERISA plans. Based on these differences, the Court held that, unlike the SSA, neither plan administrators, nor the Courts are required to apply the "treating physician rule" in interpreting claims for denial of benefits under

14

ERISA. In explaining the differences between the regulations under the SSA and those under ERISA, the Court emphasized that unlike the SSA, ERISA does not require employers to establish employee benefits plans and does not mandate what kind of benefits employers must provide if they choose to have such a plan. Id. at 833.[12]

Even if there was some obligation on Liberty Life to consider the SSDI decision, there is no evidence in the record that it failed to do so. The fact is that Plaintiff was awarded SSDI in 2001. Liberty Life was aware of that award when it initially determined that Plaintiff satisfied the "any occupation" definition of disability in December, 2002. (AR 00041) However, Plaintiff did not provide to Liberty Life the SSA decision or any other additional information relating to that decision or his continued entitlement to SSDI benefits after December, 2002. Therefore there was nothing more for Liberty Life to consider in 2005.

## II.   It Is Undisputed That Liberty Life's Decision Should Be Reviewed Under the "Arbitrary and Capricious" Standard of Review

In his motion, Plaintiff concedes that the LTD policy at issue in this case grants Liberty Life discretion to interpret the plan, and that judicial review of the denial decision is subject to an "arbitrary and capricious" standard of review recognized in Firestone Tire & Rubber Co., v. Baruch, 498 U.S. 101, 115, (1989). See Plaintiff's Brief at p. 1. However, despite well-settled First Circuit authority to the contrary, Plaintiff nevertheless seeks to circumvent that standard of review by arguing that a less deferential review, or no deference at all, should be applied in this case, because of an alleged conflict of interest resulting from the fact that Liberty "serves as both the insurer responsible for payment of LTD benefits under the ERISA plan and the administrator

---

[12] Other Courts have reiterated that the criteria for determining eligibility for Social Security disability benefits are also substantively different than the criteria established by many disability insurance plans. See Pari-Fasano 230 F.3d at 420. See generally 42 U.S.C. §416(i), 423(d). Based on these holdings, courts routinely recognize the differences between the Social Security disability program and ERISA plans and do not require plan administrators to defer to the decisions of the SSA, even when such decisions are made available to the plan administrator, which was not the case here.

15

empowered to make determinations of eligibility for such benefits." (Pl. Memorandum p. 2) Plaintiff's argument should be rejected because it is in direct conflict with well-settled First Circuit authority that any structural conflict alleged by virtue of the fact that plan administrator has a dual role as payor and administrator does not warrant a less deferential review by the Court. See Doe v. Travelers Ins. Co., 167 F.3d 53, 57 (1st Cir. 1999); Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998); Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan, 402 F.3d 67 (1st Cir. 2005). See also Tsoulas v. Liberty Life Assurance Company of Boston, 454 F.3d 69 at 76.("We have held that no automatic conflict of interest arises to elevate the standard of review where, as here, 'a finding of eligibility means that the insurer will have to pay benefits out of its own pocket'")(citing Pari-Fasano, 230 F.3d at 418).

In addition to alleging a structural conflict, Plaintiff appears to allege that Defendant acted with an "improper motive" warranting a change in the standard of review. Specifically, Plaintiff alleges that a single statement of an independent vocational consultant retained by Liberty Life in October, 2002, that if Plaintiff decided not to pursue alternate employment, "there would have to be some decision made not to continue to provide assistance . . . .," is evidence of an improper motive by Liberty Life. (Pl. Mem. p.2; AR 0335). Plaintiff further suggests that Liberty Life's subsequent efforts to provide Plaintiff with vocational assistance, and its regular requests for updated medical information are further evidence of this alleged improper motive. Plaintiff's attempt to establish an improper motive by Liberty Life, however, falls well short of the mark. The statement of the independent vocational consultant and Liberty Life's conduct in seeking updated medical information regarding Plaintiff do not establish an improper motive by Liberty Life.

Plaintiff's characterization of the statement by the independent vocational consultant is completely wrong for several reasons. First, Ms. Baris was not an employee of Liberty Life. Rather, she was an independent consultant. (AR 00042, 00332-335) Her conduct or opinions by themselves, therefore, do not establish an improper motivation by Liberty Life as Ms. Baris was not acting as a representative of Defendant. Second, the report of Ms. Baris was made in October, 2002, some 2 1/2 years <u>before</u> the decision was made to terminate Plaintiff's benefits.[13] (AR 00332)

Further, Plaintiff mischaracterized the meaning of Ms. Baris' actual statement. Plaintiff's suggestion at page 2 of his memorandum that Ms. Baris's statement was a recommendation that LTD benefits be terminated if Plaintiff failed to find suitable work is an incorrect characterization of this statement. A more reasoned review of the statement reveals that it was nothing more than a suggestion that Liberty Life cease providing *vocational assistance* (as opposed to LTD benefits) if Plaintiff was not serious about pursuing alternate employment. Indeed, in a section of her report which precedes the sentence quoted by Plaintiff, Ms. Baris noted, among other things, that since her first vocational consultation with Plaintiff in August, 2002, Plaintiff reported that "he has not done much in terms of planning or activities toward planning for any vocational pursuits" because he has been working on identifying housing for relocating to Cape Cod. (AR 00333) She further noted that while Plaintiff indicated that he would be interested in exploring vocational alternatives, he was "quite concerned about factors

