UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
_____
JOSEPH ARCHAMBAULT,            )
      Plaintiff,               )
                              )
      v.                       )        C.A. No. 05-11762-NG
                              )
LIBERTY LIFE ASSURANCE         )
COMPANY OF BOSTON,             )
      Defendant.               )
_____)
```
GERTNER, D.J.:

## MEMORANDUM AND ORDER RE: SUMMARY JUDGMENT
March 30, 2007

I.    **INTRODUCTION**

This case involves an appeal from the termination of long-term disability benefits under an Employment Retirement Income Security Act ("ERISA") insurance policy. Plaintiff, Joseph Archambault ("Archambault") began receiving benefits in January 2001, following what was clearly a debilitating stroke. The plaintiff struggles daily with significantly diminished physical abilities produced by his stroke. He requires aid in performing some of the most mundane day-to-day tasks, and cannot live the active lifestyle he once enjoyed.

Plaintiff's long-term disability benefits, however, were terminated in April 2005, when defendants determined that plaintiff no longer met the definition of "Disabled" under the terms of the policy. Plaintiff appealed the termination but was denied. He then brought suit under ERISA, 29 U.S.C. 1132(a)(1)(B), and a breach of contract theory. Cross-motions for summary judgment have been filed.

While ERISA was passed to protect employees, to provide security for health and welfare plans, too often it has had the

opposite effect.  Too often it has been applied in a way that frustrates employees' entirely legitimate claims, that undermines the very workers on whose behalf it was passed.

For example, while ERISA grants plan participants the right to file suit against the plan to recover benefits that have been withheld, Congress provided no guidance regarding the standard of review, leaving that to the courts to develop a body of federal common law.  Using trust principles as an analogy, the appellate courts, endorsed by the Supreme Court, determined that the appropriate standard of review of the employer's decision is among the most deferential standard in a court's arsenal – the "arbitrary and capricious" standard, meaning that the decision is upheld if the available evidence reasonably supports it.  As numbers of commentators have suggested, this may well have been a mistake. See e.g. Kevin Walker Beatty, "*A Decade of Confusion:  The Standard of Review for Erisa Benefit Denial Claims as Established by Firestone*," 51 Ala L. Rev. 733, 734 (Winter, 2000). Indeed, as described below, of all the courts, the First Circuit's approach is perhaps the most deferential to plan administrators and even the most forgiving of ostensible conflicts of interests.

Given the degree of deference I am obliged to accord the defendant's decision, the multiple reviews of plaintiff's records in the file, and most significantly, the weaknesses in the record produced by plaintiff's own doctors, I am obliged to **GRANT** Defendant's Motion for Summary Judgment (**document #18**) and **DENY** Plaintiff's (**document #15**).

## II.  **BACKGROUND FACTS**

Plaintiff Joseph Archambault ("Archambault") was employed by Sodexho Marriott Services, Inc., ("Sodexho") as a Food Service General Manager with a bi-weekly salary of $1,596.14.  (Pl.'s Statement of Facts ("PSOF") ¶ 1.  (As part of his employment, Plaintiff was covered by Sodexho's group disability insurance plan ("the policy"), issued by Liberty Life Assurance Co. of Boston ("Liberty").  (Def.'s Statement of Facts ("DSOF") ¶ 2.)  The policy grants discretionary authority to Liberty to make factual findings, determine eligibly for benefits and interpret the terms of the policy.  (Administrative Record ("AR") 00024.)

"Disability" is defined in Section 2 of the plan as follows:

> 'Disability' or 'Disabled' means that during the Elimination Period and the next 24 months of Disability the Covered Person is unable to perform all of the material and substantial duties of his own occupation on an Active Employment basis because of an Injury or Sickness; and

> After 24 months of benefits have been paid, the Covered person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

(AR 00005-6.)

On November 12, 2000, Archambault suffered a severe stroke.  (AR 00712-15.)  Later that month, he applied for short and long-term disability benefits.  (DSOF ¶ 7.)  On January 3, 2001, Liberty approved Archambault's claim for long-term disability ("LTD") benefits under the "own occupation" definition of disability in

-3-

Section 2 of the policy.  (Id. at ¶ 10.)  At that time, Liberty paid $957.68 to Plaintiff in bi-weekly benefits.  (Id.)

As required by the plan, Plaintiff applied for and was awarded Social Security Disability Insurance ("SSDI") benefits in the amount of $1,100.00 a month beginning in May 2001.  (Id. at ¶ 11.) On June 27, 2001, Liberty notified Plaintiff that the SSDI benefits served as an offset to his biweekly LTD payments, which would now be reduced to $499.99.  (PSOF ¶ 16.)