---

[13] It is undisputed that Liberty Life continued to pay Plaintiff's benefits based on the "own occupation" and/or "any occupation" definitions during the period October 21, 2002 (the date of the report) to April 25, 2005. It is also undisputed that Liberty Life's decision in April 2005 that benefits were no longer payable to Plaintiff was made after three of Plaintiff's treating physicians concluded that Plaintiff was capable of sedentary function, after a transferable skills analysis and labor market survey were conducted confirming that there were positions suitable for Plaintiff given his limitations and skill set, and after an independent reviewing physician concluded that Plaintiff was capable of performing sedentary work. These opinions, analyses and/or surveys were each rendered or performed well after Ms. Baris conducted her vocational review in this case. Therefore, any alleged statements made by Ms. Baris in 2002 do not establish an improper motive on the decision made by Liberty Life in April 2005.

such as the impact on his benefit, the impact on his Social Security, as well as the impact on the housing situation. He will be in HUD housing and will not be able to earn greater than a certain amount without putting his placement there in jeopardy." (AR 00334) The meaning of Ms. Baris's statement is unambiguously reflected in a further excerpt from her letter immediately preceding the clause cited by Plaintiff in his memorandum that Plaintiff chose not to include. Specifically, she stated as follows:

> If Liberty determines that there would be a cost benefit to his pursuit of vocational opportunities, it would be my suggestion that the claimant continue to receive some level of support. I believe that with the information I provided with him at this visit, that he would be able to utilize it to identify some possible part time or volunteer opportunities in which he could begin to explore his work capacity and interests.
>
> If Mr. Archambault does not intend to pursue anything that would generate an income due to the impact on his benefits (LTD, SS and Housing), then I believe that there would have to be some decision made not to continue to provide assistance from a financial perspective. . . . (AR 00335)

Evaluated in its proper context, it is clear that the support or assistance of which Ms. Baris was referring was vocational assistance, rather than LTD benefits. It is more than reasonable for Liberty Life to consider whether to continue offering vocational assistance if Plaintiff chose not to pursue vocational opportunities or alternatives. There is no evidence that Ms. Baris' statement related to LTD benefits or affected future decisions regarding such benefits.

Similarly unavailing is Plaintiff's claim that Liberty Life acted with an improper motive when, during the 2 1/2 years following Plaintiff's initial vocational skills analysis in 2002, it made regular inquiry of Plaintiff's medical status from his treating physicians. Plaintiff's suggestion that Liberty Life's inquiries were improper is ludicrous. There is no dispute that the LTD policy specifically contemplates that Liberty had the right to request proof of continued

disability and that Plaintiff had the duty to comply with any such requests. (AR 00026) Accordingly, Plaintiff has failed to establish that Liberty Life acted with any improper motive in its review of Plaintiff's claim and that any "heightened" standard of review is warranted.

**III.    Count II of Plaintiff's Complaint Fails As A Matter of Law.**

Plaintiff's motion for summary judgment does not address his breach of contract claim in Count II. However, in his opposition to Liberty Life's motion for summary judgment, Plaintiff alleges that Count II is not preempted by ERISA because it is based on federal contract law, as opposed to state contract law. Count II of Plaintiff's Complaint fails as a matter of law whether it is captioned breach of federal contract law or state contract law because the exclusive remedy Plaintiff seeks in Count II is provided by the statutory provisions of ERISA.

As an initial matter, Liberty Life specifically incorporates the discussion of Count II in its memorandum in support of its motion for summary judgment. To the extent Plaintiff seeks to avoid the expansive scope of ERISA preemption by characterizing Count II as a breach of contract based on federal common law, that claim still fails as a matter of law because of the exclusive remedy provided by ERISA. Plaintiff's memorandum fails to cite even a single case stating that he can assert a cause of action for breach of contract seeking the remedy at issue. Other courts faced with a similar claim had little difficulty concluding that a breach of contract claim based in federal common law seeking LTD benefits in a plan governed by ERISA failed as a matter of law. See e.g. Costley v. Thibodeau, Johnson & Feriancek, 189 F.Supp. 2d 938 (D. MN 2001), in which the Court stated:

> The parties concede that the Plan, as formulated and applied by the Defendants, is governed by ERISA. As a cautionary measure, [plaintiff] alternatively alleges causes of action, apart from ERISA, in the event that, for whatever reason, ERISA does not apply. Since all parties acknowledge that ERISA does control, the common law actions for unilateral breach of contract, whether

19

under the Federal or State common law, are plainly preempted.
(citations omitted)

Accordingly, Liberty Life is entitled to judgment on Count II of Plaintiff's Complaint, particularly where Plaintiff has not moved for summary judgment on Count II.

## CONCLUSION

For the reasons stated above, as well as for those presented in Liberty Life's Memorandum in Support of Its Motion for Summary Judgment, Liberty Life respectfully requests that this Court grant its Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment. If this Court does not grant Liberty Life's motion, Liberty Life respectfully submits that Plaintiff is only entitled, at most, to a remand of this case for further review by Liberty Life.

Respectfully submitted,
LIBERTY LIFE ASSURANCE COMPANY OF BOSTON,

By its attorneys,

/s/ Richard Paterniti
Guy P. Tully, BBO# 555625
Richard Paterniti, BBO #645170
JACKSON LEWIS LLP
75 Park Plaza
Boston, MA 02116
(617) 367-0025

CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2006, a copy of the foregoing was served by electronic mail and through the ECF system on Plaintiff's counsel.

/s/ Guy P. Tully
**Jackson Lewis LLP**

20