On June 13, 2002, Liberty issued a letter to Plaintiff, informing him that the 24-month "own occupation" period would end in December, and that in order to qualify for further benefits, he would have to show he was disabled from "any occupation."  (DSOF ¶ 13.)  Along with this letter, Liberty included various forms for Plaintiff to complete, including an Activities Questionnaire, Claimant Information Form, Supplementary Statement, and a Training, Education and Experience Form.  (Id.)  Plaintiff continued to receive LTD benefits throughout 2003 and 2004, well past the end of the 24-month "own occupation" period (which ended December 13, 2002).  (Id. at ¶¶ 13, 16.)

On November 29, 2004, Liberty sent a request for updated medical information to several of Plaintiff's physicians: Dr. Paul Liguori, the rehabilitation specialist coordinating Plaintiff's rehabilitation; Dr. Cariz, Plaintiff's primary care physician; and Dr. Kase, Plaintiff's neurologist.  (Id. at ¶ 16.)  On December 10, Liberty also sent a request to Dr. Bilazarian, Plaintiff's cardiorespiratory specialist.  (Id. at ¶ 17.)  On December 22,

2004, Liberty received a response from Dr. Liguori identifying the following restrictions for the Plaintiff: (1) unable to stand for long periods of time; (2) unable to walk long distance; (3) unable to lift/carry objects over 10 pounds; (4) unable to use left hand/arm; and (5) unable to bend, stoop, kneel, push or pull. (AR 00247.)

On February 23, 2005, Liberty wrote to Dr. Liguori, asking him if those restrictions were still valid, and whether based on those restrictions, Plaintiff could perform "sedentary function" without the use of his left arm. (AR 00229). Liberty also sent letters to Drs. Cariz and Bilazarian, sharing Liguori's restrictions and posing the same question. Dr. Bilazarian faxed back the document, having scribbled "yes" after the question. (AR 00213). Dr. Cariz was slightly more verbose, replying, "Based on the information provided, I agree that Mr. Archambault is capable of sedentary function without the use of his left arm." (AR 00208.)

After receiving the responses from Plaintiff's physicians, Liberty referred the file for a Transferable Skills Analysis ("TSA") to determine whether Plaintiff was disabled from performing "any" occupation. (DSOF ¶ 24.) Vocation Case Manager Laura Doherty ("Doherty") conducted the review. (Id. at ¶25) Doherty based her assessment on the restrictions identified by Dr. Liguori, and did an analysis for full-time sedentary work capacity with no use of the left arm, noting that Plaintiff is right-hand dominant. (Id.) Doherty identified the following transferable skills:

> (1) ability to understand and communicate
> nutritional information to desired audience;

> (2) skilled in providing customer service to
> ensure customer satisfaction; (3) ability to
> perform inventory control and procurement; (4)
> ability to understand and utilize accounting
> procedures to reconcile business receipts; (5)
> ability to influence others' opinions,
> attitude, and judgment; (6) ability to follow
> and give written and verbal instructions; (7)
> ability to complete a variety of tasks and
> respond to change; (8) can use logic and
> reasoning to identify the strengths and
> weaknesses or alternative solutions,
> conclusions or approaches to problems; and (9)
> document and assess information through
> entering, transcribing, recording, storing,
> and maintaining information in written or
> electronic form.

(AR 00200.)

Based on these skills, Plaintiff's physical restrictions, and labor market research, Doherty determined that Plaintiff was able to perform four occupations without the use of his left arm: (1) Customer Service/Food Sales Representative; (2) Front Desk Badge Security Clerk; (3) Information Clerk; (4) Night Auditor.  (AR 00199-201.)

On March 30, 2005, after the TSA had been completed, Liberty received an update from Dr. Liguori.  (DSOF ¶ 28.)  Dr. Liguori noted that "Due to his imbalance, it was recommended that Mr. Archambault not lift or carry objects greater than *five* pounds. There is no cognitive or memory restriction other than difficulties with fatigue and alertness which is intermittent.  Sitting balance is functional.  Ability to use the right hand for grasping and manipulating objects is functional."  (AR 00204)(emphasis added.)

On April 5, 2005, Liberty sent the TSA to Lori Havener ("Havener") of the Windham Group to conduct a Labor Market Survey

("LMS") in order to further clarify the physical demands of the occupations Doherty identified. (DSOF ¶ 29.) In its letter to Havener, Liberty incorporated Dr. Liguori's latest statement, noting that the inquiry should be whether plaintiff can perform these occupations without the use of his left arm, and being able only to lift five - not ten - pounds. (AR 00198.) Susan Delf ("Delf") of the Windham Group prepared the report. (Id. at 00186-96.) She contacted five companies about the Information Clerk position, each of which replied that the job could be done with Plaintiff's restrictions. The five companies she contacted about the Night Auditor position also responded positively. Similarly, all five companies she contacted about the Front Desk Security Guard position responded that someone in Plaintiff's position could hold the job. Only six of the ten companies Delf contacted about the Customer Service/Food Sales Representative position confirmed that someone with the Plaintiff's restrictions could hold it.

Based on this information, Liberty concluded that Plaintiff did not meet the "any occupation" definition of disability under the plan, and notified Plaintiff by letter on April 25, 2005, that LTD benefits would no longer be payable to him. (DSOF ¶ 35.) The letter informed Plaintiff that he could seek a review of the benefits denial, and that he should include "documentation such as office notes, test results, updated scientific restrictions and limitations from all treating providers as well as any additional information which you feel will support your claim." (AR 00181.)

Archambault appealed the decision on May 2, 2005. (<u>Id.</u> at 00177-78.)  Plaintiff's letter to Liberty, dated May 12, argued that Liberty's termination of benefits was unreasonable because it was based on opinions from a cardiologist, while the disorder Plaintiff suffered from was neurological in nature. (<u>Id.</u> at 00168.)  Liberty requested more time to investigate Plaintiff's claim and also that Plaintiff submit further medical records to support his appeal. (<u>Id.</u> at 00169-70.)  Plaintiff responded:

> While all Mr. Archambault's neurological providers have agreed to provide any additional documentation to support their unanimous opinion of full disability, it is unfair to require more evidence than you already possess.  Your own file contents already prove the case for the claimant and no supplementation is needed.

(<u>Id.</u> at 00168.)

On May 18, 2005, Liberty sent Plaintiff's file to MedicoLegal Services for an independent medical peer review. (DSOF ¶ 41.)  Dr. L. Neena Madireddi, a physiatrist, conducted the review. (<u>Id.</u>)  Dr. Madireddi looked at all of the medical information in Archambault's file, including the restrictions Dr. Liguori noted in December 2004, the correction regarding the five pound lifting restriction in Liguori's March 30, 2005, letter, and the fact that Drs. Cariz and Bilazarian stated, based on those restrictions, that Plaintiff could perform sedentary functions without the use of his left arm.  Dr. Madireddi concluded that "the available medical evidence supports that [Plaintiff] would be able to perform work within a sedentary level according to the U.S. Department of Labor Dictionary of Occupational Title criteria." (AR 00129.)

On June 10, 2005, Liberty sent Plaintiff a letter upholding its denial of benefits. (AR 00088-94.) Three days later, Liberty received a letter from Plaintiff's neurologist, Dr. Carlos Kase. Dr. Kase wrote:

> In addition to the motor deficits described above, [Plaintiff] has in addition been affected by frequent 'spasms' of the left limbs, which are painful, and are ascribed to the result of the spasticity of the left limbs, as a sequella of the stroke. He has been treated with various medications for the 'spasms,' including Baclofen and Zanaflex, with only partial relief of his symptoms.
>
> In view of the issues described above, it is my professional opinion that, on account of his motor deficits and the presence of 'spasms' of the left limbs, [Plaintiff] is unable to perform, with reasonable continuity, the material and substantial duties of any occupation. For this reason, I respectfully request that you re-evaluate [Plaintiff's] situation, since I believe that he is completely and permanently disabled for any occupation, on account of the situation described above.

(AR 00083-84).

Liberty then forwarded Dr. Kase's letter to Dr. Madireddi, asking him to prepare a supplemental report addressing whether Dr. Kase's statement altered his conclusions. Dr. Madireddi's supplemental report indicates that, taking into account Dr. Kase's opinion, he still believed that Plaintiff was capable of performing a full-time sedentary occupation. (AR 00078-82.)

On June 25, 2005, Liberty informed plaintiff that after reviewing Dr. Kase's letter, Liberty Life still believed that Plaintiff did not meet the "any occupation" definition of disabled, and his benefits would not be reinstated. (AR at 00065-66.)

III. __ANALYSIS__

I review Liberty's decision to terminate Plaintiff's LTD benefits under the exceedingly deferential "arbitrary and capricious" standard, meaning that the decision is upheld if the available evidence reasonably supports it.  Indeed, even if there is evidence _contrary_ to the administrator's decision, the law requires that I sustain the decision, provided it is supported by substantial evidence.  Gannon v. Metro.Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004).  The only exception to the general rule would be if the defendant had a conflict of interest or had demonstrated bad faith in which case, deference to the administrator's decision may be reduced.  Leahy v. Raytheon Co., 315 F.3d 11, 16 (1st Cir. 2002).

Plaintiff argues that both is the case -- that Liberty has a potential conflict of interest and has demonstrated bad faith. The problem is that the conflict which plaintiff has identified is identical to that which the First Circuit rejected in previous decisions.  Nor is there evidence of improper motivation on this record.

Although a reasonable, and kinder, plan administrator could have looked at the evidence in the record and concluded that Archambault suffers from complete disability, a reasonable adjudicator could look at the same record and conclude otherwise. And so, Plaintiff's ERISA claim fails.  Liberty's decision was reasonably supported by (1) medical opinions obtained from

Plaintiff's physicians, (2) vocational opinions, and (3) an Independent Peer Review.

Plaintiff's breach of contract claim is statutorily preempted by ERISA, duplicative of his first claim, and must be dismissed as a matter of law.

### A.    Summary Judgment Standard

A party moving for summary judgment is entitled to a judgment as a matter of law when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c).  To be considered material, a disputed fact "must have the potential to affect the outcome of the suit under the governing law." Hinchey v. NYNEX Corp., 144 F.3d 134, 140 (1st Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986))(internal quotations omitted).  An issue of fact is genuine only if a reasonable jury could resolve it in favor of either party.  Basic Controlex Corp., Inc., v. Klockner Moeller Corp., 202 F.3d 450, 453 (1st Cir. 2000).  Summary judgment is appropriate, however, "if evidence for one side is merely colorable, or is not significantly probative." Id. (quoting Anderson at 249-50)(internal quotations omitted).

The party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact for trial. Hinchey at 140 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  After the moving party shows that there is an absence of evidence to support the nonmoving party's case, the

burden shifts and the nonmoving party must demonstrate that a trier
of fact reasonably could find in her favor.  Id.  In deciding a
motion for summary judgment, a court must draw all reasonable
inferences in favor of the nonmoving party.  Douglas v. York
County, 360 F.3d 286, 290 (1st Cir. 2004).

**B.    Liberty's Decision is Reviewed Under the Arbitrary and
Capricious Standard**

As noted above, decisions under ERISA benefit plans that give
administrators extraordinary discretionary authority to determine
eligibility and construe the terms of the agreement are generally
reviewed under the "arbitrary and capricious" standard.  Firestone
Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Janeiro v.
Urological Surgery Professional Ass'n., 457 F.3d 130, 139 (1st Cir.
2006).  In other words, the inquiry is whether the administrator's
decision is reasonably supported by substantial evidence contained
in the record; "substantial evidence" is evidence reasonably
sufficient to support a conclusion.  See Sullivan v. Raytheon Co.,
262 F.3d 41, 50-51 (1st Cir. 2001), cert. denied, 534 U.S. 1118
(2002); Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230
F.3d 415, 419 (1st Cir. 2000).  If a claimant can show a conflict
of interest or improper motivation on the part of the
administrator, then I can afford the administrative decision less
deference.  See Firestone, 489 U.S. at 115; Janeiro, 457 F.3d at
139; Wright v. R.R. Donnelley & Sons Co., 402 F.3d 67, 74 (1st Cir.
2005).

Plaintiff argues (1) a structural conflict exists because,
"Liberty serves as both the insurer responsible for payment . . .

and the administrator empowered to make determinations of eligibility" (Pl.'s Am. Mem. Supp. Sum. J. 2.), and (2) Liberty's course of conduct implies an improper motive (Id.).

## 1. **No Conflict of Interest**

Plaintiff's argument that a structural conflict of interest exists merely by virtue of Liberty's dual status as administrator and payor must fail as contrary to First Circuit precedent.  In Wright the First Circuit found that even though an insurer has a conflict of interest of sorts when a finding of eligibility means it would have to pay benefits out of its own profits, that conflict was vitiated because of so-called "market forces."  402 F.3d at 75. The Court took the position that market forces create the incentive for benefit plans to be administered in a way that would please employees, noting that employers "will not want to keep an overly tight-fisted insurer." Id. (citing Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998)). See e.g. Tsoulas v. Liberty Life Assurance Co. of Boston, 454 F.3d 69, 76 (1st Cir. 2006) ("No automatic conflict of interest arises to elevate the standard of review where, as here, 'a finding of eligibility means that the insurer will have to pay benefits out of its own pocket.'" (quoting Pari-Fasano, 230 F.3d at 418); see also Doe v. Traveler's Ins. Co., 167 F.3d 53, 57 (1st Cir. 1999) ("Travelers can hardly sell policies if it is too severe in administering them.").

And, even if the claim decision-maker *were* operating under a conflict of interest, the First Circuit would modify the review standard only to a limited degree.  In conflict of interest

situations, courts are to "adher[e] to the arbitrary and capricious principle, with special emphasis on reasonableness, motivation but with the burden on the claimant to show that the [insurer's] decision was improperly motivated." Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d at 418 (quoting Doyle, 144 F.3d at 184 (alterations in original)).

Other courts and commentators have disagreed with the First Circuit's approach both as to what comprises a conflict of interest and the impact of such a finding on the standard of review. The "market forces" rationale has been rejected by other circuits. See Wright, 402 F.3d at 74 n. 5 (cases cited). And other courts have concluded that when a conflict of interest is found, the review is de novo, and not deferential. See Whitney v. Emire Blue Cross & Blue Shield, 106 F.3d 475, 477 (2d Cir. 1997).[1] But the First

---

[1] Federal courts engrafted the standards for evaluating ERISA claims from section 302 of the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. § 186 (2000). But the LMRA structure is different. In LMRA cases, trustees who review worker claims are presumed to be neutral because labor enjoys equal power with management in selecting trustees to administer the trusts. ERISA plans are entirely different. Judge Becker noted:

> [the Firestone severance] plan is controlled entirely by the employer, not by a group evenly divided between employer and employees. Because the plan is unfunded, every dollar provided in benefits is a dollar spent by defendant Firestone, the employer; and every dollar saved by the administrator on behalf of his employer is a dollar in Firestone's pocket.

Bruch v. Firestone Tire & Rubber Co., 828 F.2d 134, 144 (3d Cir. 1987). Accordingly, Judge Becker reviewed Firestone's plan under a de novo standard of review.

The Supreme Court affirmed de novo review, but not on the grounds articulated by the Third Circuit. The Court granted de novo review only because the plan documents did not contain any language granting discretionary powers to the plan administrator. As to conflicts of interests, the Court said: "Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a "facto[r] in determining whether there is an abuse of discretion." Firestone Tire & Rubber Co. et al. v. Bruch et al., 489 U.S. 101, 115 (1989). This ambiguous language set the stage for the divergent

Circuit will not reconsider its position, in the absence of an opinion by the Supreme Court, an en banc overruling of First Circuit precedent or statutory overruling.

I am obviously bound by the First Circuit's approach.  Thus, the simple fact that Liberty is both the administrator and payor of the policy does not create a conflict that alters the standard of review.


### 2. __No Bad Faith__

Plaintiff's second argument – that Liberty's course of conduct in handling his claim demonstrates an improper motive – is also lacking.  Plaintiff alleges that the October 2002 statements of Ms. Kathleen Baris, the independent vocational consultant hired by Liberty to assess alternative employment options for the plaintiff, demonstrates something nefarious.  (Pl.'s Am. Mem. Supp. Sum. J. 2).  Ms. Baris stated:

---

opinions on conflicts of interest and their significance described above.  As one commentator noted:

> . . . With its offhand dicta, and its shorthand analysis of how trust law may weigh conflicts of interest, the Court laid the foundation for lower courts to defer to conflicted plan administrator claim denials, even when such courts believed that the conflicted plan administrator had wrongfully denied a benefits claim.  By framing the issue as a breach of trust, instead of a breach of contract, and by then failing to plumb the full depth of trust law, the __Firestone__ Court ironically ushered in an era where plan participants are worse off under ERISA than they were before Congress enacted this trumpeted consumer protection statute.

Donald T. Bogan & Benjamin Fu, *Erisa: No Further Inquiry Into Conflicted Plan Administrator Claim Denials*, 58 Okla. L. Rev. 637, 649 (Winter 2005).

>If Liberty determines that there would be a
>cost benefit to [Plaintiff's] pursuit of
>vocational opportunities, it would be my
>suggestion that the claimant continue to
>receive some level of support . . . .  If
>[Plaintiff] does not intend to pursue anything
>that would generate an income due to the
>impact on his benefits (LTD, SS and Housing),
>then I believe that there would have to be
>*some decision made to not continue to provide*
>*assistance from a financial perspective*.

(AR 00335)(emphasis added).

This single statement is insufficient to demonstrate improper motive on the part of Liberty because it was made by an independent consultant, not a Liberty employee or representative.  Quite apart from that, the statement as excerpted is taken out of context.  The assistance Ms. Baris referred to was vocational counseling.  Moreover, the statement was made two and half years before Liberty reached the decision to terminate Plaintiff's LTD benefits, during which time Plaintiff did not pursue employment opportunities and continued to receive payments.  Given these facts, Ms. Baris' statements do not reflect an improper motive on Liberty's part.

Plaintiff's argument that Liberty acted improperly by "wag[ing] an intense campaign of calls and correspondence seeking further medical documentation from Plaintiff's physicians to support a finding of work capacity" (Pl.'s Am. Mem. Supp. Sum. J. 3) is similarly unpersuasive.  The policy grants Liberty the right to request proof of continued disability and imposes on the Plaintiff the duty to comply with such requests.  (AR 00026).  Plaintiff has not offered evidence that Liberty treated him differently than other claimants, or violated any of their own

policies and guidelines.  Regular inquiries into Plaintiff's medical status that are anticipated by the policy cannot be the basis for a finding of improper motive.

### C.  Liberty's Decision is Reasonably Supported by the Record

Liberty based its termination of Plaintiff's LTD benefits on three bodies of evidence: (1) the medical opinions supplied by Plaintiff's own physicians; (2) the vocational opinions supplied by the TSA and LMS; and (3) the independent peer review by MedicoLegal Services.  Taken together, the evidence ekes out a rational basis for Liberty's conclusion.

### 1.  Opinions of Plaintiff's Own Physicians

Physician records can amount to substantial evidence that may reasonably support a decision to terminate benefits.  See e.g. Sullivan, 262 F.3d at 51; Pari-Fasano, 230 F.3d at 417.  Not all the physicians queried must come to the same conclusion; the existence of contradictory evidence in the record does not automatically render a decision arbitrary or capricious.  See Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 30 (1st Cir. 2001).  However, reliance on materially misleading characterizations of the medical record *will* render a decision arbitrary and capricious.  Buffonge v. Prudential Life Ins. Co., 426 F.3d 20, 30 (1st Cir. 2005).

Liberty relies on the opinions of Plaintiff's own physicians, and maintained updated copies of treatment records as part of their claims file.  In December 2004, Liberty received a Restriction Form from Dr. Liguori, listing Plaintiff's disabilities.  (AR 00247.)

Liguori's response was forwarded to Drs. Cariz and Bilazarian, and formed the basis for their opinions that Plaintiff was capable of "sedentary function." In March 2005, Dr. Liguori sent a report to Liberty supplementing the 2004 Restriction Form, indicating that Plaintiff was limited to lifting five - not ten - pounds. He also responded to Liberty's inquiry about sedentary function capability by saying "Sitting balance is functional. Ability to use right hand for grasping and manipulating objects is functional." (AR 00204.) (This updated report was apparently never referred to Drs. Cariz or Bilazarian for comment.)

In June 2005, Dr. Kase, Plaintiff's neurologist, sent a letter to Liberty explaining in some detail his medical opinion that Plaintiff was completely disabled from performing the duties of any job. (AR 00083-84.)

Plaintiff argues that this evidence does not reasonably support Liberty's termination of his LTD benefits because it is "non-probative" to the underlying neurological basis of his disorder, and it is based on materially misleading medical information, namely the ten versus five pound lifting discrepancy.

Plaintiff's argument that only neurological medical opinions are relevant to Liberty's decision to terminate his benefits has been previously rejected by the First Circuit. See Vlass, 244 F.3d at 30. Much like Archambault, the plaintiff in Vlass suffered from a neurological disorder, and his neurologist believed that he was disabled while other physicians believed he was capable of sustaining a sedentary occupation. Id. at 29. The district court

reinstated the ERISA benefits because the policy administrator relied on "unduly selective . . . extracted medical observations" when they decided to terminate benefits against the advice of the neurologist. Id. at 29. The First Circuit reversed and upheld the termination as reasonable, noting that conflicting evidence does not render a decision arbitrary or unreasonable, and the opinion of any single physician is not entitled to special weight or authority. See id. at 30.

Archambault is faced with the same situation as the plaintiff in Vlass. The fact that *all but one* of his own physicians believe that he is capable of sedentary function, when coupled with the other evidence in the record, supports Liberty's decision to terminate his benefits. A single dissenting medical opinion does not render Liberty's decision impermissible.

Plaintiff also argues that because Drs. Cariz and Bilazarian based their opinions that he was capable of sustaining sedentary activities on Dr. Liguori's original ten-pound restriction, and not the revised five-pound restriction, their conclusions are materially misleading. Although Dr. Liguori revised his Restriction Form, he simultaneously concluded Plaintiff *could* perform sedentary activities. It is true that Liberty never forwarded the revised Restriction Form to Drs. Cariz or Bilazarian for comment; and if Liberty relied on those opinions alone, its decision would not be reasonably supported. However, the revised restrictions were considered along with the rest of the medical evidence – which included Liguori and Madireddi's conclusions

incorporating the five pound restriction - when Liberty decided to terminate Plaintiff's benefits.  Additionally, Plaintiff was provided time during the administrative review to submit additional materials to his physicians and allow them to revise their opinions, but did not.

### 2.  **Vocational Opinions**

Liberty also relied on vocational opinions to support its decision to terminate Plaintiff's benefits.  Transferable Skills Analyses and Labor Market Surveys are accepted as substantial evidence that may reasonably support a decision to terminate benefits.  See e.g. Vlass, 244 F.3d at 31.  Again, reliance on vocational opinions based on materially misleading characterizations of available information renders a decision arbitrary and capricious.  See id.; Buffonge, 426 F.3d at 30.

The TSA conducted by Liberty relied on the entire medical record, including Dr. Liguori's original ten-pound restriction, when analyzing Plaintiff's occupational skills.  The independent LMS relied on Liberty's TSA, but specifically took Dr. Liguori's revised five-pound restriction into consideration.  The LMS identified a number of potential employment options for a person with Archambault's skills and limitations.  (AR 00199-201.)  The lifting limitation was much more germane to the LMS than the TSA. The TSA identified Archambault's skills, which were primarily cognitive.[2]  The LMS is conducted by contacting employers and

---

[2] "(1) ability to understand and communicate nutritional information to desired audience; (2) skilled in providing customer service to ensure customer satisfaction; (3) ability to perform inventory control and procurement; (4) ability to understand and utilize accounting procedures to reconcile business

asking them whether someone with the plaintiff's skills and limitations can perform the identified jobs.  While the difference between lifting ten and five pounds certainly does not affect Plaintiff's "ability to influence others' opinions," it may affect his ability to perform job tasks as identified by potential employers.  Therefore, the fact that the five pound correction was incorporated into the LMS inquiry more than cures any deficit created by its absence in the TSA.

### 3.   Independent Peer Review

As part of the administrative appeal process, Liberty obtained an independent peer review from MedicoLegal Services. Independent Peer Reviews are accepted as substantial evidence that may reasonably support a decision to terminate benefits.  See e.g. Sullivan, 262 F.3d at 46.  Of course, reliance on peer reviews based on materially misleading characterizations of available information renders a decision arbitrary and capricious.  See id.; Buffonge, 426 F.3d at 30.

Dr. Madireddi, a physiatrist, reviewed Liberty's files, including a set of updated medical records, the statements by Archambault's physicians that he was capable of sedentary function, the Activities Questionnaire that Archambault himself filled out (stating that he can sit for six hours a day), and the vocational

---

receipts; (5) ability to influence others' opinions, attitude, and judgment; (6) ability to follow and give written and verbal instructions; (7) ability to complete a variety of tasks and respond to change; (8) can use logic and reasoning to identify the strengths and weaknesses or alternative solutions, conclusions or approaches to problems; and (9) document and assess information through entering, transcribing, recording, storing, and maintaining information in written or electronic form."  (AR 00200.)

opinions.  Madireddi also compared the other doctors' conclusions and Archambault's self-assessment to the medical records, determining that the doctors statements were accurate, and Archambault's statements about his limitations were slightly exaggerated.

Dr. Kase's June 2005 letter was received by Liberty after Dr. Madireddi's report was complete, but was forwarded to her for further review in order to ensure that the appeal relied on the most recent medical evidence available.  Madireddi prepared a supplementary report, ultimately reaffirmed her conclusion that Plaintiff was capable of sustaining sedentary occupation.  (AR 00078-82.)

### 4. <u>Relevance of Plaintiff's Eligibility for SSDI Benefits</u>

Plaintiff also argues that the termination of his LTD benefits was arbitrary and capricious because Liberty failed to consider the evidentiary weight of the government decision awarding him Social Security Disability Insurance, and the policy's definition of "Disabled" is substantially identical to the SSDI definition.

"Benefits eligibility determinations by the Social Security Administration," however, "are not binding on disability insurers." <u>Pari-Fasano v. IIT Hartford Life</u>, 230 F.3d 415, 420 (2000).  <u>See also</u> <u>Smith v. Fortis Benefits Co.</u>, 2003 US App. LEXIS 20777 (1st Cir. 2003); <u>see</u> <u>also</u> <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 831 (2003)(noting differences between SSDI and ERISA plans).  Liberty was not bound by the Social Security determinations regarding the Plaintiff.  Additionally, the evidence

-22-

reasonably supports the conclusion that Liberty did consider the SSDI awards when deciding to terminate the benefits. Plaintiff was required to obtain SSDI benefits under the terms of the policy and gave notice to Liberty once he secured them. Liberty was aware of the fact that Plaintiff was awarded the SSDI benefits when it made its termination decision.

### 5.    The Sum of the Evidence Offers Reasonable Support for Liberty's Decision

There is sufficient evidence in the record that Archambault is capable of "sedentary function," even discounting Drs. Bilazarian and Cariz's statements as based on outdated information. Both Drs. Liguori and Madireddi came to that conclusion. Only Dr. Kase differed. Liberty reasonably relied on those medical conclusions, coupled with the LMS, to find that Archambault was not "Disabled" under the draconian terms of the policy.

### D.    Plaintiff's Breach of Contract Claim is Preempted

Plaintiff also alleges that Liberty is liable for breach of contract under federal common law for failing to adhere to the terms of the policy. (Compl. ¶ 11.) Liberty correctly counters that this claim is statutorily pre-empted by ERISA.

Congress intended ERISA's civil enforcement remedies to be exclusive and to preempt other claims relating to employee benefits. See 29 U.S.C. § 1144(a)(ERISA shall "supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."); see also Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 54 (1987); Hampers v. W.R. Grace & Co., Inc., 202 F.3d

44, 50 (1st Cir. 2000).  The phrase "relate to" is to be construed in the broadest sense possible.  <u>Shaw v. Delta Air Lines, Inc.</u>, 463 U.S. 85, 98 (1983); <u>see</u> <u>also</u> <u>Sejman v. Warner-Lambert Co.</u>, 845 F.2d 66, 68 (4th Cir. 1988)(ERISA contains "the most sweeping federal preemption statute ever enacted by Congress").  That claims sounding in contract on ERISA-governed policies are preempted is by now a hackneyed proposition.  <u>See</u> <u>e.g.</u> <u>Danca v. Emerson Hospital</u>, 185 F.3d 1 (1st Cir. 1999), <u>Carol v. Reed Rolled Thread Dice Co.</u>, 49 F.3d 790 (1st Cir. 1995), <u>Wickman v. Northwestern Nat'l. Ins. Co.</u>, 908 F.2d 1077, 1082 (1st Cir. 1990).

Plaintiff's breach of contract claim clearly relates to the termination of his employee benefits under ERISA and affords him no remedies not already available to him under 29 U.S.C. § 1132(a)(1)(B)( "A civil action may be brought by the . . . beneficiary to recover benefits due to him under the terms of his plan, [or] to enforce his rights . . .").  Given the expansive scope of the ERISA preemption provision, the Congressional intent that it remain the exclusive remedy, and the fact that Plaintiff's breach of contract allegations clearly relate to his termination of benefits under ERISA, this claim is pre-empted by ERISA.

**IV.  <u>CONCLUSION</u>**

Liberty's decision to terminate Plaintiff's LTD benefits was reasonable and supported by substantial evidence available to them at the time, specifically, (1) medical opinions, (2) vocational opinions, and (3) an Independent Peer Review.  Plaintiff is unable to present evidence that Liberty's decision was made while under a

conflict of interest, in bad faith, or that it was unsupported by the substantial available evidence.  Liberty's decision should therefore be affirmed.

For the reasons set forth above, Plaintiff's Motion for Summary Judgment (**document #15**) is hereby **DENIED**, and Defendant's Motion for Summary Judgment (**document #18**) is hereby **GRANTED**.


**SO ORDERED.**

**Date: March 30, 2007**          */s/Nancy Gertner*
                                  **NANCY GERTNER, U.S.D.C.**